49 Cal.Rptr.3d 675 (2006)
143 Cal.App.4th 873
In re MARRIAGE CASES.
[Six consolidated appeals[*]].
Nos. A110449, A110450, A110451, A110463, A110651, A110652.
Court of Appeal of California, First District, Division Three.
October 5, 2006.
*680 Alliance Defense Fund, Benjamin W. Bull, Glen Lavy, Christopher R. Stovall, Dale Schowengerdt; Advocates for Faith and Freedom, Robert H. Tyler; Law Offices of Terry L. Thompson, Terry L. Thompson; Law Offices of Andrew P. Pugno and Andrew P. Pugno for Plaintiff and Appellant Proposition 22 Legal Defense and Education Fund.
Vincent P. McCarthy, Laura B. Hernandez and Kristina J. Wenberg for American Center for Law & Justice, Northeast, Inc., as Amici Curiae on behalf of Plaintiff and Appellant Proposition 22 Legal Defense and Education Fund.
Liberty Counsel, Mathew D. Staver, Rena M. Lindevaldsen and Mary McAlister for Plaintiff and Appellant Campaign for California Families.
Bill Lockyer, Attorney General, Louis R. Mauro, Senior Assistant Attorney General, Christopher E. Krueger, Douglas J. Woods, Kathleen A. Lynch, Hirem M. Patel and Zachery P. Morazzini, Deputy Attorneys General, and Louis R. Mauro, Assistant Attorney General for Defendant and Appellant State of California.
Kenneth W. Starr, Los Angeles; Kirton & McConkie and Alexander Dushku for The Church of Jesus Christ of Latter-Day Saints, California Catholic Conference, National Association of Evangelicals, Union of Orthodox Jewish Congregations of America as Amici Curiae on behalf of Defendant and Appellant State of California.
The Claremont Institute Center for Constitutional Jurisprudence, John C. Eastman, Redondo Beach; Institute for Marriage and Public Policy and Joshua K. Baker for James Q. Wilson, Hadley Arkes, Steven G. Calabresi, Lloyd Cohen, Edward J. Erler, Robert P. George, Leon Kass, Charles Kesler, Douglas W. Kmiec, Daniel H. Lowenstein, David Popenoe, Stephen B. Presser, Katherine Shaw Spaht and Thomas G. West as Amici Curiae on behalf of Defendant and Appellant State of California.
*681 Marriage Law Foundation and Monte N. Stewart for United Families International and Family Leader Foundation as Amici Curiae on behalf of Defendant and Appellant State of California.
Allred, Maroko & Goldberg, Gloria Allred, Michael Maroko and John Steven West, Los Angeles, for Plaintiffs and Respondents Robin Tyler, Diane Olson, Troy Perry and Phillip De Blieck.
Heller Ehrman, Stephen V. Bomse, Richard Denatale, Christopher F. Stoll, San Francisco, Ryan R. Tacorda; National Center for Lesbian Rights, Shannon Minter, Courtney Joslin; Lambda Legal Defense and Education Fund, Jon W. Davidson, Jennifer C. Pizer; ACLU Foundation of Southern California, Christine P. Sun, Peter J. Eliasberg, Los Angeles; ACLU Foundation of Northern California, Tamara Lange, Alan L. Schlosser, San Francisco; Steefel, Levitt & Weiss, Dena Narbaitz, San Francisco, Clyde J. Wadsworth; Law Office of David C. Codell and David C. Codell, Los Angeles, for Plaintiffs and Respondents Lancy Woo, Cristy Chung, Joshua Rymer, Tim Frazer, Jewelle Gomez, Diane Sabin, Myra Beals, Ida Matson, Arthur Frederick Adams, Devin Wayne Baker, Jeanne Rizzo, Pali Cooper, Karen Shain, Jody Sokolower, Janet Wallace, Deborah Hart, Corey Davis, Andre Lejeune, Rachel Lederman, Alexsis Beach, Stuart Gaffney, John Lewis, Phyllis Lyon, Del Martin, Our Family Coalition and Equality California, Del Martin, Phyllis Lyon, Sarah Connor, Gillian Smith, Margot McShane, Alexandra D'Amario, David Scott Chandler, Jeffrey Wayne Chandler, Theresa Michelle Petry, Cristal Rivera-Mitchel and Equality California.
Law Offices of Waukeen Q. McCoy, San Francisco, and Waukeen McCoy; Paul Hanley & Harley and Jason E. Hasley, Berkeley, for Plaintiffs and Respondents Gregory Clinton, Gregory Morris, Anthony Bernan, Edward Neugebauer, Stephanie O'Brien, Janet Levy, Joseph Falkner, Arthur Healey, Kristin Anderson, Michele Bettega, Derrik Anderson and Wayne Edfors.
Gibson, Dunn & Crutcher and Jeffrey F. Webb for Children of Lesbians and Gays Everywhere, MassEquality, National Gay and Lesbian Task Force and Freedom to Marry as Amici Curiae on behalf of Plaintiffs and Respondents.
Munger, Tolles & Olson, Jerome Roth and Daniel J. Powell, San Francisco, for Bay Area Lawyers for Individual Freedom, Family Pride, Human Rights Campaign, Human Rights Campaign Foundation, The National Lesbian and Gay Law Association, Parents, Families and Friends of Lesbians and Gays, Inc., SacLEGAL and Tom Homann Law Association as Amici Curiae as Amici Curiae on behalf of Plaintiffs and Respondents.
Cal-Women's Law Center, Vicky Barker; Irell & Manella, Laura W. Brill, Elizabeth L. Rosenblatt, Douglas NeJaime, Los Angeles; Legal Momentum, Jennifer K. Brown and Deborah A. Widiss for Cal-Women's Law Center, Legal Momentum, Herma Hill Kay, Equal Rights Advocates, The Legal Aid Society-Employment Law Center and Queen's Bench Bar Association of the San Francisco Bay Area as Amici Curiae on behalf of Plaintiffs and Respondents.
Jon B. Eisenberg for California State Conference of the National Association For the Advancement of Colored People as Amici Curiae on behalf of Plaintiffs and Respondents.
University of Toronto Faculty of Law International Human Rights Clinic, Noah Novogradsky; Cassel Brock & Blackwell and Laurie Livingstone for The University of Toronto Faculty of Law International Human Rights Clinic, Women's Institute *682 For Leadership Development, Mayo Moran, Brenda Cossman, Sujit Choudhry, Robert Wintemute, Paul Schiff Berman, Kenji Yoshino, Beth Van Schaack, William Aceves, Margaret Satterthwaite and Barbara Cox as Amici Curiae on behalf of Plaintiffs and Respondents.
Asian Pacific Islander Legal Outreach and Victor M. Hwang for Pacific Islander Legal Outreach, Asian American Bar Association of the Greater Bay Area, Asian American Justice Center, Asian American Legal Defense and Education Fund, Asian Equality, Asian Law Alliance, Asian Law Caucus, Asian Pacific American Bar Association of Los Angeles County, Asian Pacific American Legal Center of Southern California, Asian and Pacific Islander Equality, Asian Pacific Islander Family Pride, Asian Pacific Islander Health Forum, Asian and Pacific Islander Parents & Friends of Lesbians and Gays, Asian Pacific Islander Wellness Center, Asian Women's Shelter, Asian Youth Promoting Advocacy and Leadership, Chinese for Affirmative Action, Chinese Progressive Association, Filipinos for Affirmative Action, Gay Asian Pacific Alliance, Gay Asian Pacific Support Network, Institute for Leadership Development and Study of Pacific Asian North American Religion, Japanese American Bar Association, Japanese American Citizens League, Korean Community Center of the East Bay, My Sister's House, Organization of Chinese Americans San Francisco Chapter, Southeast Asian Community Center and Vietnamese American Bar Association of Northern California as Amici Curiae on behalf of Plaintiffs and Respondents.
O'Melveny & Myers, Peter Obstler, Nikhil Shanbhag, San Francisco, Flora Vigo and Jee Young You for Asian American Justice Center, Asian Pacific American Bar Association, Asian Pacific American Legal Center, Asian and Pacific Islander Lesbian and Bisexual Women and Transgender Network, Asian Pacific Islander Pride Council, Bienestar Human Services, Coalition for Humane Immigrant Rights, Disability Rights Education and Defense Fund, Equal Justice Society, Japanese American Bar Association, La Raza Centro Legal, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Mexican American Legal Defense and Educational Fund, Multicultural Bar Alliance of Los Angeles, National Black Justice Coalition, National Lawyers Guild of San Francisco, People for the American Way Foundation, United Lesbians of African Heritage, Ventura County Black Attorneys Association and Zuna Institute as Amici Curiae on behalf of Plaintiffs and Respondents.
Raoul D. Kennedy, Elizabeth Harlan, Jo Ann Hoenninger, Joren S. Bass, San Francisco, Philip A. Lieder, Michael D. Meuti, Stephen Lee; Eric Alan Isaacson; and Reverend Silvio Nardoni, Glendale, for Affirmation: Gay and Lesbian Mormons, Al-Fatiha Foundation, Dignity USA, Executive Committee of the American Friends Service Committee, General Synod of the United Church of Christ, Soka-Gakkai International-USA, Union for Reform Judaism, Unitarian Universalist Association of Congregations, Universal Fellowship of Metropolitan Community Churches, California Church IMPACT, California Council of Churches, California Faith for Equality, Council of Churches of Santa Clara County, Friends Committee on Legislation of California, Jews for Marriage Equality (Southern California), Pacific Central District Chapter of the Unitarian Universalist Ministers Association, Pacific Southwest Council of the Union for Reform Judaism, Pacific Southwest District Chapter of the Unitarian Universalist Ministers Association, Progressive Christians Uniting, Reconciling Ministries Clergy of the California-Nevada Conference *683 of the United Methodists, Unitarian Universalist Legislative Ministry-CA, All Saints Episcopal Church, All Saints Metropolitan Community Church, Bay Area American Indian Two-Spirits, Berkeley Fellowship of Unitarian Universalists, Emerson Unitarian Universalist Church Board of Trustees, First Unitarian Universalist Church of San Diego Board of Trustees, Neighborhood Unitarian Universalist Church Board of Trustees, Unitarian Universalist Church of Ventura Board of Trustees, UCC Community Church of Atascadero, Congregation Beth Chayim Chadashim, Congregation Kol Ami, Congregation Sha`ar Zahav, Congregation Shir Hadash, Conejo Valley Unitarian Universalist Fellowship Faith in Action Committee, First Unitarian Universalist Church of Stockton, First Unitarian Universalist Society of San Francisco, Humboldt Unitarian Universalist Fellowship, Kol Hadash, Community for Humanistic Judaism, Metropolitan Community Church in the Valley, Metropolitan Community Church of San Jose, Metropolitan Community Church Los Angeles, Mt. Diablo Unitarian Universalist Church, Mt. Hollywood Congregational Church United Church of Christ, Pacific School of Religion, Parkside Community Church, United Church of Christ, Pilgrim United Church of Christ, San Leandro Community Church, Berkeley Unitarian Universalist Fellowship Social Justice Committee, Social Justice Ministry at First Church, St. John Evangelist Episcopal Church, Starr King Unitarian Universalist Church, The Ecumenical Catholic Church, Unitarian Universalist Church of Palo Alto, Unitarian Universalist Church of the Monterey Peninsula, Unitarian Universalist Community Church of Sacramento, Unitarian Universalist Community Church of Santa Monica, Unitarian Universalist Community Church of South County, Unitarian Universalist Congregation of Marin, Unitarian Universalist Fellowship of Laguna Beach, Unitarian Universalist Fellowship of Redwood City, Unitarian Universalist Fellowship of Stanislaus County, Unitarian Universalists of San Mateo, Unitarian Universalists of Santa Clarita, United Church of Christ in Simi Valley, Universalist Unitarian Church of Santa Paula, University Lutheran Chapel, Reverend Doctor Pam Allen-Thompson, Reverend Rachel Anderson, Rabbi Camille Angel, Rabbi Melanie Aron, Reverend Joy Atkinson, Reverend JD Benson, Rabbi Linda Bertenthal, Pastor LeAnn Blackert, Reverend Susan Brecht, Pastor Paul Brenner, Reverend Doctor Ken Brown, Reverend Kevin Bucy, Reverend Helen Carroll, Rabbi Ari Cartun, Reverend Craig B. Chapman, Reverend Barbara M. Cheatham, Reverend Jan Christian, The Reverend Beate Chun, Reverend June M. Clark, The Reverend Anne G. Cohen, Rabbi Helen T. Cohn, Rabbi Susan S. Comforti, Rabbi Laurie Coskey, Reverend Lyn Cox, Reverend Sofia Craethnenn, Reverend Robbie Cranch, Reverend Matthew Crary, Reverend Cinnamon Daniel, Reverend Diann Davisson, Pastor Jerry De Jong, Reverend Frances A. Dew, Rabbi Lisa A. Edwards Ph.D., Rabbi Denise Eger, Reverend Michael Ellard, Reverend Stefanie EtzbachDale, Pastor Brenda Evans, Interim Minister Mark Evens, Reverend Lydia Ferrante-Roseberry, Reverend Michelle Favreult, Reverend Renae Extrum-Fernandez, Rabbi Joel Fleekop, Reverend Diana Gibson, Reverend Doctor Robert Goss, Reverend Doctor June Goudey, Reverend Robert C. Grabowski, Reverend James Grant, Rabbi Bruce DePriester Greenbaum, Reverend Doctor Susan Hamilton, Reverend Bill Hamilton-Holway, Reverend Barbara Hamilton-Holway, Reverend Doctor Kathy Hearn, Reverend Jane Heckles, Rabbi Alan Henkin, Rabbi Jay Heyman, Reverend Anne Felton Hines, Reverend Jackie Holland, *684 Reverend Marcia Hootman, Reverend Ricky Hoyt, Reverend Kathy Huff, Reverend Keith Inouye, Reverend Bryan Jessup, Reverend Jeff Johnson, Reverend Beth Johnson, Reverend Roger Jones, Reverend Julie Kain, Reverend Kathryn Kandarian, Reverend John Kirkley, Reverend Benjamin A. Kocs-Meyers, Reverend Kurt Kuhwald, Reverend Richard Kuykendall, Reverend Peter Laarman, Rabbi Howard Laibson, Reverend Darcey Laine, Pastor Scott Landis, Rabbi Moshe Levin, Reverend Tom Lewis, Reverend Ken MacLean, Rabbi Tamar Malino, Reverend Elder Debbie Martin, Pastor Michael-Ray Matthews, Reverend Gregory W. McGonigle, Reverend Joseph McGowan, Rev. William McKinney, Reverend Susan Meeter, Reverend Eric H. Meter, Reverend Judith Meyer, Reverend Barbara F. Meyers, Reverend Beth Miller, Reverend John Millspaugh, Reverend Sarah Moldenhauer-Salazar, Reverend Amy Zucker Morgenstern, Reverend David Moss, Reverend Silvio Nardoni, Reverend James A. Nelson, Reverend Drew Nettinga, Reverend Julia Older, Reverend Nancy Palmer Jones, Rev. Doctor Rebecca Parker, Reverend Ernest Pipes, Reverend Georgia Prescott, Reverend Carolyn Price, Reverend Sherry Prud'homme, Reverend Jane Quandt, Reverend Lindi Ramsden, Rabbi Lawrence Raphael, Reverend John Robinson, Reverend Carol Rudisill, Reverend Susan Russell, Reverend David Sammons, Reverend Thomas Schmidt, Reverend Craig Scott, Reverend Wayne Scovell, Reverend Michael Schuenemeyer, Doctor John M. Sherwood, Most Reverend Mark Shirilau, The Reverend Madison Shockley II, Reverend Grace Simons, Most Reverend Bruce J. Simpson, Reverend Dan Smith, Reverend Jeffrey Spencer, Reverend June Stanford-Clark, Reverend Doctor Betty Stapleford, Reverend Stanley Stefancic, Reverend Arvid Straube, Reverend Doctor Archer Summers, Reverend Steven Swope, Reverend Paul Tellstrom, Reverend Margo Tenold, Reverend Neil Thomas, Reverend Lynn Ungar, Reverend Nada Velimirovic, Rabbi Arthur Waskow, Reverend Theodore A. Webb, Reverend Doctor Petra Weldes, Reverend Vail Weller, Reverend Bets Wienecke, Reverend Elder Nancy Wilson, Rope Wolf, Reverend Ned Wright and Rabbi Bridget Wynne as Amici Curiae on behalf of Plaintiffs and Respondents.
Dennis J. Herrera, City Attorney, Therese M. Stewart, Chief Deputy City Attorney, Julia M.C. Friedlander, Kathleen S. Morris and Sherri Skokeland Kaiser, Deputy City Attorneys; Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Bobbie J. Wilson and Amy Margolis, San Francisco, for Defendant and Respondent City and County of San Francisco.
Thomas J. Kuna-Jacob as Amicus Curiae.
McGUINESS, P.J.
The legal issue presented in these appeals is straightforward: Did the trial court err when it concluded Family Code statutes defining civil marriage as the union between a man and a woman are unconstitutional? (Fam.Code, §§ 300, 301, 302, 308.5.) Appellants assert legal error; respondents reiterate their arguments that excluding same-sex couples from marriage violates due process and equal protection and is not supported by a compelling state interest. Our dissenting colleague advances theories and arguments not made by the parties or relied on by the trial court and concludes a constitutionally protected privacy interest compels expanding the definition of marriage to include same-sex couples.
California has long sought to eliminate discrimination against gays and lesbians. Our Legislature has passed landmark legislation *685 providing substantially all the rights, responsibilities, benefits and protections of marriage to same-sex couples who register as domestic partners. (Fam. Code, § 297 et seq.) We must now decide whether the state's definition of marriage, which historically has precluded same-sex partners from marrying, is constitutional. Obviously, the question is one of great significance, and it requires us to venture into the storm of a fierce national debate. Both sides believe passionately in their positions. One side argues the time has come for lesbian and gay relationships to enjoy full social equality, and it is fundamentally unfair for the state to continue to reserve marriage as an institution for heterosexual couples only. The other side stresses the need for judicial restraint and the importance of preserving the traditional understanding of marriagewhich is very important to many Californians, who fear such a fundamental change will destroy or seriously weaken the institution at the heart of family life.
While we have considered all arguments raised on both sides of the issue, our task as an appellate court is not to decide who has the most compelling vision of what marriage is, or what it should be. "[T]he judiciary is not in the business of preferring, much less anointing, one value as more valid than another. . . ." (Lewis v. Harris (2005) 378 N.J.Super. 168, 200, 875 A.2d 259 (conc. opn. of Parrillo, J.A.D.).) We are called upon to decide only whether the statutory definition of marriage as the union of a man and a womanwhich has existed, explicitly or implicitly, since the founding of our stateis unconstitutional because it does not permit gays and lesbians to marry persons of their choice.
All can agree that California has not deprived its gay and lesbian citizens of a right they previously enjoyed; same-sex couples have never before had the right to enter a civil marriage. It is also beyond dispute that our society has historically understood "marriage" to refer to the union of a man and a woman. These facts do not mean the opposite-sex nature of marriage can never change, or should never change, but they do limit our ability as a court to effect such change. The respondents in these appeals are asking this court to recognize a new right. Courts simply do not have the authority to create new rights, especially when doing so involves changing the definition of so fundamental an institution as marriage. "The role of the judiciary is not to rewrite legislation to satisfy the court's, rather than the Legislature's, sense of balance and order. Judges are not `"knight[s]-errant, roaming at will in pursuit of [their] own ideal of beauty or of goodness."' [Citation.]" (People v. Carter (1997) 58 Cal.App.4th 128, 134, 67 Cal.Rptr.2d 845.) In other words, judges are not free to rewrite statutes to say what they would like, or what they believe to be better social policy.
Because we have a fundamentally different view of the appellate judicial function, at least in relation to these cases, we part ways with our dissenting colleague. The dissent delivers what is essentially an impassioned policy lecture on why marriage should be extended to same-sex couples. Lacking controlling precedent, it misconstrues case law and mischaracterizes the parties' claims and our analysis to reach this result. But the court's role is not to define social policy; it is only to decide legal issues based on precedent and the appellate record. The six cases before us ultimately distill to the question of who gets to define marriage in our democratic society. We believe this power rests in the people and their elected representatives, and courts may not appropriate to themselves the power to change the definition of such a basic social institution. Our dissenting colleague's views, while well intentioned, *686 disregard this delicate balance. Moreover, his unfortunate rhetoric suggesting our opinion is an exercise in discrimination rather than a legitimate attempt to follow the law (dis. opn., post, at pp. ___-___) does nothing to advance the serious subject matter of these appeals.
We conclude California's historical definition of marriage does not deprive individuals of a vested fundamental right or discriminate against a suspect class, and thus we analyze the marriage statutes to determine whether the opposite-sex requirement is rationally related to a legitimate government interest. According the Legislature the extreme deference that rational basis review requires, we conclude the marriage statutes are constitutional. The time may come when California chooses to expand the definition of marriage to encompass same-sex unions. That change must come from democratic processes, however, not by judicial fiat.

BACKGROUND
Litigation in California over the right to same-sex marriage was sparked by the controversial decision of Gavin Newsom, Mayor of the City and County of San Francisco (City), to begin issuing marriage licenses without regard to the gender or sexual orientation of either prospective spouse. On February 10, 2004, Newsom sent a letter to County Clerk Nancy Alfaro asking her to alter the forms used in order to provide marriage licenses regardless of gender or sexual orientation. (Lockyer v. City and County of San Francisco (2004) 33 Cal.4th 1055, 1069-1070, 17 Cal.Rptr.3d 225, 95 P.3d 459 (Lockyer).)[1] Observing that "`[t]he Supreme Courts in other states have held that equal protection provisions in their state constitutions prohibit discrimination against gay men and lesbians with respect to the rights and obligations flowing from marriage,'" the mayor stated his belief that these decisions were persuasive "`and that the California Constitution similarly prohibits such discrimination.' " (Id. at p. 1070, 17 Cal.Rptr.3d 225, 95 P.3d 459.) Finally, Mayor Newsom asserted his request "was made `[p]ursuant to [his] sworn duty to uphold the California Constitution, including specifically its equal protection clause . . . .'" (Ibid., fn. omitted.)
In accordance with this directive, the City began issuing marriage licenses to same-sex couples on February 12, 2004. (Lockyer, supra, 33 Cal.4th at p. 1071, 17 Cal.Rptr.3d 225, 95 P.3d 459.) The following day, two actions were filed in the San Francisco County Superior Court seeking an immediate stay and writ relief to halt the issuance of such licenses. (Thomasson v. Newsom (Super.Ct. S.F. City & County, 2004, No. CGC-04-428794) (Thomasson);[2]Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco (Super.Ct. S.F. City & County, 2004, No. CPF-04-503943) (Proposition 22).) After the trial court refused to grant an immediate stay, the Attorney General filed an original writ petition in the California Supreme Court, asserting *687 the City's actions were unlawful and immediate intervention by the Supreme Court was justified. (Lockyer, supra, 33 Cal.4th at p. 1072, 17 Cal.Rptr.3d 225, 95 P.3d 459.) On March 11, 2004, the Supreme Court issued an order to show cause and stayed all proceedings in the Thomasson and Proposition 22 actions, noting, however, that its order would not preclude the filing of a separate action raising a direct challenge to the constitutionality of California's marriage statutes. (Lockyer, supra, 33 Cal.4th at pp. 1073-1074, 17 Cal.Rptr.3d 225, 95 P.3d 459.)
Acting on this suggestion, the City filed a complaint for declaratory relief and a petition for writ of mandate challenging the validity of Family Code provisions limiting marriage in California to unions between a man and a woman. (Fam.Code, §§ 300, 308.5.) (City and County of San Francisco v. State of California (Super.Ct. S.F. City & County, 2004, No. CGC-04-429539) (CCSF).) Two similar actions were filed by groups of same-sex couples, who allege they are involved in committed relationships but are prevented from marrying in California, or whose out-of-state marriages are not recognized under California law. (Tyler v. County of Los Angeles (Super.Ct. L.A.County, 2004, No. BS-088506) (Tyler); Woo v. Lockyer (Super.Ct. S.F. City & County, 2004, No. CGC-04-504038) (Woo).)[3]
On August 12, 2004, the Supreme Court issued its opinion in Lockyer. Having concluded local officials in San Francisco exceeded their authority in issuing marriage licenses to same-sex couples, the court issued a writ of mandate directing these officials to enforce the statutes governing marriage "unless and until they are judicially determined to be unconstitutional" and compelling them to take remedial action with respect to marriages that were previously conducted in violation of applicable laws. (Lockyer, supra, 33 Cal.4th at pp. 1069, 1120, 17 Cal.Rptr.3d 225, 95 P.3d 459.) A majority of the court also concluded that the approximately 4,000 same-sex marriages performed in San Francisco were void and of no legal effect. (Id. at pp. 1069, 1071, 1114, 17 Cal.Rptr.3d 225, 95 P.3d 459.)[4] The high court repeatedly stressed that the constitutional validity of California's limitation of marriage to opposite-sex couples was not before it, and the court expressed no opinion on the issue. (Id. at p. 1069, 17 Cal.Rptr.3d 225, 95 P.3d 459; see also id. at p. 1125, 17 Cal.Rptr.3d 225, 95 P.3d 459 (conc. opn. of Moreno, J.); id. at pp. 1132-1133, 17 Cal.Rptr.3d 225, 95 P.3d 459 (conc. & dis. opn. of Kennard, J.).)
Meanwhile, when Lockyer was pending, the Judicial Council coordinated the three actions challenging the constitutionality of the marriage laws into a single proceeding, known as the Marriage Cases (JCCP No. 4365), and assigned them to San Francisco Superior Court Judge Richard A. Kramer. A fourth suit filed by a group of same-sex couples was later added. (Clinton v. State of California (Super.Ct. S.F. City and County, 2004, No. CGC-04-429-548) (Clinton).) The Thomasson and Proposition 22 cases, which had been stayed while the *688 Supreme Court considered Lockyer, were also assigned to the coordinated proceedings before Judge Kramer. The trial court directed all parties to submit briefs, and, on December 22 and 23, 2004, it held hearings in the coordinated cases to consider the constitutional validity of California's marriage statutes.[5]
On April 13, 2005, the trial court issued its final decision. Although the City and other plaintiffs had also claimed the marriage laws violated their rights to due process and privacy, the court addressed only those challenges based on the equal protection clause of the California Constitution (Cal. Const., art. I § 7, subd. (a)). The court ruled that Family Code provisions limiting marriage in California to opposite-sex unions are subject to strict judicial scrutiny because they rest on a suspect classification (gender) and because they impinge upon the fundamental right to marry. After considering interests advanced by the state and other partiesi.e., CCF and the Proposition 22 Legal Defense and Education Fund (the Fund)and searching for additional interests in relevant legislative history and ballot materials, the court concluded the marriage statutes' opposite-sex requirement does not pass strict scrutiny, or even the more deferential review accorded under the rational basis test, because it does not further any legitimate state interest. Accordingly, the court declared Family Code sections 300 and 308.5 unconstitutional under the California Constitution and entered judgment in each of the coordinated cases in favor of the City and/or the individual plaintiffs and interveners. Separate appeals from the state, the Fund and CCF followed, and we consolidated all six appeals for purposes of decision.[6]

DISCUSSION

I. Justiciability Issues
As a preliminary matter, we must address arguments that two of the cases before us should have been dismissed because they are not justiciable controversies.
After the Supreme Court issued a remittitur in Lockyer and dissolved the stay that had applied to the Thomasson and Proposition 22 actions, CCF and the Fund sought leave to amend the complaints in these cases. The City and certain intervener-defendants opposed this request and moved to dismiss Thomasson and Proposition 22 as moot, arguing the Supreme Court's decision in Lockyer had granted all the relief sought in these cases and plaintiffs lacked standing to pursue bare claims for declaratory relief. The trial court denied the plaintiffs' request for leave to amend but also denied the defendants' motion to dismiss. The court concluded the Thomasson and Proposition 22 complaints "adequately state[d]" claims for declaratory relief concerning the constitutionality of the marriage laws.
On appeal, the City and interveners renew their arguments that claims brought in the Thomasson and Proposition 22 actions are not justiciable. Such challenges may be raised without a cross-appeal because they do not seek affirmative relief; *689 rather, they are alternative legal theories offered to support affirmance of the judgments in these cases. (Code Civ. Proc., § 906; see Westinghouse Electric Corp. v. County of Los Angeles (1982) 129 Cal.App.3d 771, 781, 181 Cal.Rptr. 332 [respondent's challenge to ruling on standing proper without cross-appeal].) Assuming the trial court acted within its discretion when it construed the declaratory relief claims in Thomasson and Proposition 22 broadly to encompass issues about the constitutionality of the marriage statutes (see Application Group, Inc. v. Hunter Group, Inc. (1998) 61 Cal.App.4th 881, 892-893, 72 Cal.Rptr.2d 73),[7] we conclude the court erred in denying the motion to dismiss because CCF and the Fund lacked standing to pursue these pure declaratory relief claims.
Code of Civil Procedure section 1060 confers standing upon "[a]ny person interested under a written instrument" who brings an action for declaratory relief "in cases of actual controversy relating to the legal rights and duties of the respective parties." The validity or construction of a statute is recognized as a proper subject of declaratory relief. (City of Cotati v. Cashman (2002) 29 Cal.4th 69, 79, 124 Cal.Rptr.2d 519, 52 P.3d 695.) However, declaratory relief is only appropriate where there is an actual controversy, and not simply an abstract or academic dispute, between parties who are affected by the legislation. (See Newland v. Kizer (1989) 209 Cal.App.3d 647, 657, 257 Cal. Rptr. 450.) In general, to have standing, a plaintiff must have an actual interest in the subject matter that is subject to injury depending on the outcome of the suit. "`One who invokes the judicial process does not have "standing" if he, or those whom he properly represents, does not have a real interest in the ultimate adjudication because the actor has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented.' [Citations.] [¶] `[T]he mere surmise that some right or claim may be asserted does not confer jurisdiction. . . .' [¶] `The plaintiff must establish facts which give rise as a matter of law to an existing or imminent invasion of his rights by the defendant which would result in injury to him.' [Citations.]" (Zetterberg v. State Dept. of Public Health (1974) 43 Cal.App.3d 657, 662-663, 118 Cal.Rptr. 100.)
For reasons we discussed in a prior opinion concerning the Fund's attempt to intervene in the CCSF and Woo cases, neither the Fund nor CCF satisfies these requirements for injury-based standing. In determining that the Fund lacked a sufficiently direct and immediate interest to support intervention, we observed there was no indication that a judgment in the action would in any way benefit or harm the Fund's members. (City and County of San Francisco v. State of California (2005) 128 Cal.App.4th 1030, 1038, 27 Cal.Rptr.3d 722.) "Specifically, the Fund [did] not claim a ruling about the constitutionality of denying marriage licenses to same-sex couples [would] impair or invalidate the existing marriages of its members, or affect the rights of its members to marry *690 persons of their choice in the future. Nor ha[d] the Fund identified any diminution in legal rights, property rights or freedoms that an unfavorable judgment might impose on" its members, or on other Californians who oppose same-sex marriage. (Id. at pp. 1038-1039, 27 Cal.Rptr.3d 722, fn. omitted.)[8] The same is true for CCF. Although these associations, and their members, may have a strong philosophical or political interest in defending the validity of California's marriage laws, they have not alleged or demonstrated any possibility that they will suffer injury from an adverse judgment in these actions. While the Fund urges us to relax the standing rules due to the great public interest in the issues at stake, "[t]he fact that an issue raised in an action for declaratory relief is of broad general interest is not grounds for the courts to grant such relief in the absence of a true justiciable controversy. [Citations.]" (Zetterberg v. State Dept. of Public Health, supra, 43 Cal.App.3d at p. 662, 118 Cal.Rptr. 100; see also id. at p. 663, 118 Cal.Rptr. 100 ["A difference of opinion as to the interpretation of a statute as between a citizen and a governmental agency does not give rise to a justiciable controversy"].)
However, unlike in federal courts, two related rules permit standing in California in the absence of such potential injury. "Code of Civil Procedure section 526a permits a taxpayer to bring an action to restrain or prevent an illegal expenditure of public money. No showing of special damage to a particular taxpayer is required as a requisite for bringing a taxpayer suit. [Citation.] Rather, taxpayer suits provide a general citizen remedy for controlling illegal governmental activity. [Citation.]" (Connerly v. State Personnel Bd. (2001) 92 Cal.App.4th 16, 29, 112 Cal.Rptr.2d 5.) The purpose of the taxpayer standing statute "is to permit a large body of persons to challenge wasteful government action that otherwise would go unchallenged because of the standing requirement. [Citation.]" (Waste Management of Alameda County, Inc. v. County of Alameda (2000) 79 Cal.App.4th 1223, 1240, 94 Cal.Rptr.2d 740.) Although members of CCF and the Fund may be taxpayers, these organizations do not have standing under Code of Civil Procedure section 526a to seek declaratory relief because their claims do not identify or challenge any allegedly illegal expenditure of public funds. In accordance with the Supreme Court's directive in Lockyer, the City has stopped issuing marriage licenses to same-sex couples, and neither the Fund nor CCF has identified any continuing public expenditure it challenges. Regardless of the liberal construction granted claims under Code of Civil Procedure section 526a, "the essence of a taxpayer action remains an illegal or wasteful expenditure of public funds or damage to public property. [Citation.] The taxpayer action must involve an actual or threatened expenditure of public funds. [Citation.]" (Waste Management of Alameda County v. County of Alameda, supra, 79 Cal.App.4th at p. 1240, 94 Cal.Rptr.2d 740.)
In addition to taxpayer actions, standing requirements are also relaxed in the area of so-called citizen suits. In such actions, citizens who are not personally affected may nevertheless sue to compel performance of a public duty. (Connerly v. State Personnel Bd., supra, 92 Cal.App.4th at p. 29, 112 Cal.Rptr.2d 5.) This exception to standing requirements applies, typically in the context of a mandamus *691 proceeding, "where the question is one of public right and the object of the action is to enforce a public duty  in which case it is sufficient that the plaintiff be interested as a citizen in having the laws executed and the public duty enforced. [Citations.]" (Waste Management of Alameda County v. County of Alameda, supra, 79 Cal.App.4th at pp. 1236-1237, 94 Cal.Rptr.2d 740; see Green v. Obledo (1981) 29 Cal.3d 126, 144, 172 Cal.Rptr. 206, 624 P.2d 256.) This exception gave CCF and the Fund standing to pursue their original actions for mandamus, because these claims sought to compel City officials to enforce the marriage laws. However, mandamus having been granted by the Supreme Court, the "citizen suit" exception does not give these organizations standing to pursue pure declaratory relief claims in which neither they nor their members have a personal beneficial interest. Judicial recognition of citizen standing is not a repudiation of the usual requirement of a plaintiff's beneficial interest in litigation. (Waste Management of Alameda County v. County of Alameda, supra, 79 Cal.App.4th at p. 1237, 94 Cal. Rptr.2d 740.) Because the remaining claims in Thomasson and Proposition 22 seek only declaratory relief about the constitutionality of the marriage laws, and do not seek to enforce a public duty (such as the execution of these laws), the citizen suit exception no longer applies.
Although we have determined CCF and the Fund lack standing to pursue their declaratory relief claims, this conclusion has had little to no significance, as a practical matter, in our review of the substantive issues in these appeals. We have reviewed all appellate briefs submitted by the Fund and CCF, and amicus curiae briefs submitted on their behalf, and have considered all the arguments contained therein. For reasons discussed later in this opinion, we have concluded California's marriage laws are subject to review under the rational basis test. Because rational basis review requires a court to consider all reasonably conceivable state interests that may be furthered by a challenged statute (Warden v. State Bar (1999) 21 Cal.4th 628, 644, 650, 88 Cal.Rptr.2d 283, 982 P.2d 154), we would have been obliged to consider the merit of state interests proposed by CCF and the Fund regardless of how they were presented (i.e., in appellate or amicus curiae briefs). As a legal matter, however, our conclusion that CCF and the Fund lack standing means that the judgments against them in Thomasson and Proposition 22 must be affirmed on the ground that the cases were not justiciable controversies.

II. Relevant Statutory Provisions

A. The Marriage Statutes
Civil marriage in this state is entirely a creature of statutory law. (Lockyer, supra, 33 Cal.4th at p. 1074, 17 Cal.Rptr.3d 225, 95 P.3d 459; Estate of DePasse (2002) 97 Cal.App.4th 92, 99, 118 Cal.Rptr.2d 143.) While many legislative enactments govern the creation and dissolution of marriages, and the legal consequences of marriage, these cases require us to address only the statutes that limit the availability of marriage to unions in California between a man and a woman.[9] Of these, the most significant is probably Family Code, *692 section 300, which defines what a marriage is. Family Code, section 300 states, in relevant part: "Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary." Gender-specific language also appears in sections 301 and 302 of the Family Code, which set the age of consent for marriage between "[a]n unmarried male" and "an unmarried female" at 18 years or older, absent parental consent and court approval.
The gender specifications were added to the Family Code's definition of marriage in 1977. (Stats.1977, ch. 339, § 1, p. 1295.) Previous versions of the statute stated only that marriage "is a personal relation arising out of a civil contract, to which the consent of the parties capable of making that contract is necessary." (Former Civ. Code, § 4100, added by Stats.1969, ch. 1608, § 8, p. 3314 and repealed by Stats. 1992, ch. 162, § 10, p. 474 [moving the provision, without substantive change, to Fam.Code, § 300]; see also former Civ. Code, § 55, enacted 1872 [stating "Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary"].) In 1977, the County Clerks Association of California sponsored Assembly Bill No. 607, which sought to specify that marriage is a relationship "between a man and a woman." (Assem. Bill No. 607 (1977-1978 Reg. Sess.).) Although county clerks throughout the state had interpreted existing law as permitting only opposite-sex marriages, and consequently had "uniformly denied marriage licenses to same sex couples" (Legis. Counsel, Rep. on Assem. Bill No. 607 (1977-1978 Reg. Sess.) p. 1), they believed former Civil Code, section 4100 was unclear and could be interpreted to encompass same-sex unions. (Sen. Republican Caucus, analysis of Assem. Bill No. 607 (1977-1978 Reg. Sess.) p. 1.) Assembly Bill No. 607 was therefore introduced, and passed, for the express purpose of amending the statute "to prohibit persons of the same sex from entering lawful marriage." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977-1978 Reg. Sess.) as amended May 23, 1977, p. 1; see Lockyer, supra, 33 Cal.4th at p. 1076, fn. 11, 17 Cal.Rptr.3d 225, 95 P.3d 459 [stating the bill's objective of prohibiting same-sex marriage is clear from its legislative history].) Former Civil Code, section 4100 was later recodified, without substantial change, as Family Code, section 300. (Stats.1992, ch. 162, § 10, p. 474.)
A second statute limiting marriage in California to opposite-sex unions was passed by voter initiative in 2000. Proposition 22 added Family Code section 308.5, which states: "Only marriage between a man and a woman is valid or recognized in California." The scope of section 308.5 remains a matter of some dispute. Last year, Division One of the Second District Court of Appeal held that Family Code section 308.5 addresses only the extent to which out-of-state marriages will be recognized as valid in California. (Armijo v. Miles (2005) 127 Cal.App.4th 1405, 1422-1424, 26 Cal.Rptr.3d 623.) After reviewing the Legislative Analyst's ballot summary of Proposition 22 and arguments in favor of the initiative  which acknowledged that same-sex marriage was currently prohibited in California but suggested the state might be required to recognize same-sex marriages entered in other states[10]  the *693 Armijo court concluded Proposition 22 "was designed to prevent same-sex couples who could marry validly in other countries or who in the future could marry validly in other states from coming to California and claiming, in reliance on Family Code section 308, that their marriages must be recognized as valid marriages. With the passage of Proposition 22, then, only opposite-sex marriages validly contracted outside this state will be recognized as valid in California." (Armijo v. Miles, supra, 127 Cal.App.4th at p. 1424, 26 Cal.Rptr.3d 623.)
The Third District Court of Appeal has reached a somewhat broader interpretation of the reach of Proposition 22. In rejecting a claim that the state's domestic partnership laws (Fam.Code, § 297 et seq.) constitute an inappropriate amendment to Proposition 22, because they grant marriage-like rights to same-sex unions, the Third District concluded the initiative was intended "to prevent the recognition in California of homosexual marriages that have been, or may in the future be, legitimized by laws of other jurisdictions," and "to limit the status of marriage to heterosexual couples." (Knight v. Superior Court (2005) 128 Cal.App.4th 14, 18, 26 Cal.Rptr.3d 687.) The Knight court observed the plain language of Proposition 22, and the resulting statute (Family Code section 308.5), "reaffirms the [existing] definition of marriage in section 300, by stating that only marriage between a man and a woman shall be valid and recognized in California. This limitation ensures that California will not legitimize or recognize same-sex marriages from other jurisdictions, as it otherwise would be required to do pursuant to section 308, and that California will not permit same-sex partners to validly marry within the state." (Knight v. Superior Court, supra, 128 Cal. App.4th at pp. 23-24, 26 Cal.Rptr.3d 687, italics added.) In other words, according to the Knight decision, Proposition 22 was designed to reserve marriage in California as an institution exclusively for opposite-sex couples. (See id. at p. 26, 26 Cal. Rptr.3d 687.) Furthermore, in light of this broad interpretation of the initiative, Knight observed that, "[w]ithout submitting the matter to the voters, the Legislature cannot change this absolute refusal to recognize marriages between persons of the same sex. (Cal. Const., art. II, § 10, subd. (c).)" (Knight v. Superior Court, supra, 128 Cal.App.4th at p. 24, 26 Cal. Rptr.3d 687; see also Proposition 103 Enforcement Project v. Quackenbush (1998) 64 Cal.App.4th 1473, 1483-1484, 1487, 76 Cal.Rptr.2d 342 [Legislature may not directly or indirectly amend a law passed by initiative without obtaining voters' consent].)
We need not resolve this controversy because issues about the precise scope of Proposition 22, and whether it inhibits the Legislature from passing laws to permit same-sex marriage between Californians, are not directly presented in these appeals. Taken together, Family Code, sections 300 and 308.5 clearly and consistently limit the institution of marriage in California to opposite-sex unions. We must decide only whether the limitation is constitutional. Before turning to this question, however, we discuss the rights and benefits California law currently provides to same-sex relationships, most notably through the domestic partnership statutes.

B. The Domestic Partner Act
California has passed many laws to reduce discrimination against gays and lesbians. *694 For example, the Unruh Civil Rights Act (Civ.Code, § 51) prohibits business establishments that offer services to the public from discriminating on the basis of sexual orientation. (Curran v. Mount Diablo Council of the Boy Scouts (1983) 147 Cal.App.3d 712, 733-734, 195 Cal.Rptr. 325; see also Koebke v. Bernardo Heights Country Club (2005) 36 Cal.4th 824, 850, 31 Cal.Rptr.3d 565, 115 P.3d 1212 [concluding Unruh Civil Rights Act prohibits discrimination against registered domestic partners in favor of married couples].) Similarly, California's Fair Employment and Housing Act expressly identifies sexual orientation discrimination as an unlawful employment practice. (Gov.Code, § 12940, subd. (a).) Gays and lesbians are equally entitled to become foster parents or adoptive parents (Welf. & Inst.Code, § 16013 ["all persons engaged in providing care and services to foster children, including, but not limited to, foster parents, adoptive parents, relative caregivers, and other caregivers . . . shall not be subjected to discrimination or harassment on the basis of . . . sexual orientation"]), and the Supreme Court has upheld the use of "second parent" adoption as a means for a nonbiological parent to establish legal family ties with the child of his or her same-sex partner. (Sharon S. v. Superior Court (2003) 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554; see Fam.Code, § 9000, subds. (b) & (g) [providing for adoption by registered domestic partner]; see also Elisa B. v. Superior Court (2005) 37 Cal.4th 108, 113, 119-120, 33 Cal.Rptr.3d 46, 117 P.3d 660 [same-sex partner not biologically related to child may be considered a "parent" for purposes of Uniform Parentage Act].)
In 1999, the Legislature passed a bill creating a statewide domestic partnership registry. (Stats.1999, ch. 588, § 2 [adding Fam.Code, §§ 297-299.6]; see Armijo v. Miles, supra, 127 Cal.App.4th at p. 1411, 26 Cal.Rptr.3d 623.) In so doing, "California became one of the first states to allow cohabiting adults of the same sex to establish a `domestic partnership' in lieu of the right to marry." (Holguin v. Flores (2004) 122 Cal.App.4th 428, 433, 18 Cal.Rptr.3d 749.) Newly enacted Family Code, section 297 defined "domestic partners" as "two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring." (Fam. Code, § 297; Holguin v. Flores, supra, 122 Cal.App.4th at p. 433, 18 Cal.Rptr.3d 749.) Among other requirements for registration, domestic partners must share a common residence, be at least 18 years old and unrelated by blood, and be either members of the same sex or over the age of 62. (Fam.Code, § 297, subd. (b).)[11]
Soon after their creation, these domestic partnership laws were expanded by *695 amendments that granted registered partners new legal rights. (Stats.2001, ch. 893; Holguin v. Flores, supra, 122 Cal.App.4th at p. 434, 18 Cal.Rptr.3d 749.) Then in 2003, with the passage of Assembly Bill No. 205 (2003-2004 Reg. Sess.), the Legislature significantly broadened domestic partnership rights by enacting comprehensive legislation: the California Domestic Partner Rights and Responsibilities Act of 2003 (Domestic Partner Act). (Stats.2003, ch. 421.)
Family Code, section 297.5, subdivision (a) was added by the Domestic Partner Act and became operative on January 1, 2005. (Stats.2003, ch. 421, § 4; Armijo v. Miles, supra, 127 Cal.App.4th at p. 1413, 26 Cal.Rptr.3d 623.) This statute declares: "Registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law . . . as are granted to and imposed upon spouses." (Fam.Code, § 297.5, subd. (a).) Specifically, registered domestic partners have the same rights and obligations as married spouses regarding financial support, property ownership, child custody and support. (Fam.Code, § 297.5, subds. (a)-(d).)
There are some exceptions, however. First, the Domestic Partner Act confers only rights and responsibilities available under California law; it does not (because it cannot) extend to domestic partners the numerous benefits married couples enjoy under federal law. (Fam.Code, § 297.5, subd. (k); Knight v. Superior Court, supra, 128 Cal.App.4th at p. 30, 26 Cal. Rptr.3d 687.)[12] Registered domestic partners may not file joint income tax returns, nor is their earned income treated as community property for state or federal tax purposes. (Fam.Code, § 297.5, subd. (g).)[13] Second, the Domestic Partner Act does not (because it cannot) impact rights and responsibilities that are expressly reserved for married couples under the California Constitution or statutes adopted by initiative. (Fam.Code, § 297.5, subd. (j).) So, for example, the property tax reassessment benefit granted to surviving spouses under Proposition 13 is not available to a surviving domestic partner. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 205 (2003-2004 Reg. Sess.) as amended Mar. 25, 2003, p. 4.) Third, given the federal Defense of Marriage Act (28 U.S.C. § 1738c) and similar state enactments, registered domestic partners do not have the assurance that their partnerships will be legally recognized in other states, as marriages are. (Knight v. Superior Court, supra, 128 Cal.App.4th at p. 31, 26 Cal.Rptr.3d 687; see also Assem. Com. on Judiciary, Analysis of Assem. Bill No. 205 (2003-2004 Reg. Sess.) as amended Mar. 25, 2003, pp. 4, 7.) As a result, domestic partners who travel or move out of California may lose many or all of the rights conveyed by the Domestic Partner Act. (Knight v. Superior Court, supra, 128 Cal. App.4th at p. 31, 26 Cal.Rptr.3d 687.)
Moreover, the prerequisites for forming a domestic partnership, and the mechanisms for terminating such a partnership, *696 differ in significant ways from marriage. (See Knight v. Superior Court, supra, 128 Cal.App.4th at pp. 30-31, 26 Cal.Rptr.3d 687.) A same-sex couple may form a domestic partnership simply by filing a "Declaration of Domestic Partnership" form with the Secretary of State (Fam.Code, § 298.5), and under certain circumstances they may terminate the partnership simply by filing a corresponding "Notice of Termination of Domestic Partnership" form. (Fam.Code, § 299.) In contrast, marriages must be licensed and solemnized in some form of ceremony (Fam.Code, §§ 300, 420), and even the most summary dissolution of a marriage requires judicial proceedings. (Fam.Code, §§ 2400-2403.)
Consideration of these differences led the Third District Court of Appeal to observe that "marriage is considered a more substantial relationship and is accorded a greater stature than a domestic partnership." (Knight v. Superior Court, supra, 128 Cal.App.4th at p. 31, 26 Cal.Rptr.3d 687.) While this may be true, the Legislature declared that the 2003 Domestic Partner Act was intended to serve a broad remedial goal of "help[ing] California move closer to fulfilling the promises of inalienable rights, liberty, and equality contained in Sections 1 and 7 of Article 1 of the California Constitution by providing all caring and committed couples, regardless of their gender or sexual orientation, the opportunity to obtain essential rights, protections, and benefits and to assume corresponding responsibilities, obligations, and duties and to further the state's interests in promoting stable and lasting family relationships, and protecting Californians from the economic and social consequences of abandonment, separation, the death of loved ones, and other life crises." (Stats. 2003, ch. 421, § 1, subd. (a); see Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at p. 838, 31 Cal.Rptr.3d 565, 115 P.3d 1212; Bouley v. Long Beach Memorial Medical Center (2005) 127 Cal.App.4th 601, 612, 25 Cal.Rptr.3d 813.) Having found that "despite longstanding social and economic discrimination, many lesbian, gay, and bisexual Californians have formed lasting, committed, and caring relationships with persons of the same sex," the Legislature determined that expanding the rights and responsibilities of registered domestic partners "would further California's interests in promoting family relationships and protecting family members during life crises, and would reduce discrimination on the bases of sex and sexual orientation in a manner consistent with the requirements of the California Constitution." (Stats. 2003, ch. 421, § 1, subd. (b).) Contrary to Knight's observation about the greater stature of marriage, these legislative declarations and the statutory language of Family Code, section 297.5 recently led the Supreme Court to conclude that "a chief goal of the Domestic Partner Act is to equalize the status of registered domestic partners and married couples." (Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at p. 839, 31 Cal.Rptr.3d 565, 115 P.3d 1212.)
Our review of domestic partnership laws would not be complete without a discussion of the Legislature's recent attempt to extend marriage rights to same-sex couples. In 2005, Assemblyman Mark Leno introduced a bill to enact the Religious Freedom and Civil Marriage Protection Act. (Legis. Counsel's Dig., Assem. Bill No. 849 (2005-2006 Reg. Sess.), p. 1.) Assembly Bill No. 849 recited legislative findings that (1) gender-specific language added by the 1977 amendments to the marriage laws (Fam.Code, § 300 et seq.) discriminates against same-sex couples; (2) the exclusion of same-sex couples from marriage violates the rights of gays and lesbians under the California Constitution; (3) California's same-sex couples are harmed in various *697 ways by their exclusion from marriage; and (4) "[t]he Legislature has an interest in encouraging stable relationships regardless of the gender or sexual orientation of the partners. The benefits that accrue to the general community when couples undertake the mutual obligations of marriage accrue regardless of the gender or sexual orientation of the partners." (Assem. Bill No. 849 (2005-2006 Reg. Sess.) as amended June 28, 2005, § 3, subds. (d), (f), (g) & (j).) With a declared intent to "correct the constitutional infirmities" of the marriage laws (id., § 8), the bill would have amended Family Code, sections 300 through 302 to remove all gender-specific terms. (Assem. Bill No. 849 (2005-2006 Reg. Sess.) as amended June 28, 2005, §§ 4-6.) Recognizing its inability to correct any such problems in Family Code, section 308.5, due to its enactment by initiative, the Legislature declared Assembly Bill No. 849 was not intended to alter or amend the prohibition in section 308.5 against recognizing same-sex marriages entered outside California. (Assem. Bill No. 849 (2005-2006 Reg. Sess.) as amended June 28, 2005, §§ 3, subd. (k), 8.) Finally, the bill provided that no clergy or religious official would be required to solemnize a marriage in violation of his or her constitutional right to free exercise of religion. (Id., § 7.)
Although Assembly Bill No. 849 passed both houses of the Legislature in September 2005, it was vetoed by the Governor. In his veto message, Governor Schwarzenegger explained that while he supported domestic partnerships for gay and lesbian couples, he did not believe the Legislature could amend Family Code, section 308.5 without submitting the provision for voter approval. (Governor's veto message to Assem. on Assem. Bill No. 849 (Sept. 29, 2005) Recess J. No. 4 (2005-2006 Reg. Sess.) pp. 3737-3738.) Moreover, because the constitutionality of the marriage laws was pending before this appellate court at the time, the Governor believed Assembly Bill No. 849 would add "confusion" to the constitutional issues under review. (Ibid.) He remarked, "If the ban of same-sex marriage is unconstitutional, this bill is not necessary. If the ban is constitutional, this bill is ineffective." (Ibid.)

III. Respondents' Constitutional Claims
Respondents claim Family Code provisions limiting marriage to unions between a man and a woman violate their fundamental right to marry, under the due process and equal protection clauses of the California Constitution, and discriminate against them on the basis of gender and sexual orientation, in violation of the equal protection clause. (Cal. Const., art. I, § 7, subd. (a) ["A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . ."].) Respondents also argue the marriage laws violate their constitutional rights to privacy and freedom of expression and association. (Cal. Const., art. I, §§ 1, 2.)
A two-tiered analysis is typically used to determine the constitutionality of laws challenged under the equal protection clause, depending upon the classification involved or the nature of the interest affected. (D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 16-17, 112 Cal.Rptr. 786, 520 P.2d 10; Sail'er Inn, Inc. v. Kirby (1971) 5 Cal.3d 1, 16, 95 Cal.Rptr. 329, 485 P.2d 529.) "Although normally any rational connection between distinctions drawn by a statute and the legitimate purpose thereof will suffice to uphold the statute's constitutionality [citation], closer scrutiny is afforded a statute which affects fundamental interests or employs a suspect classification. [Citations.]" *698 (In re Gary W. (1971) 5 Cal.3d 296, 306, 96 Cal.Rptr. 1, 486 P.2d 1201.) If a law abridges a fundamental right, or employs a suspect classification, it is reviewed under the strict scrutiny test, under which "the state bears the burden of establishing not only that it has a compelling interest which justifies the law but that the distinctions drawn by the law are necessary to further its purpose." (D'Amico v. Board of Medical Examiners, supra, 11 Cal.3d at p. 17, 112 Cal.Rptr. 786, 520 P.2d 10; see also Serrano v. Priest (1976) 18 Cal.3d 728, 761, 135 Cal.Rptr. 345, 557 P.2d 929.) If the law does not impact a fundamental right or employ a suspect classification, we review it under the less stringent "rational relationship" test. (Hardy v. Stumpf (1978) 21 Cal.3d 1, 8, 145 Cal.Rptr. 176, 576 P.2d 1342; D'Amico v. Board of Medical Examiners, supra, 11 Cal.3d at p. 16, 112 Cal.Rptr. 786, 520 P.2d 10.) Under this standard, which applies to most economic and social welfare legislation, a law passed by the Legislature or the people is presumed to be constitutional, and distinctions drawn by the law must merely "`bear some rational relationship to a conceivable legitimate state purpose.' [Citation.]" (D'Amico v. Board of Medical Examiners, supra, 11 Cal.3d at p. 16, 112 Cal.Rptr. 786, 520 P.2d 10.) "Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon the party who assails it." (Id. at p. 17, 112 Cal.Rptr. 786, 520 P.2d 10.)
A similar approach is employed in passing upon substantive due process challenges to legislative measures. "In analyzing a substantive due process claim, we first examine the nature of the interest at issue to determine whether it is a `fundamental right' protected by the Fourteenth Amendment. [Citation.] Where there is a fundamental right, we must next determine whether the state has significantly infringed upon this right. [Citation.] If so, we then consider whether an important state interest justifies the infringement. [Citation.]" (In re Adoption of Kay C. (1991) 228 Cal.App.3d 741, 748, 278 Cal. Rptr. 907.) "In the absence of such factors, `a Legislature does not violate due process so long as an enactment is procedurally fair and reasonably related to a proper legislative goal.' [Citations.]" (In re Arthur W. (1985) 171 Cal.App.3d 179, 185, 217 Cal.Rptr. 183, fn. omitted.)
In addressing respondents' constitutional claims, we consider decisions of the United States Supreme Court and other federal courts as persuasive authority because the equal protection provision of the California Constitution is "substantially the equivalent of the equal protection clause of the Fourteenth Amendment. . . ." (Dept. of Mental Hygiene v. Kirchner (1965) 62 Cal.2d 586, 588, 43 Cal.Rptr. 329, 400 P.2d 321; see Manduley v. Superior Court (2002) 27 Cal.4th 537, 571-572, 117 Cal.Rptr.2d 168, 41 P.3d 3; Children's Hospital & Medical Center v. Bonta (2002) 97 Cal.App.4th 740, 769, 118 Cal.Rptr.2d 629.) However, "it is well established that the California Constitution `is, and always has been, a document of independent force' [citation], and that the rights embodied in and protected by the state Constitution are not invariably identical to the rights contained in the federal Constitution. [Citation.]" (American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 325, 66 Cal.Rptr.2d 210, 940 P.2d 797.) In the area of civil liberties, for example, the California Supreme Court has observed that "our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded *699 respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law.' [Citations.]" (Serrano v. Priest, supra, 18 Cal.3d at pp. 764-765, 135 Cal.Rptr. 345, 557 P.2d 929.)

A. No Fundamental Right to Marriage Between Same-sex Partners Has Been Recognized.
The due process clause of the Fourteenth Amendment includes a substantive component that forbids the government from infringing certain fundamental liberty interests unless the infringement is narrowly tailored to serve a compelling state interest. (Reno v. Flores (1993) 507 U.S. 292, 301-302, 113 S.Ct. 1439, 123 L.Ed.2d 1; Dawn D. v. Superior Court (1998) 17 Cal.4th 932, 939-940, 72 Cal.Rptr.2d 871, 952 P.2d 1139.) Impairment of a fundamental right or liberty interest is similarly prohibited under equal protection principles. (See, e.g., Zablocki v. Redhail (1978) 434 U.S. 374, 381-382, 98 S.Ct. 673, 54 L.Ed.2d 618 [law infringing fundamental right to marry violated equal protection]; Perez v. Sharp (1948) 32 Cal.2d 711, 714, 731-732, 198 P.2d 17 [same].) As is typically the case with substantive due process claims, the question whether California's marriage laws infringe upon a fundamental right depends almost entirely on how that right is defined.
Undoubtedly, all citizens have a fundamental constitutional right to marry. (Zablocki v. Redhail, supra, 434 U.S. at pp. 383-386, 98 S.Ct. 673; Loving v. Virginia (1967) 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010; Skinner v. Oklahoma (1942) 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655; Perez v. Sharp, supra, 32 Cal.2d at pp. 714-715, 198 P.2d 17.) Even prison inmates, however terrible their crime, have an acknowledged right to marry. (Turner v. Safley (1987) 482 U.S. 78, 95-96, 107 S.Ct. 2254, 96 L.Ed.2d 64; see also Ortiz v. Los Angeles Police Relief Assn. (2002) 98 Cal.App.4th 1288, 1304, 120 Cal.Rptr.2d 670.) Moreover, our high court has explained that this fundamental right includes the right to marry the person of one's choice. (Perez v. Sharp, supra, 32 Cal.2d at p. 715, 198 P.2d 17.)
Respondents urge us to end the discussion here. Because marriage is a fundamental right that belongs to everyone, respondents reason the Family Code provisions that prevent them from marrying the persons they choose  i.e., their same-sex partners  deprive them of this fundamental right.[14] Language from many historical decisions stressing the importance of the right to marriage supports their position. (See, e.g., Perez v. Sharp, supra, 32 Cal.2d at p. 714, 198 P.2d 17 ["Marriage is thus something more than a civil contract subject to regulation by the state; it is a fundamental right of free men"]; Loving v. Virginia, supra, 388 U.S. at p. 12, 87 S.Ct. 1817 ["The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men"]; Skinner v. Oklahoma, supra, 316 U.S. at p. 541, 62 S.Ct. 1110 ["Marriage and procreation are fundamental to the very existence and survival of the race"].) However, we cannot ignore the reality that none of these cases addressed the type of *700 union respondents are now urging California to recognize within the institution of marriage.[15]
Until very recently, the term "marriage" in court opinions has always referred, either explicitly or implicitly, to the union of a man and a woman. (See, e.g., Elden v. Sheldon (1988) 46 Cal.3d 267, 274-275, 250 Cal.Rptr. 254, 758 P.2d 582 [noting, in context of discussing state's interest in promoting marriage, that marriage is accorded special status "`in recognition that "[t]he joining of the man and woman in marriage is at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime"'"]; Mott v. Mott (1890) 82 Cal. 413, 416, 22 P. 1142 [describing marriage as a civil contract "`by which a man and woman reciprocally engage to live with each other during their joint lives, and to discharge toward each other the duties imposed by law on the relation of husband and wife'"].) When cases challenging the constitutionality of marriage laws were first filed in the 1970's, courts dismissed the idea of same-sex marriage as a definitional impossibility. (E.g., Adams v. Howerton (C.D.Cal.1980) 486 F.Supp. 1119, 1122 ["The term `marriage[]' . . . necessarily and exclusively involves a contract, a status, and a relationship between persons of different sexes"]; Jones v. Hallahan (Ky.Ct.App.1973) 501 S.W.2d 588, 589 ["appellants are prevented from marrying, not by the statutes of Kentucky or the refusal of the County Court Clerk . . . to issue them a license, but rather by their own incapability to enter into a marriage as that term is defined"]; Singer v. Hara (1974) 11 Wash.App. 247, 522 P.2d 1187, 1192 ["appellants are not being denied entry into the marriage relationship because of their sex; rather, they are being denied entry into the marriage relationship because of the recognized definition of that relationship as one which may be entered into only by two persons who are members of the opposite sex"].) The reaction of these courts is not surprising, because "there is a long history in this country of defining marriage as a relation between one man and one woman. . . ." (Lockyer, supra, 33 Cal.4th at p. 1127, 17 Cal. Rptr.3d 225, 95 P.3d 459 (conc. & dis. opn. of Kennard, J.).)
This is not to say that marriage can never be defined to include same-sex unions. As noted, civil marriage in California is based entirely on statutory law. (Lockyer, supra, 33 Cal.4th at p. 1074, 17 Cal.Rptr.3d 225, 95 P.3d 459.) Thus, if the Legislature someday amends Family Code section 300 to omit gender references, the definition of marriage in this state will encompass same-sex unions. "The Court here does not hold marriage must remain a heterosexual institution." (Smelt v. County of Orange (C.D.Cal.2005) 374 F.Supp.2d 861, 878, fn. 22, vacated on another ground (9th Cir.2006) 447 F.3d 673.) However, it is important to acknowledge the historical definition of marriage because this definition limits the precedential value of cases discussing the fundamental right to marriage. No authority binding upon us  from California appellate courts to the United States Supreme Court  has ever held or suggested that individuals have a fundamental constitutional right to enter the public institution of marriage *701 with someone of the same sex.[16] Although appellants are probably correct in asserting that marriage is an evolving institution, and that the idea of same-sex marriage is gaining acceptance around the world, they do not dispute the historical understanding of marriage as opposite-sex in nature, and this understanding must inform our consideration of the relevant case law. (See Hernandez v. Robles, supra, 821 N.Y.S.2d at p. 783, 855 N.E.2d at p. 14, 2006 WL 1835429 (conc. opn. of Graffeo, J.) ["[T]o ignore the meaning ascribed to the right to marry in these cases and substitute another meaning in its place is to redefine the right in question and to tear the resulting new right away from the very roots that caused the U.S. Supreme Court . . . to recognize marriage as a fundamental right in the first place"].)
Whereas respondents frame the fundamental right at issue generically, as the right to marriage, appellants argue the interest truly at issue here is the more narrow right to same-sex marriage.
In considering which side has the better definition of the right at stake, we heed the guiding principle that substantive due process analysis "must begin with a careful description of the asserted right." (Reno v. Flores, supra, 507 U.S. at p. 302, 113 S.Ct. 1439; see also Washington v. Glucksberg (1997) 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772.) As our Supreme Court has explained, this "careful description" must be "concrete and particularized, rather than abstract and general." (Dawn D. v. Superior Court, supra, 17 Cal.4th at p. 940, 72 Cal.Rptr.2d 871, 952 P.2d 1139.) Judicial restraint in the area of defining fundamental rights is especially important because "`[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field," [citation], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court, [citation].' [Citation.]" (Id. at p. 939, 72 Cal.Rptr.2d 871, 952 P.2d 1139, quoting Washington v. Glucksberg, supra, 521 U.S. at p. 720, 117 S.Ct. 2258.) Thus, the judicial branch has generally been reluctant to expand the catalog of rights protected as fundamental. (Washington v. Glucksberg, supra, 521 U.S. at p. 720, 117 S.Ct. 2258; Jimenez v. County of Los Angeles (2005) 130 Cal.App.4th 133, 141, 29 Cal.Rptr.3d 553.)
*702 Considering the importance of judicial restraint in this area, we must agree with appellants that, carefully described, the right at issue in these cases is the right to same-sex marriage, not simply marriage. Just as the United States Supreme Court determined the right before it in Glucksberg was the right to assisted suicide, and not a more generic "right to die" or right to control the manner of one's death (Washington v. Glucksberg, supra, 521 U.S. at pp. 722-723, 117 S.Ct. 2258), we must be as precise as possible about the right being asserted by the parties before us. As discussed, the term "marriage" has traditionally been understood to describe only opposite-sex unions. Respondents, who are as free as anyone to enter such opposite-sex marriages, clearly seek something different here.
Although the Woo respondents forcefully argue that a fundamental right should not be defined based on the group that is seeking to exercise it,[17] the due process clause does not require us to blind ourselves to reality. Where the identity of individuals who claim a fundamental right is relevant in defining the precise liberty interest asserted, courts have not ignored such pertinent facts. For example, in Dawn D. v. Superior Court, a man who claimed to be the biological father of a child born during the mother's marriage to another man challenged a statutory presumption that favored the mother's husband as the child's natural father. (Dawn D. v. Superior Court, supra, 17 Cal.4th at pp. 934-935, 72 Cal.Rptr.2d 871, 952 P.2d 1139.) Rather than defining the constitutional liberty interest broadly as the claimant's right to have an opportunity to develop a parental relationship with his child (see id. at p. 935, 72 Cal.Rptr.2d 871, 952 P.2d 1139), our Supreme Court narrowly defined the right, consistent with Glucksberg, as the interest of an alleged biological father "in establishing a relationship with his child born to a woman married to another man at the time of the child's conception and birth." (Dawn D. v. Superior Court, supra, 17 Cal.4th at p. 941, 72 Cal.Rptr.2d 871, 952 P.2d 1139.)
Constitutionally protected fundamental rights need not be defined so broadly that they will inevitably be exercised by everyone. For example, although the ability to make personal decisions regarding child rearing and education has been recognized as a fundamental right (see, e.g., Pierce v. Society of the Sisters (1925) 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070), this right is irrelevant to people who do not have children. Yet, everyone who has children enjoys this fundamental right to control their upbringing. A similar analogy applies in the case of marriage. Everyone has a fundamental right to "marriage," but, because of how this institution has been defined, this means only that everyone has a fundamental right to enter a public union with an opposite-sex partner. That such a right is irrelevant to a lesbian or gay person does not mean the definition of the fundamental right can be expanded by the judicial branch beyond its traditional moorings.
*703 Furthermore, for purposes of a due process analysis, only rights that are "objectively, `deeply rooted in this Nation's history and tradition,' [citations] and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed'" are recognized as fundamental. (Washington v. Glucksberg, supra, 521 U.S. at pp. 720-721, 117 S.Ct. 2258; Dawn D. v. Superior Court, supra, 17 Cal.4th at p. 940, 72 Cal.Rptr.2d 871, 952 P.2d 1139; Coshow v. City of Escondido (2005) 132 Cal.App.4th 687, 708, 34 Cal.Rptr.3d 19.) It is this prong of the analysis that dooms respondents' fundamental rights claim.[18]
Everyone agrees there is no historical tradition of same-sex marriage in this country. Quite the contrary. Until just three years ago, United States Supreme Court precedent permitted states to criminalize intimate homosexual conduct. (See Lawrence v. Texas (2003) 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508, overruling Bowers v. Hardwick (1986) 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140.) Not surprisingly, given Bowers's sanction of such a severe curtailment of the liberty of gays and lesbians, the issue of whether states should or must permit marriage between same-sex partners has only recently come into public debate. Only one state currently allows same-sex couples to enter the institution of marriage itself, i.e., as opposed to alternative legal relationships such as civil unions or domestic partnerships (Goodridge v. Department of Public Health, supra, 440 Mass. 309, 798 N.E.2d 941), and the Massachusetts Supreme Judicial Court's decision establishing this right has been controversial. (See, e.g., Note, Civil Partnership in the United Kingdom and a Moderate Proposal for Change in the United States (2005) 22 Ariz. J. Internat. & Comparative L. 613, 630-631 [describing the controversy engendered by Goodridge]; see also Lewis v. Harris, supra, 378 N.J.Super. at p. 193, 875 A.2d 259 [concluding from "the strongly negative public reactions" to Goodridge, and similar decisions from lower courts of other states, that "there is not yet any public consensus favoring recognition of same-sex marriage"].) Several other states have reacted negatively by, for example, amending their constitutions to prohibit same-sex marriage. (See Stein, Symposium on Abolishing Civil Marriage: An Introduction (2006) 27 Cardozo L.Rev. 1155, 1157, fn. 12 [noting, as of January 2006, "39 states [had] either passed laws or amended their constitutions (or done both) to prohibit same-sex marriages, to deny recognition of same-sex marriages from other jurisdictions, and/or to deny recognition of other types of same-sex relationships"].)
Nevertheless, recognition of the rights and liberties of gays and lesbians is progressing swiftly, and "our laws and traditions in the past half century are of most relevance" in this area. (Lawrence v. Texas, supra, 539 U.S. at pp. 571-572, 123 S.Ct. 2472.) Even the recent history of the last 50 years, however, does not demonstrate the existence of a "deeply rooted" right to or practice of same-sex marriage. While same-sex relationships have undeniably gained greater societal and legal acceptance, the simple fact is that same-sex *704 marriage has never existed before. The novelty of this interest, more than anything else, is what precludes its recognition as a constitutionally protected fundamental right. (See Smelt v. County of Orange, supra, 374 F.Supp.2d at p. 878 ["A definition of marriage only recognized in Massachusetts and for less than two years cannot be said to be `deeply rooted in this Nation's history and tradition' of the last half century"]; see also Coshow v. City of Escondido, supra, 132 Cal.App.4th at p. 709, 34 Cal.Rptr.3d 19 [noting the "mere novelty" of an asserted fundamental right "is sufficient to create a doubt" whether it is so deeply rooted in our country's traditions and conscience as to be considered fundamental]; Duncan, Legislative Deference & the Novelty of Same-Sex Marriage (2005) 16 Stan. L. & Pol'y. Rev. 83, 86 ["To this point, no court has ever held that same-sex marriage is deeply rooted in a state's history and tradition"].)
Respondents argue it is illogical to require that a right long denied by law be supported by a deeply rooted tradition. Of course no such tradition will be found if the people asserting the right have been legally precluded from exercising it. For example, when our Supreme Court struck down California's antimiscegenation laws in Perez v. Sharp, supra, 32 Cal.2d 711, 198 P.2d 17, it did not ask whether there was a "deeply rooted tradition of interracial marriage." Nor did the United States Supreme Court when it addressed this issue on a national scale. (See Loving v. Virginia, supra, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010.)
On the surface, the interracial marriage cases appear to provide compelling support for finding gays and lesbians have a fundamental right to marry their same-sex partners. However, upon closer inspection, the analogy is flawed. The central holdings of Perez and Loving are that laws prohibiting interracial marriage constitute invidious racial discrimination in violation of the equal protection clause. (Loving v. Virginia, supra, 388 U.S. at p. 12, 87 S.Ct. 1817 ["There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause"]; Perez v. Sharp, supra, 32 Cal.2d at p. 718, 198 P.2d 17 ["By restricting the individual's right to marry on the basis of race alone, [antimiscegenation statutes] violate the equal protection of the laws clause of the United State Constitution"].) These laws were subjected to strict scrutiny because they drew distinctions based solely on the race of potential spouses, and race has long been recognized as a suspect classification. (See Loving v. Virginia, supra, 388 U.S. at pp. 11-12, 87 S.Ct. 1817; Perez v. Sharp, supra, 32 Cal.2d at pp. 718-719, 198 P.2d 17.) To be sure, the cases also held antimiscegenation laws deprived the participants of their fundamental right to marriage, but this holding cannot be divorced from the laws' racially discriminatory context. The laws were doubly evil for equal protection purposes because they denied people a fundamental right (marriage) based upon the most suspect of classifications (race). (See Loving v. Virginia, supra, 388 U.S. at p. 12, 87 S.Ct. 1817 [the Constitution requires "that the freedom of choice to marry not be restricted by invidious racial discriminations"]; Perez v. Sharp, supra, 32 Cal.2d at p. 715, 198 P.2d 17 [laws infringing fundamental right to marry "must be based upon more than prejudice and must be free from oppressive discrimination" to satisfy the Constitution].)
Moreover, although antimiscegenation laws had been around for many years when they were declared invalid (see Perez v. Sharp, supra, 32 Cal.2d at pp. 746-748, 198 P.2d 17 (dis. opn. of Shenk, J.) [tracing history of these laws]), the Perez and Loving *705 decisions contain no indication that interracial marriages were regarded at the time as so unprecedented that recognizing them would work a fundamental change in the definition of marriage itself. (See Smelt v. County of Orange, supra, 374 F.Supp.2d at p. 879 [observing "there is nothing in Loving that suggests an extension of the definition of the fundamental right"].)
Because marriage in this state has always been defined, implicitly or explicitly, as the union of opposite-sex individuals, the fundamental right respondents urge us to recognize requires a redefinition of the term "marriage."[19] Courts in this state simply do not have authority to redefine marriage. In California, "`the Legislature has full control of the subject of marriage and may fix the conditions under which the marital status may be created or terminated. . . .' [Citation.]" (Lockyer, supra, 33 Cal.4th at p. 1074, 17 Cal.Rptr.3d 225, 95 P.3d 459.) The Legislature's power to regulate marriage is thus exclusive, and subject only to constitutional restrictions. (Ibid. ["`The regulation of marriage and divorce is solely within the province of the Legislature, except as the same may be restricted by the Constitution'"]; Estate of DePasse, supra, 97 Cal.App.4th at p. 99, 118 Cal.Rptr.2d 143.) Our role is limited to determining whether the Legislature's definition comports with constitutional standards. Were we to expand the definition of marriage to include same-sex unions, we would overstep our bounds as a coequal branch of government. (See Dawn D. v. Superior Court, supra, 17 Cal.4th at p. 939, 72 Cal.Rptr.2d 871, 952 P.2d 1139 [courts must exercise caution in entertaining substantive due process challenges lest they assume an improper policymaking role]; see also Hernandez v. Robles, supra, 26 A.D.3d at p. 102, 805 N.Y.S.2d 354 [in "purportedly creat[ing] a new constitutional right" to same-sex marriage, lower court exceeded its constitutional mandate and usurped legislature's function].) "While such a change of a basic element of the institution may eventually find favor with the Legislature"  and perhaps it will sooner rather than later, if the passage of Assembly Bill No. 849 is any indication  "we are not persuaded that the Due Process Clause requires a judicial redefinition of marriage." (Samuels v. New York State Dept. of Health (2006) 29 A.D.3d 9, 811 N.Y.S.2d 136, 142; see also Goodridge v. Department of Public Health, supra, 798 N.E.2d at p. 978 (dis. opn. of Spina, J.) ["The purpose of substantive due process is to protect existing rights, not to create new rights"].)
We do not presume to hold same-sex marriage will never enjoy the same constitutional protection as is accorded to opposite-sex marriage. "Constitutional concepts are not static" (People v. Belous (1969) 71 Cal.2d 954, 967, 80 Cal.Rptr. 354, 458 P.2d 194), and Californians' evolving notions of equality may eventually lead to the recognition of a right to same-sex marriage and its ultimate status as a constitutionally guaranteed right. However, these developments are still in their infancy, and the courts may not compel the change respondents seek. "[W]hile same-sex marriage may be the law at a future time, it will be because the people declare it to be, not because . . . members of this court *706 have dictated it." (Andersen v. King County, supra, 138 P.3d at p. 969.)

B. The Marriage Laws Do Not Discriminate Based on Gender
Respondents also claim California's marriage laws impermissibly discriminate on the basis of gender. "Public policy in California strongly supports eradication of discrimination based on sex." (Koire v. Metro Car Wash (1985) 40 Cal.3d 24, 36, 219 Cal.Rptr. 133, 707 P.2d 195.) Indeed, gender discrimination is one area in which the California Constitution has been construed to provide more protection than the federal Constitution. (See Sail'er Inn, Inc. v. Kirby, supra, 5 Cal.3d at pp. 17-19, 95 Cal.Rptr. 329, 485 P.2d 529; Connerly v. State Personnel Bd., supra, 92 Cal.App.4th at pp. 31-32, 39, 112 Cal. Rptr.2d 5.) Classifications based on gender are therefore considered "suspect" in equal protection analyses under the California Constitution, and laws that discriminate based on sex are subject to strict scrutiny. (Catholic Charities of Sacramento, Inc. v. Superior Court (2004) 32 Cal.4th 527, 564, 10 Cal.Rptr.3d 283, 85 P.3d 67; Sail'er Inn, Inc. v. Kirby, supra, 5 Cal.3d at p. 17, 95 Cal.Rptr. 329, 485 P.2d 529.)
The trial court concluded the marriage laws are discriminatory, reasoning: "If a person, male or female, wishes to marry, then he or she may do so as long as the intended spouse is of a different gender. It is the gender of the intended spouse that is the sole determining factor." Obviously, however, the opposite-sex requirement for marriage applies regardless of the applicant's gender. The laws treat men and women exactly the same, in that neither group is permitted to marry a person of the same gender. We fail to see how a law that merely mentions gender can be labeled "discriminatory" when it does not disadvantage either group. (See Hi-Voltage Wire Works, Inc. v. City of San Jose (2000) 24 Cal.4th 537, 559-560, 101 Cal.Rptr.2d 653, 12 P.3d 1068 ["`[D]iscriminate' means `to make distinctions in treatment; show partiality (in favor of) or prejudice (against)'"]; Connerly v. State Personnel Bd., supra, 92 Cal.App.4th at p. 45, 112 Cal.Rptr.2d 5 ["where the operation of the law does not differ between one individual and another based upon a suspect classification, strict scrutiny is not required even though the law might mention matters such as race or gender"]; cf. Gay Law Students Assn. v. Pacific Tel. & Tel. Co. (1979) 24 Cal.3d 458, 490, 156 Cal.Rptr. 14, 595 P.2d 592 [rejecting argument that discrimination against homosexuals was effectively "sex discrimination" prohibited by statute because it was discrimination based on the gender of the homosexual's partner].)
All of the leading sex-discrimination decisions from the United States Supreme Court have involved statutes that singled out men or women as a class for unequal treatment. (Smelt v. County of Orange, supra, 374 F.Supp.2d at pp. 876-877; Baker v. State of Vermont, supra, 744 A.2d at p. 880, fn. 13; see, e.g., United States v. Virginia (1996) 518 U.S. 515, 519-520, 116 S.Ct. 2264, 135 L.Ed.2d 735 [law excluded women from attending Virginia Military Institute]; Mississippi Univ. for Women v. Hogan, supra, 458 U.S. at p. 719, 102 S.Ct. 3331 [policy prevented men from attending state-sponsored nursing school]; Craig v. Boren (1976) 429 U.S. 190, 191-192, 97 S.Ct. 451, 50 L.Ed.2d 397 [law allowed women to purchase low-alcohol beer at an earlier age than men].) The same is true for the California Supreme Court's gender discrimination cases. (See, e.g., Arp v. Workers' Comp. Appeals Bd. (1977) 19 Cal.3d 395, 398-399, 407, 138 Cal.Rptr. 293, 563 P.2d 849 [invalidating *707 statute that created conclusive presumption of dependency, for establishing entitlement to death benefits, to widows but not widowers]; Sail'er Inn, Inc. v. Kirby, supra, 5 Cal.3d at pp. 6, 20-22, 95 Cal. Rptr. 329, 485 P.2d 529 [invalidating statute that prevented women from working as bartenders unless they were liquor licensees, wives of a licensee, or shareholders in a corporate licensee].)
Despite acknowledging that the marriage laws treat "all men and all women . . . the same," the trial court asserted this equality is beside the point because the laws establish explicit gender-based classifications. Similarly, respondents argue proof of disparate treatment is not required because the laws facially classify by gender. However, we are aware of no controlling authority imposing strict constitutional scrutiny on a law that merely mentions gender, without treating either group differently.[20] Rather than dealing in semantics, a court's primary concern in analyzing gender classifications under the equal protection clause is to ensure equal treatment for men and women. (See Koire v. Metro Car Wash, supra, 40 Cal.3d at p. 37, 219 Cal.Rptr. 133, 707 P.2d 195 ["public policy in California mandates the equal treatment of men and women"]; Michelle W. v. Ronald W. (1985) 39 Cal.3d 354, 364, 216 Cal.Rptr. 748, 703 P.2d 88 [under the equal protection clause, "a sovereign may not subject men and women to disparate treatment"]; cf. Boren v. Department of Employment Dev. (1976) 59 Cal.App.3d 250, 257, 130 Cal.Rptr. 683 [more important than a statute's neutral language is whether it has the ultimate effect of creating unequal treatment].) Indeed, unequal treatment is always the touchstone of an equal protection analysis. (See People v. Wilkinson (2004) 33 Cal.4th 821, 836, 16 Cal.Rptr.3d 420, 94 P.3d 551 [noting, in the context of a criminal's defendant's equal protection claim, "[i]t is a fundamental principle that, `[t]o succeed on [a] claim under the equal protection clause, [a defendant] first must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner'"].)
Several respondents rely on cases striking antimiscegenation laws as support for their positions. Just as today's marriage laws prohibit men and women equally from entering into same-sex marriages, respondents argue, antimiscegenation laws from the past century prohibited persons of all races equally from marrying outside their race. In the interracial marriage context, the United State Supreme Court "reject[ed] the notion that the mere `equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations. . . ." (Loving v. Virginia, supra, 388 U.S. at p. 8, 87 S.Ct. 1817.) Several years earlier, the California Supreme Court rejected the same argument, stating: "The decisive question, *708 however, is not whether different races, each considered as a group, are equally treated. The right to marry is the right of individuals, not of racial groups. The equal protection clause of the United States Constitution does not refer to rights of the Negro race, the Caucasian race, or any other race, but to the rights of individuals. [Citations.]" (Perez v. Sharp, supra, 32 Cal.2d at p. 716, 198 P.2d 17; see also Connerly v. State Personnel Bd., supra, 92 Cal.App.4th at p. 35, 112 Cal. Rptr.2d 5 [noting rights guaranteed by the equal protection clause are personal rights belonging to the individual].)[21]
The analogy to statutes prohibiting interracial marriage is not entirely apt, however. Close examination of Perez and Loving reveals that these courts were especially troubled by the challenged laws' reliance on express racial classifications. Noting that "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination" (Loving v. Virginia, supra, 388 U.S. at p. 10, 87 S.Ct. 1817), the Loving court held that all laws employing racial classifications must be subjected to strict scrutiny, and it refused to make an exception for laws that appear to affect all races equally. (Id. at p. 9, 87 S.Ct. 1817 ["the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race"]; see also Perez v. Sharp, supra, 32 Cal.2d at p. 719, 198 P.2d 17 [regarding California's antimiscegenation statute "with great suspicion" due to its classification based on racial groups].)
Moreover, the Supreme Court looked beyond the apparently neutral classification scheme and determined that the true purpose of Virginia's antimiscegenation law was "to maintain White Supremacy." (Loving v. Virginia, supra, 388 U.S. at p. 11, 87 S.Ct. 1817.) The law punished only marriages "between `a white person and a colored person,'" but did not prevent intermarriage between non-White persons of different ethnicities. (Id. at pp. 4-5, 87 S.Ct. 1817; see also Perez v. Sharp, supra, 32 Cal.2d at p. 721, 198 P.2d 17 [California law restricted marriages between "white persons" and members of certain other races but left non-White races free to intermarry].) Thus, the high court concluded the law's superficially neutral classification was in reality a vehicle to perpetuate invidious racial discrimination. (Loving v. Virginia, supra, 388 U.S. at pp. 11-12, 87 S.Ct. 1817.) The analogy to respondents' claim of gender discrimination clearly falters on this point. No evidence indicates California's opposite-sex definition of marriage was intended to discriminate against males or females, and respondents do not argue that the purpose of the definition is to discriminate against either gender. If anything, relevant legislative history and voter materials suggest the intent was to single out same-sex couples for disparate treatment. (See pp. 691-693, ante.)
Respondents correctly point out that, during the last century, California has abolished or altered many marriage-related laws because they were based on improper sex-role stereotypes. For example, a husband was once regarded as the owner of all community property in a marriage, *709 and he enjoyed the sole ability to control such marital property. (Droeger v. Friedman, Sloan & Ross (1991) 54 Cal.3d 26, 32, 283 Cal.Rptr. 584, 812 P.2d 931.) Our state's community property laws did not become completely gender-neutral until reform legislation was passed 1975. (Id. at p. 35, 283 Cal.Rptr. 584, 812 P.2d 931.) Also illustrative, the Legislature did not make forcible rape of a spouse a crime until 1979. (See People v. Hillard (1989) 212 Cal.App.3d 780, 784, 260 Cal.Rptr. 625.) However, this history does not demonstrate that the definition of marriage as male-female can itself be traced to a discriminatory purpose. "It is one thing to show that long-repealed marriage statutes subordinated women to men within the marital relation. It is quite another to demonstrate that the authors of the marriage laws excluded same-sex couples because of incorrect and discriminatory assumptions about gender roles or anxiety about gender-role confusion. That evidence is not before us." (Baker v. State of Vermont, supra, 744 A.2d at p. 880, fn. 13.)[22]

C. Disparate Impact on Gays and Lesbians Does Not Trigger Strict Scrutiny
Although the trial court did not address this issue, we must consider respondents' claim that the marriage statutes are unconstitutional because they discriminate on the basis of sexual orientation. As noted (ante, fn. 9), the Family Code provisions we are considering make no reference to the sexual orientation of potential marriage partners. California law does not literally prohibit gays and lesbians from marrying; however, it requires those who do to marry someone of the opposite sex. As a practical matter, of course, this requirement renders marriage unavailable to gay and lesbian individuals, whose choice of a life partner will, by definition, be a person of the same sex. Clearly, the statutory definition of marriage as male-female has a disparate impact on gay and lesbian individuals.[23] (See Personnel Administrator v. *710 Feeney (1979) 442 U.S. 256, 272-274, 99 S.Ct. 2282, 60 L.Ed.2d 870 [disparate impact of a facially neutral law supports equal protection claim if the impact can be traced to a discriminatory purpose].) As such, the marriage laws implicitly classify along sexual orientation lines. (Cf. Lockyer, supra, 33 Cal.4th at pp. 1126, 1128, fn. 2, 17 Cal.Rptr.3d 225, 95 P.3d 459 (conc. & dis. opn. of Kennard, J.) [noting California law restricts marriage to "heterosexual couples"]; id. at p. 1135, 17 Cal.Rptr.3d 225, 95 P.3d 459 (conc. & dis. opn. of Werdegar, J.) [contrasting "heterosexual marriages" with same-sex unions that were voided by the majority opinion].)
Moreover, the Legislature's manifest purpose in enacting the 1977 amendments to Family Code, section 300, was to exclude same-sex couples from the institution of marriage. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977-1978 Reg. Sess.) as amended May 23, 1977, p. 1 [stating the purpose of Assembly Bill No. 607 was "to prohibit persons of the same sex from entering lawful marriage"]; see Lockyer, supra, 33 Cal.4th at p. 1076, fn. 11, 17 Cal.Rptr.3d 225, 95 P.3d 459 [legislative history demonstrates the bill's purpose was to prohibit same-sex marriage].) Likewise, the exclusionary intent of California voters who passed Proposition 22 could not be more clear. Ballot arguments in favor of the initiative raised the specter of same-sex couples moving to this state and forcing California to recognize marriages they entered elsewhere, even though California law would not have authorized the marriage. (See Ballot Pamp., Primary Elec. (Mar. 7, 2000) argument in favor of Prop. 22, p. 52 ["If [judges in other states] succeed, California may have to recognize new kinds of marriages, even though most people believe marriage should be between a man and a woman"]; id., rebuttal to argument against Prop. 22, p. 53 ["UNLESS WE PASS PROPOSITION 22, LEGAL LOOPHOLES COULD FORCE CALIFORNIA TO RECOGNIZE `SAME-SEX MARRIAGES' PERFORMED IN OTHER STATES"].) The intent of this measure, as with the Legislature's 1977 Family Code amendments, was clearly to prohibit gays and lesbians from marrying their same-sex partners.
However, though we agree with respondents that the marriage statutes implicitly classify based on sexual orientation, we do not agree that this classification requires that the laws be subjected to strict scrutiny. There is no precedent for doing so.
The equal protection clauses of the United States and California Constitutions prohibit arbitrary discrimination against any class of individuals, including homosexuals. (Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra, 24 Cal.3d at p. 467, 156 Cal.Rptr. 14, 595 P.2d 592; Citizens for Responsible Behavior v. Superior Court (1991) 1 Cal.App.4th 1013, 1025, 2 Cal. Rptr.2d 648.) But, "[w]hile all citizens are entitled to equal protection, the standard of review to be employed in analyzing legislation which singles out a particular group does depend on whether the group is classified as `suspect,' as well as whether the legislation impinges upon a fundamental right. If a suspect class or fundamental right is involved, the court examines legislation under the `strict scrutiny' standard; otherwise, a `rational basis' test is generally employed. [Citation.]" (Citizens for Responsible Behavior v. Superior Court, supra, 1 Cal.App.4th at p. 1025, 2 Cal.Rptr.2d 648.) Having concluded respondents are not seeking to exercise a fundamental right, we are therefore called upon to decide whether sexual orientation *711 is a suspect classification for purposes of equal protection analysis. Unfortunately, prior case law does not provide a ready answer.
Lower federal courts have held that sexual orientation does not constitute a suspect or quasi-suspect classification. (E.g., Holmes v. California Army Natl. Guard, supra, 124 F.3d at p. 1132; High Tech Gays v. Defense Industrial Security Clearance Office (9th Cir.1990) 895 F.2d 563, 571; Padula v. Webster (D.C.Cir.1987) 822 F.2d 97, 102-103.) However, these decisions generally relied on the United States Supreme Court's now-disfavored decision in Bowers v. Hardwick, supra, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140, overruled in Lawrence v. Texas, supra, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508. In Bowers, the Supreme Court concluded there was no fundamental right, protected by substantive due process, to engage in homosexual sodomy. (Bowers v. Hardwick, supra, 478 U.S. at pp. 190-192, 106 S.Ct. 2841.) The Ninth Circuit Court of Appeals reasoned that this holding foreclosed heightened protection for homosexuals under the equal protection clause: "[B]y the [Bowers v.] Hardwick majority holding that the Constitution confers no fundamental right upon homosexuals to engage in sodomy, and because homosexual conduct can thus be criminalized, homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes. [Citations.]" (High Tech Gays v. Defense Industrial Security Clearance Office, supra, 895 F.2d at p. 571; see also Padula v. Webster, supra, 822 F.2d at p. 103 ["If the Court was unwilling to object to state laws that criminalize the behavior that defines the class, it is hardly open to a lower court to conclude that state sponsored discrimination against the class is invidious. After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal"].)
In 2003, however, the United State Supreme Court destroyed the foundation of these arguments when it overturned its 17-year-old decision in Bowers. Noting that the Bowers court had failed to appreciate the liberty interest at stake and had demeaned this interest by framing it only as a right to engage in certain sexual conduct, the Supreme Court held "Bowers was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent." (Lawrence v. Texas, supra, 539 U.S. at pp. 566-567, 578, 123 S.Ct. 2472.) The court also explained it was reexamining Bowers because of the stigma the decision had perpetuated against homosexuals: "When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres. . . . [Bowers's] continuance as precedent demeans the lives of homosexual persons." (Lawrence v. Texas, supra, 539 U.S. at p. 575, 123 S.Ct. 2472.)
Despite this forceful repudiation of Bowers, the Lawrence court did not apply strict scrutiny to Texas's antisodomy law. (See Lawrence v. Texas, supra, 539 U.S. at p. 578, 123 S.Ct. 2472 [stating the statute "furthers no legitimate state interest"].) Similarly, Justice O'Connor's concurrence concluded the law was invalid under the "more searching form of rational basis review" the court applies to laws that are designed to harm a politically unpopular group.[24] (Lawrence v. Texas, supra, 539 *712 U.S. at p. 580, 123 S.Ct. 2472 (conc. opn. of O'Connor, J.); see also Romer v. Evans (1996) 517 U.S. 620, 632-633, 116 S.Ct. 1620, 134 L.Ed.2d 855 [invalidating under rational basis review a state constitutional amendment that prohibited any legislative, executive or judicial action designed to protect homosexuals].)[25] Moreover, the Lawrence majority specifically disclaimed an intention to comment on the constitutionality of laws prohibiting same-sex marriage. (Lawrence v. Texas, supra, 539 U.S. at p. 578, 123 S.Ct. 2472 [noting the case before it did not involve "whether the government must give formal recognition to any relationship that homosexual persons seek to enter"]; see also id. at p. 585, 123 S.Ct. 2472 (conc. opn. of O'Connor, J.) [noting invalidation of the antisodomy law "does not mean that other laws distinguishing between heterosexuals and homosexuals would similarly fail under rational basis review," and suggesting one legitimate state interest for such laws could be "preserving the traditional institution of marriage"]; but see id. at pp. 601, 604-605, 123 S.Ct. 2472 (dis. opn. of Scalia, J.) [arguing the majority's insufficiently deferential application of rational basis review portends the ultimate invalidation of state laws limiting marriage to opposite-sex couples].)
Lower courts have not seized on Lawrence as authority for imposing heightened scrutiny on laws that classify based on sexual orientation. (See, e.g., In re Kandu, supra, 315 B.R. at pp. 143-144 [noting that, while Lawrence "may indicate a shift in the Supreme Court's treatment of same-sex couples," it did not disturb Ninth Circuit precedent holding homosexuals are not a suspect or quasi-suspect class]; see also People v. Limon (2005) 280 Kan. 275, 122 P.3d 22, 29-30 [rejecting argument that Lawrence required heightened scrutiny and applying rational basis test to "Romeo and Juliet" statute that reduced penalties only for heterosexual sex with a minor].) Respondents have alerted us to no decision applying strict scrutiny to a classification based on sexual orientation, and the dissent has identified only one appellate opinion suggesting homosexuals belong to a suspect class. (See Tanner v. Oregon Health Sciences University (1998) 157 Or.App. 502, 971 P.2d 435, 447 [holding nonmarried homosexual couples are a suspect class under the Oregon Constitution's privileges and immunities clause].)
California courts have not decided whether sexual orientation is a suspect classification under our state Constitution's equal protection clause. In Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra, 24 Cal.3d at p. 467, 156 Cal.Rptr. 14, 595 P.2d 592, the California Supreme Court held state and federal equal protection principles prohibit arbitrary discrimination "against any class of individuals in employment decisions," including gays and lesbians. However, this holding was based on the fundamental nature of the right to work and the arbitrariness of the employment policy at issue. (See id. at pp. 467-470, 156 Cal.Rptr. 14, 595 P.2d 592.) Although the court observed the homosexual *713 community's struggle for equal rights bears close resemblance to the civil rights struggles of African-Americans, women and other minorities (id. at p. 488, 156 Cal.Rptr. 14, 595 P.2d 592), its decision "did not establish homosexuality as a suspect class." (Hinman v. Department of Personnel Admin. (1985) 167 Cal.App.3d 516, 526, fn. 8, 213 Cal.Rptr. 410.) The question was also left unanswered in Citizens for Responsible Behavior v. Superior Court, supra, 1 Cal.App.4th at p. 1013, 2 Cal.Rptr.2d 648. Although the Court of Appeal invalidated a citizens' initiative that sought to repeal antidiscrimination laws pertaining to sexual orientation and HIV infection, it did so under the rational basis test and expressly declined to decide whether a form of heightened scrutiny should apply. (Id. at pp. 1025-1026 & fn. 8, 2 Cal.Rptr.2d 648.)[26]
For a statutory classification to be considered "suspect" for equal protection purposes, generally three requirements must be met. The defining characteristic must (1) be based upon "an immutable trait"; (2) "bear[] no relation to [a person's] ability to perform or contribute to society"; and (3) be associated with a "stigma of inferiority and second class citizenship," manifested by the group's history of legal and social disabilities. (Sail'er Inn, Inc. v. Kirby, supra, 5 Cal.3d at pp. 18-19, 95 Cal.Rptr. 329, 485 P.2d 529.) While the latter two requirements would seem to be readily satisfied in the case of gays and lesbians, the first is more controversial. (See, e.g., Ludwig, Protecting Laws Designed to Remedy Anti-Gay Discrimination from Equal Protection Challenges: The Desirability of Rational Basis Scrutiny (2006) 8 U. Pa. J. Const. L. 513, 552-553 [citing a CBS News/New York Times poll in which respondents were equally divided on the issue of "whether sexuality is a biology-based trait or a choice"]; see also Halley, Sexual Orientation and the Politics of Biology: A Critique of the Argument from Immutability, 46 Stan. L.Rev. 503, 563-567 [concluding advocates' reliance on biological immutability arguments may ultimately impede gay and lesbian rights].)[27] In any event, whether sexual orientation is immutable presents a factual question. The trial court did not conduct an evidentiary hearing, and there is no factual record addressing any of the three suspect classification factors. Nevertheless, despite the complete absence of evidence on these issues, the dissent is prepared to declare sexual orientation a suspect classification based on assertions made by the authors of law review articles and unrelated federal opinions. (Dis. opn. post, at pp. 753-755.) We are not. (Cf. Dean v. District of Columbia (D.C.1995) 653 A.2d 307, 356-357 (conc. & dis. opn. of Ferren, J.) [despite extensive *714 familiarity with relevant articles, a court should not resolve questions about the immutability of sexual orientation "without benefit of a trial record with the right kind of expert testimony, subject to cross-examination"].)
Lacking guidance from our Supreme Court or decisions from our sister Courts of Appeal, and lacking even a finding from the trial court on the issue, we decline to forge new ground in this case by declaring sexual orientation to be a suspect classification for purposes of equal protection analysis. Instead, we will follow the lead of the federal courts and other state courts and review the constitutionality of the marriage laws under the rational basis test. (See, e.g., Wilson v. Ake (M.D.Fla. 2005) 354 F.Supp.2d 1298, 1307-1308; In re Kandu, supra, 315 B.R. at pp. 143-144; Andersen v. King County, supra, 138 P.3d at pp. 973-977, 980-985; Hernandez v. Robles, supra, 805 N.Y.S.2d at pp. 360-361.)

D. The Marriage Laws Do Not Infringe Other Asserted Constitutional Rights.
Finally, we turn to two additional, somewhat contradictory, arguments respondents have raisedi.e., that the opposite-sex definition of marriage violates their constitutional rights to privacy and to freedom of expression.

1. Right of Privacy/Intimate Association
Unlike the federal Constitution, the California Constitution contains an explicit guarantee of the right of privacy. (Cal. Const., art. I, § 1; American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th at p. 326, 66 Cal.Rptr.2d 210, 940 P.2d 797.)[28] "[N]ot only is the state constitutional right of privacy embodied in explicit constitutional language not present in the federal Constitution, but past California cases establish that, in many contexts, the scope and application of the state constitutional right of privacy is broader and more protective of privacy than the federal constitutional right of privacy as interpreted by the federal courts. [Citations.]" (American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th at p. 326, 66 Cal.Rptr.2d 210, 940 P.2d 797.)
The Supreme Court has articulated three requirements necessary to support a constitutional invasion of privacy claim: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1, 39-40, 26 Cal.Rptr.2d 834, 865 P.2d 633.) The parties have differing views on each of these elements, but they particularly disagree about whether same-sex couples have a legally protected privacy interest that the state is intruding upon by refusing them permission to marry.
"Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information (`informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference (`autonomy privacy')." (Hill v. National Collegiate Athletic Assn., supra, 7 Cal.4th at p. 35, 26 Cal.Rptr.2d 834, 865 *715 P.2d 633.) Respondents are concerned here with the autonomy form of privacy or, perhaps more precisely stated, the freedom of intimate association. (See Warfield v. Peninsula Golf & Country Club (1995) 10 Cal.4th 594, 624-625, 42 Cal. Rptr.2d 50, 896 P.2d 776 [describing constitutional protection afforded to close family relationships]; see also Ortiz v. Los Angeles Police Relief Assn., supra, 98 Cal. App.4th at p. 1302, 120 Cal.Rptr.2d 670 [identifying intimate and expressive association as the two types of association protected under the constitutional right of free association].) "Courts have `repeated[ly] acknowledg[ed] . . . a "right of privacy" or "liberty" in matters related to marriage, family, and sex.' (People v. Belous [, supra,] 71 Cal.2d [at p.] 963[, 80 Cal.Rptr. 354, 458 P.2d 194]; accord, Committee to Defend Reproductive Rights v. Myers (1981) 29 Cal.3d 252, 275[, 172 Cal. Rptr. 866, 625 P.2d 779].)" (Ortiz v. Los Angeles Police Relief Assn., supra, 98 Cal. App.4th at p. 1303, 120 Cal.Rptr.2d 670; see also Griswold v. Connecticut (1965) 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 [describing the marital relationship as "a right of privacy older than the Bill of Rights"].) Similarly, the right to marry one's chosen partner is "virtually synonymous" with the right of intimate association. (Ortiz v. Los Angeles Police Relief Assn., supra, 98 Cal.App.4th at pp. 1303, 1306, 120 Cal.Rptr.2d 670.)
Relying on Lawrence v. Texas, supra, 539 U.S. 558, 123 S.Ct. 2472, respondents argue there is now an acknowledged constitutional right to intimate association with persons of the same sex. This is a fair reading of Lawrence. But the existence of a protected right of privacy in having intimate relations with a same-sex partner does not mean the right to marry, as it has traditionally been understood, must be expanded to encompass a constitutionally protected privacy interest in same-sex marriage. Lawrence addressed the most private of activities between consenting adults and held that states may not criminalize such highly intimate relations based on outdated notions of morality. (Lawrence v. Texas, supra, 539 U.S. at pp. 567, 571-572, 577-579, 123 S.Ct. 2472.) Marriage, however, is much more than a private relationship. To be valid in California, a civil marriage must be licensed and solemnized in some form of ceremony. (Fam.Code, § 306; Estate of DePasse, supra, 97 Cal.App.4th at pp. 103, 106, 118 Cal.Rptr.2d 143.) More importantly, marriage is revered as a public institution. (De Burgh v. De Burgh (1952) 39 Cal.2d 858, 863-864, 250 P.2d 598.) It is valued not just for the private commitment it fosters between the individuals who marry, but also for its public role in organizing fundamental aspects of our society. (See Maynard v. Hill (1888) 125 U.S. 190, 213, 8 S.Ct. 723, 31 L.Ed. 654 [describing marriage as "`not so much the result of private agreement as of public ordination. . . . It is a great public institution, giving character to our whole civil polity'"]; Elden v. Sheldon, supra, 46 Cal.3d at p. 275, 250 Cal.Rptr. 254, 758 P.2d 582 [stating "[t]he policy favoring marriage is `rooted in the necessity of providing an institutional basis for defining the fundamental relational rights and responsibilities of persons in organized society'"].)
Our dissenting colleague insists that respondents have a constitutionally protected privacy interest in marrying their same-sex partners yet pointedly ignores the reality that respondents have never enjoyed such a right before. This is not a case in which the state has taken away a person's right to get married (e.g., Zablocki v. Redhail, supra, 434 U.S. at pp. 381-382, 98 S.Ct. 673; Turner v. Safley, supra, 482 U.S. at pp. 95-96, 107 S.Ct. 2254) or criminalized certain private sexual *716 conduct (Lawrence v. Texas, supra, 539 U.S. at pp. 567, 571-572, 123 S.Ct. 2472); rather, this is a case in which people who have never had a legal right to marry each other argue that the institution unconstitutionally excludes them. Under these circumstances, the dissent's failure to explain precisely how the marriage laws intrude upon respondents' right to privacy and intimate association is a glaring omission.
Moreover, all of the California decisions the dissent cites addressing the right to "autonomy privacy" concern limits that the Constitution places on the government's ability to interfere into an individual's highly personal decisions or affairs. (See, e.g., American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th at pp. 332-334, 66 Cal.Rptr.2d 210, 940 P.2d 797 [holding autonomy privacy right protects decision whether to continue or terminate a pregnancy]; Hill v. National Collegiate Athletic Assn., supra, 7 Cal.4th at pp. 40-41, 26 Cal.Rptr.2d 834, 865 P.2d 633 [finding an autonomy privacy interest in freedom from observation of urination, "a function recognized by social norms as private"]; Ortiz v. Los Angeles Police Relief Assn., supra, 98 Cal.App.4th at pp. 1306-1307, 1312, 120 Cal.Rptr.2d 670 [concluding termination of employee due to her choice of spouse was an actionable invasion of privacy, but finding it justified by legitimate employer interests]; Leibert v. Transworld Systems, Inc. (1995) 32 Cal. App.4th 1693, 1702, 39 Cal.Rptr.2d 65 [rejecting argument that employee's harassment and discharge due to his sexual orientation infringed his right to autonomy privacy]; see also Tom v. City and County of San Francisco (2004) 120 Cal.App.4th 674, 680, 16 Cal.Rptr.3d 13 [finding an autonomy privacy interest "in choosing the persons with whom a person will reside, and in excluding others from one's private residence"].) Here, however, the State of California provides benefits for a relation-shipcivil marriageand respondents are seeking access to these benefits. The state is not interfering with how respondents conduct personal aspects of their lives; rather, by limiting marriage to opposite-sex couples, it is arguably affording its citizens unequal access to the tangible and intangible benefits marriage provides. This claim is most appropriately analyzedlike other unequal access claims under equal protection principles. Furthermore, by contorting these privacy holdings to fit same-sex marriage, the dissent stands the notion of "autonomy privacy" on its head: The right to be let alone from government interference is the polar opposite of insistence that the government acknowledge and regulate a particular relationship, and afford it rights and benefits that have historically been reserved for others.
The Constitution does not protect every conceivable claim for privacy. "`[N]ot every act which has some impact on personal privacy invokes the protections of [our Constitution]. . . . [A] court should not play the trump card of unconstitutionality to protect absolutely every assertion of individual privacy.' [Citation.]" (Hill v. National Collegiate Athletic Assn., supra, 7 Cal.4th at p. 37, 26 Cal.Rptr.2d 834, 865 P.2d 633.) Here, respondents have cited no authority showing the right to marry a same-sex partner has ever been recognized as a legally protected privacy interest. We must interpret and apply the right of privacy consistent with the intent of California voters who added this right to our state Constitution. (Id. at p. 16, 26 Cal. Rptr.2d 834, 865 P.2d 633.) The Supreme Court has observed that ballot arguments on this subject referred to "the federal constitutional tradition of safeguarding certain intimate and personal decisions from government interference in the form of penal and regulatory laws" but did not *717 "purport to create any unbridled right of personal freedom of action." (Id. at p. 36, 26 Cal.Rptr.2d 834, 865 P.2d 633; Leibert v. Transworld Systems, Inc., supra, 32 Cal.App.4th at p. 1702, 39 Cal.Rptr.2d 65.) Because same-sex marriage has not been regarded as a right of any kind under the federal Constitution or state statutes or common law (see Hill v. National Collegiate Athletic Assn., supra, 7 Cal.4th at p. 16, 26 Cal.Rptr.2d 834, 865 P.2d 633 [describing legal sources of privacy rights when voters added privacy to the Constitution]), it would be inconsistent with voters' intent to expand our constitutional privacy right to encompass it. Just as the lack of any prior legal recognition of same-sex marriage prevented us from finding it to be a fundamental right, the lack of any precedent for same-sex marriage precludes us from finding it to concern a legally protected privacy interest.
The dissent suggests we have somehow abdicated our responsibility to address respondents' privacy claim. Not so. Respondents' briefing on privacy was often cursory and sometimes completely absent. Much of the parties,' and our, discussion of issues raised in the dissent proceeds under the rubric of a fundamental rights analysis. The dissent often conflates the fundamental right issue with privacy, following the style of some federal opinions, but nothing obligates the majority to adopt the same approach  especially where the parties have not done so. To the extent a substantial privacy argument has been raised, it has been raised by the dissent.

2. Right of Free Expression
The marriage laws do not interfere with the ability of individuals in this state to enter intimate relationships with persons of their choosing, regardless of gender. The laws do not proscribe any form of intimate conduct between same-sex partners. Nor do they prevent same-sex couples from associating with each other or from publicly expressing their mutual commitment through some form of ceremony. Indeed, California provides formal recognition to same-sex relationships in the Domestic Partner Act. (Fam.Code, § 297 et seq.) What the marriage statutes prohibit, however, is the state's recognition of same-sex relationships as "marriage." Although there are expressive aspects to it, entering a marriage is obviously something much more than a communicative act. If the state has legitimate reasons for limiting marriage to opposite  sex couples, then the unavailability for same-sex couples of this one form of expressing commitment  when all other expressions remain availabledoes not rise to the level of a constitutional violation.
The dissent argues the state is constitutionally required to change the traditional definition of marriage in order to afford same-sex couples access to this particular form of expression. (Dis. opn. post, at p. 736.) Contrary to the dissent's suggestion, the holding in Turner v. Safley, supra, 482 U.S. at pages 94-95, 107 S.Ct. 2254 was not based upon prisoners' First Amendment rights to free expression. We are aware of no constitutional jurisprudence that would require states to make a particular mode of expressive conduct available to all citizens.

IV. The Marriage Laws Withstand Rational Basis Review
Because we have concluded the marriage statutes do not abridge a fundamental right or involve a suspect classification, we review them under the "rational basis" test. (Warden v. State Bar, supra, 21 Cal.4th at p. 644, 88 Cal.Rptr.2d 283, 982 P.2d 154; Hardy v. Stumpf, supra, 21 Cal.3d at p. 8, 145 Cal.Rptr. 176, 576 P.2d 1342.) As noted, rational basis review is *718 extremely deferential: "It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and `requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose.' [Citation.]" (D'Amico v. Board of Medical Examiners, supra, 11 Cal.3d at p. 16, 112 Cal.Rptr. 786, 520 P.2d 10.) Under this standard of review, we must uphold the challenged law "`if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. [Citations.] Where there are "plausible reasons" for [the classification] "our inquiry is at an end."' [Citations.]" (Warden v. State Bar, supra, 21 Cal.4th at p. 644, 88 Cal.Rptr.2d 283, 982 P.2d 154.) Moreover, the state is under no obligation to produce evidence supporting the rationality of a classification. (Heller v. Doe (1993) 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257.) "`[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.' [Citations.]" (Warden v. State Bar, supra, 21 Cal.4th at p. 650, 88 Cal. Rptr.2d 283, 982 P.2d 154.) So long as the asserted state interest is a reasonably conceivable justification for the law, "rather than [a] `fictitious purpose[] that could not have been within the contemplation of the Legislature'" (id. at p. 649, 88 Cal.Rptr.2d 283, 982 P.2d 154), "`[i]t is . . . "constitutionally irrelevant whether [the] reasoning in fact underlay the legislative decision"' [citation] or whether the `conceived reason for the challenged distinction actually motivated the legislature.' [Citation.]" (Id. at p. 650, 88 Cal.Rptr.2d 283, 982 P.2d 154; see also People v. Hofsheier (2006) 37 Cal.4th 1185, 1202, 39 Cal.Rptr.3d 821, 129 P.3d 29; City and County of San Francisco v. Flying Dutchman Park, Inc. (2004) 122 Cal.App.4th 74, 83, 18 Cal.Rptr.3d 532.) As challengers of the marriage laws, respondents bear the burden of demonstrating their constitutional invalidity under the rational basis test. (D'Amico v. Board of Medical Examiners, supra, 11 Cal.3d at p. 17, 112 Cal.Rptr. 786, 520 P.2d 10.)
Under the rational basis test, then, we must decide whether the opposite-sex definition of marriage furthers a legitimate state interest. (D'Amico v. Board of Medical Examiners, supra, 11 Cal.3d at p. 16, 112 Cal.Rptr. 786, 520 P.2d 10.) The dissent misapprehends the rational basis testand the judicial functionwhen it criticizes us for undertaking "no serious inquiry" into the nature of the interests supporting and served by marriage. (Dis. opn. post, at p. 746.) The dissent argues that these interests apply equally to same-sex couples, and so advocates that the state extend marriage to them. But the court's role is not to look at interests served by an institution to see if it makes sense to expand the institution. That is policymaking. In reviewing the constitutionality of a statute, a court asks only whether valid state interests are served by limits the state has placed on the activity. Our task is to decide whether the challenged limit is constitutional, not whether state policies would be better served by removing the restriction.

A. State's Interest in Preserving the Traditional Definition of Marriage Is Legitimate
The Attorney General urges us to take a broad view and consider the availability of domestic partnership laws when we assess the constitutionality of laws restricting marriage to opposite-sex couples. He argues the state has a legitimate interest in "maintaining the understanding of marriage *719 that has always existed in California, while declaring that registered domestic partners shall have the same rights, protections and benefits as spouses." Under rational basis review, it is appropriate for us to consider other relevant laws concerning the rights of same-sex couples, such as the Domestic Partner Act. (See Brown v. Merlo (1973) 8 Cal.3d 855, 862, 106 Cal. Rptr. 388, 506 P.2d 212 [analysis of constitutional validity need not be confined to the four corners of the challenged statute].)
In recent years, the Legislature has worked consistently to expand the legal rights of same-sex domestic partners. (Bouley v. Long Beach Memorial Medical Center, supra, 127 Cal.App.4th at p. 609, 25 Cal.Rptr.3d 813.) Through the Domestic Partner Act, California provides one of the most comprehensive systems of rights and benefits for same-sex couples in the country. The Domestic Partner Act gives couples who register as domestic partners substantially "the same rights, protections and benefits" as married spouses, and imposes upon them "the same responsibilities, obligations and duties under law" as are imposed on married couples. (Fam. Code, § 297.5, subd. (a); Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at pp. 837-838, 31 Cal.Rptr.3d 565, 115 P.3d 1212.) Indeed, the California Legislature has granted same-sex domestic partners virtually all of the same rights married couples enjoy to the extent it may do so without running afoul of federal law.[29] Despite the differences focused on by respondents and the dissent, our Supreme Court has concluded that, in the Domestic Partner Act, "the Legislature has granted legal recognition comparable to marriage both procedurally and in terms of the substantive rights and obligations granted to and imposed upon the partners, which are supported by policy considerations similar to those that favor marriage. [Citation.]" (Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at p. 845, 31 Cal.Rptr.3d 565, 115 P.3d 1212, italics added.) "Additionally, the Legislature has made it abundantly clear that an important goal of the Domestic Partner Act is to create substantial legal equality between domestic partners and spouses." (Ibid.)
Ignoring legislative declarations in the Domestic Partner Act, and our high court's interpretation of its purpose, the dissent accuses the Act of "stigmatiz[ing] homosexual unions" and insists the "most powerful message" conveyed by a domestic partnership is the couple's "inferior status." (Dis. opn. post, at pp. 761, 760.) We doubt our colleague truly believes that, absent marriage vows, gay and lesbian couples are incapable of creating any meaning for their partnerships beyond oppression and subjugation.[30] In any event, *720 however one regards the symbolic value of domestic partnership, the increase in tangible rights and protections the Domestic Partner Act gives to registered couples cannot be denied.
At the same time, in Family Code sections 300 and 308.5, the Legislature has preserved the traditional definition of marriage. Since our Constitution was enacted, "marriage" has referred to the legal union between a man and a woman. (See, e.g., Murphy v. Ramsey (1885) 114 U.S. 15, 45, 5 S.Ct. 747, 29 L.Ed. 47 [describing "the union for life of one man and one woman in the holy estate of matrimony" as "the sure foundation of all that is stable and noble in our civilization"].) This traditional definition of marriage is echoed in federal law (1 U.S.C. § 7) and, currently, in the laws of every other state except Massachusetts. (See Goodridge v. Department of Public Health, supra, 798 N.E.2d at p. 965 [observing court's decision authorizing same-sex marriage "marks a significant change in the definition of marriage as it has been inherited from the common law and understood by many societies for centuries"].)
Certainly, the state has a strong interest in promoting marriage. (See, e.g., Elden v. Sheldon, supra, 46 Cal.3d at p. 275, 250 Cal.Rptr. 254, 758 P.2d 582 [explaining this policy is based on the institutional function marriage serves in defining social roles and responsibilities].) This same interest in supporting stable family relationships is served by the Legislature's expansion of domestic partnership rights. "[T]he Legislature was entitled to conclude that enactment of a statute encouraging same-sex couples to register as domestic partners is beneficial to society in the same way as is encouraging heterosexual couples to marry. It provides an institutional basis for defining their fundamental rights and responsibilities, which is essential to an organized and civilized society and to promote family stability." (Knight v. Superior Court, supra, 128 Cal.App.4th at p. 29, 26 Cal.Rptr.3d 687; see also Bouley v. Long Beach Memorial Medical Center, supra, 127 Cal.App.4th at p. 611, 25 Cal.Rptr.3d 813 [identifying a "significant public interest," comparable to the interest supporting marriage, in "promoting stable families and individual rights and responsibilities through the extension of rights to domestic partners"].) The state policy favoring domestic partnerships is thus similar to, and intertwined with, the policy favoring marriage. (See Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at pp. 845-847, 31 Cal.Rptr.3d 565, 115 P.3d 1212 [noting the policies both seek to promote and protect families].) If the Domestic Partner Act does not go far enough in serving this policy, the Legislature can amend the law, but it is not for the court to implement this change.
Under the highly deferential standard of review that applies, we believe it is rational for the Legislature to preserve the opposite-sex definition of marriage, which has existed throughout history and which continues to represent the common understanding of marriage in most other countries and states of our union, while at the same time providing equal rights and benefits to same-sex partners through a comprehensive *721 domestic partnership system. The state may legitimately support these parallel institutions while also acknowledging their differences.
Some respondents dismiss the state's interest in preserving the definition of marriage as the mere perpetuation of historical discrimination. "Certainly the fact alone that the discrimination has been sanctioned by the state for many years does not supply [a compelling] justification" for sustaining such discrimination. (Perez v. Sharp, supra, 32 Cal.2d at p. 727, 198 P.2d 17.) But this argument presupposes the existence of discrimination. Viewed in its entirety, California's system of marital and domestic partnership rights is not discriminatory. (See Brown v. Merlo, supra, 8 Cal.3d at p. 862, 106 Cal.Rptr. 388, 506 P.2d 212 [proper to consider other relevant laws].) The state provides equal rights and benefits to same-sex couples to the extent possible given conflicting federal law.[31] Moreover, we have concluded the marriage laws do not trigger strict scrutiny because they do not deprive individuals of a fundamental right and do not discriminate against a suspect class. Because the Perez court reached an opposite conclusion with respect to laws banning interracial marriage, it rejected the "history" justification for these laws in the context of applying strict scrutiny. (Perez v. Sharp, supra, 32 Cal.2d at pp. 719, 727, 198 P.2d 17.) Under rational basis review, we must view the Legislature's dual system of domestic partnership and marriage rights with much more deference. (See Heller v. Doe, supra, 509 U.S. at p. 319, 113 S.Ct. 2637 ["rational-basis review in equal protection analysis `is not a license for courts to judge the wisdom, fairness, or logic of legislative choices'"].)
The trial court minimized the state's interest in providing rights to same-sex couples through a parallel domestic partnership scheme, arguing the provision of "marriage-like rights without marriage . . . smacks of a concept long rejected by the courts: separate but equal." Likewise, the dissent maligns our reliance on the Domestic Partner Act as a return to the discredited reasoning of Plessy v. Ferguson (1896) 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256. (Dis. opn. post, at pp. 759-761.) In Brown v. Board of Education (1954) 347 U.S. 483, 493-495, 74 S.Ct. 686, 98 L.Ed. 873, the Supreme Court rejected Plessy's central justification for the Jim Crow laws, holding racially segregated public schools deprived minority children of equal protection even though the facilities provided were tangibly equal in all respects. Moreover, even before Brown was decided, our Supreme Court observed that the "separate but equal" jurisprudence justifying provision of racially segregated facilities was "clearly inapplicable to the right of an individual to marry." (Perez v. Sharp, supra, 32 Cal.2d at p. 717, 198 P.2d 17.)
Once again, however, the facile comparison of California's marriage statutes to racial segregation is inappropriate. Analogizing the Domestic Partner Act to a "separate but equal" facility assumes the *722 existence of a constitutionally suspect classification. Brown and Perez addressed laws and policies designed to perpetuate racial segregation, and the courts reviewed these laws and policies with great suspicion. (Cf. Loving v. Virginia, supra, 388 U.S. at p. 11, 87 S.Ct. 1817 [racial classifications are "subjected to the `most rigid scrutiny'" in equal protection analysis].) Quite the opposite of the Jim Crow laws, the Domestic Partner Act was enacted not to perpetuate discrimination but to remedy it. Unlike the racial segregation regime ratified in Plessy, the Domestic Partner Act did not strip rights away from members of the minority group; rather, the Domestic Partner Act granted same-sex couples a panoply of rights and protections they had never previously enjoyed. (See Eskridge, Equality Practice: Civil Unions and the Future of Gay Rights, supra, pp. 139-145 [disputing the analogy of civil unions to racial apartheid and arguing civil unions are more like Brown than Plessy because they advance gay rights and promote liberal principles such as respect and tolerance].) Indeed, because registered domestic partners enjoy nearly all the same rights and responsibilities as married couples, to the extent California has the power to provide them, the quarrel here is largely symbolic, albeit highly significant. Respondents and the dissent stress the importance of this symbol. (Dis. opn. post, at pp. 759-761.) Of course, we agree marriage has extraordinary symbolic significance. This is all the more reason why a court should not impose drastic changes on the institution in the absence of a clear constitutional violation. Notwithstanding any "separate but equal" rhetoric, the substantial equality afforded to same-sex relationships by the Domestic Partner Act stands in stark contrast to the gross inequality that was imposed on racial minorities under Plessy.
We are not dealing with a suspect classification such as race. Therefore, under the correct legal standard (rational basis review), we must uphold the opposite-sex requirement for marriage if it is supported by any plausible reason. (Warden v. State Bar, supra, 21 Cal.4th at p. 644, 88 Cal. Rptr.2d 283, 982 P.2d 154.) Unlike strict scrutiny, it is permissible under rational basis review for the Legislature to apply a piecemeal approach to providing rights or attacking social ills. (Warden v. State Bar, supra, 21 Cal.4th at p. 649, 88 Cal. Rptr.2d 283, 982 P.2d 154; cf. McLaughlin v. Florida (1964) 379 U.S. 184, 194, 85 S.Ct. 283, 13 L.Ed.2d 222 [holding "legislative discretion to employ [a] piecemeal approach stops short" of justifying racial classifications].)[32] In the context of rational basis review, "`[c]ountless constitutional precedents establish . . . that the equal protection clause does not prohibit [the state] from implementing a reform measure "one step at a time" [citation]. . . .' [Citation.]" (Warden v. State Bar, supra, 21 Cal.4th at p. 649, 88 Cal. Rptr.2d 283, 982 P.2d 154.)
The trial court suggested the Legislature's provision of domestic partnership rights for same-sex couples is irrelevant, stating: "The issue is not whether such a system is `irrational.' . . . The issue under the rational basis test in this case is whether there is a legitimate governmental purpose for denying same-sex couples the last step in the equation: the right to marriage itself." With all due respect, what the *723 trial court described is not a rational basis analysis. Rational basis review starts with a presumption that distinctions drawn in a statute are constitutional. (Heller v. Doe, supra, 509 U.S. at p. 320, 113 S.Ct. 2637; Warden v. State Bar, supra, 21 Cal.4th at p. 641, 88 Cal.Rptr.2d 283, 982 P.2d 154; see also Legislature v. Eu (1991) 54 Cal.3d 492, 501, 286 Cal.Rptr. 283, 816 P.2d 1309 [measures passed by initiative are presumed valid and "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears"].) While we must probe the relationship between the statutory distinction and the asserted state interest (People v. Hofsheier, supra, 37 Cal.4th at pp. 1201, 1203, 39 Cal.Rptr.3d 821, 129 P.3d 29; Young v. Haines (1986) 41 Cal.3d 883, 900, 226 Cal.Rptr. 547, 718 P.2d 909), rational basis review does not permit us to assume that a group is being "den[ied]" a "right" and demand justification for the group's inferior treatment. If "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not," a statutory classification benefiting the first group is not discriminatory under rational basis review. (Johnson v. Robison (1974) 415 U.S. 361, 383, 94 S.Ct. 1160, 39 L.Ed.2d 389 [rational basis supported classification providing educational benefit to veterans but not conscientious objectors]; see also Romer v. Evans, supra, 517 U.S. at p. 632, 116 S.Ct. 1620 [under rational basis review, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous"].)
Here, the opposite-sex requirement in the marriage statutes is rationally related to the state's interest in preserving the institution of marriage in its historical opposite-sex form, while also providing comparable rights to same-sex couples through domestic partnership laws. The same-sex requirement for couples under age 62 who register as domestic partners (Fam.Code, § 297, subd. (b)(5)) could be likewise justified by the state's interest in providing rights to committed couples through this dual system. Contrary to the trial court's assertion, the question for purposes of rational basis review is indeed whether this system is irrational. We conclude it is not. (See Lawrence v. Texas, supra, 539 U.S. at p. 585, 123 S.Ct. 2472 (conc. opn. of O'Connor, J.) [stating in dicta that "preserving the traditional institution of marriage" is a legitimate state interest].)
Setting aside charges of discrimination, respondents also dispute the legitimacy of the state's interest in preserving tradition. The City labels this a "`status quo' justification" and asserts, "Nothing could be more arbitrary than to uphold a law simply because it is the law and always has been." Marriage is more than a "law," of course; it is a social institution of profound significance to the citizens of this state, many of whom have expressed strong resistance to the idea of changing its historically opposite-sex nature.[33] We cannot say the *724 state's interest in continuing this institution in the form it has always taken, and continues to take across the country, is so unreasonable that the marriage laws must be stricken under rational basis review. Given that the state affords same-sex couples "legal recognition comparable to marriage" (Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at p. 845, 31 Cal.Rptr.3d 565, 115 P.3d 1212) through the domestic partnership laws, the state's reliance on the history and tradition of opposite-sex marriage, and the common understanding of most citizens, does not appear to be a smokescreen hiding a discriminatory intent.

B. State's Interest in Carrying Out the Will of Its Citizens Is Legitimate
In addition to tradition, the Attorney General argues the marriage laws are justified by a related state interest in carrying out the expressed wishes of a majority of Californians. In 2000, voters in this state passed Proposition 22, enacting a law that provides only a marriage between a man and a woman is valid or recognized in California. (Fam.Code, § 308.5.) Regardless of whether this initiative should be interpreted to pertain to all marriages or only those entered outside California (see ante, at pp. 693-694), the citizens who voted for Proposition 22 unquestionably expressed a desire to limit recognition of same-sex partnerships as marriage in this state. Meanwhile, the citizens' elected representatives in the Legislature have found that the public policy of this state supports providing equal rights and opportunities for gay and lesbian families. (See Stats.2003, ch. 421, § 1, subd. (b) [finding that expanding the rights and responsibilities of registered domestic partners furthers California's interest in promoting and protecting stable family relationships]; see also Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at p. 847, 31 Cal.Rptr.3d 565, 115 P.3d 1212 [public policy favoring domestic partnerships, like policy favoring marriage, "seeks to promote and protect families as well as reduce discrimination based on gender and sexual orientation"].) Thus, the Legislature has enacted sweeping domestic partnership laws to provide substantially the same rights as marriage to committed same-sex couples. By maintaining the traditional definition of marriage while simultaneously granting legal recognition and expanded rights to same-sex relationships, the Legislature has struck a careful balance to satisfy the diverse needs and desires of Californians.
Of course, the mere fact that a majority wishes it so cannot save an otherwise unconstitutional law. Majoritarian whims or prejudices will never be sufficient to sustain a law that deprives individuals of a *725 fundamental right or discriminates against a suspect class. (See Bixby v. Pierno (1971) 4 Cal.3d 130, 141, 93 Cal.Rptr. 234, 481 P.2d 242 [it is a solemn duty of the courts "to preserve constitutional rights, whether of individual or minority, from obliteration by the majority"].) But, in reviewing a challenged law under the rational basis test, we must give due deference to the Legislature's considered judgment. (See Pacific Legal Foundation v. Brown (1981) 29 Cal.3d 168, 180, 172 Cal. Rptr. 487, 624 P.2d 1215; Schettler v. County of Santa Clara (1977) 74 Cal. App.3d 990, 999, 141 Cal.Rptr. 731 ["where, as here, the findings of the Legislature have a reasonable basis, the question of what constitutes a legitimate public purpose or public policy is largely one for the Legislature which may not be second-guessed, much less disturbed by the reviewing court"].) It is the proper role of the Legislature, not the court, to fashion laws that serve competing public policies. "The legislative process involves setting priorities, making difficult decisions, making imperfect decisions and approaching problems incrementally, and rational basis analysis does not require that a legislature take the ideal or best approach [citations]." (Hernandez v. Robles, supra, 26 A.D.3d at p. 106, 805 N.Y.S.2d 354.)[34]
Like Justice Sosman in Massachusetts, we "fully appreciate the strength of the temptation to find [the marriage laws] unconstitutional." (Goodridge v. Department of Public Health, supra, 798 N.E.2d at p. 982 (dis. opn. of Sosman, J.).) Gay and lesbian couples canand doform committed, lasting relationships that compare favorably with any traditional marriage. Many same-sex couples have also devoted themselves to raising children, and these families are equally worthy of protection. (See Sharon S. v. Superior Court, supra, 31 Cal.4th at pp. 437-440, 2 Cal.Rptr.3d 699, 73 P.3d 554.) But, absent infringement of a constitutional right, it is not for us to say the state must allow these couples to marry.
The Legislature and the voters of this state have determined that "marriage" in California is an institution reserved for opposite-sex couples, and it makes no difference whether we agree with their reasoning. We may not strike down a law simply because we think it unwise or because we believe there is a fairer way of dealing with the problem. (Fein v. Permanente Medical Group (1985) 38 Cal.3d 137, 163, 211 Cal.Rptr. 368, 695 P.2d 665; see also California Federation of Teachers v. Oxnard Elementary Sch. (1969) 272 Cal. App.2d 514, 535, 77 Cal.Rptr. 497 ["It is not the duty of the courts to evaluate the wisdom of specific legislation"].) Respect for the considered judgment of the Legislature and the voters is especially warranted where the issue is so controversial and divisive as is the question whether gays and lesbians should be permitted to marry their same-sex partners. "It is not the judiciary's function to reorder competing societal interests which have already been ordered by the Legislature. [Citation.]" (University of Southern California v. Superior Court (1996) 45 Cal.App.4th 1283, 1289, 53 Cal.Rptr.2d 260; cf. Goodridge v. Department of Public Health, supra, 798 N.E.2d at p. 982 (dis. opn. of Sosman, J.) *726 [great controversy and publicity surrounding same-sex marriage issue "make it all the more imperative that we adhere precisely and scrupulously to the established guideposts of our constitutional jurisprudence," including the extreme deference accorded to legislative justifications under the rational basis test].)[35]
The trial court's decision, although purporting to apply rational basis review, essentially redefined marriage to encompass unions that have never before been considered as such in this state. Laudable as the trial court's intentions may have been, it is beyond the judiciary's realm of authority to redefine a statute or to confer a new right where none previously existed. "While courts have the authority to recognize rights supported by the Constitution, the creation of new and unique rights is more properly reserved for the people through the legislative process." (In re Kandu, supra, 315 B.R. at p. 145.) In the final analysis, the court is not in the business of defining marriage. The Legislature has control of the subject of marriage, subject only to initiatives passed by the voters and constitutional restrictions. (Lockyer, supra, 33 Cal.4th at p. 1074, 17 Cal.Rptr.3d 225, 95 P.3d 459; Estate of DePasse, supra, 97 Cal.App.4th at p. 99, 118 Cal.Rptr.2d 143.) If marriage is to be extended to same-sex couples, this change must come from the peopleeither directly, through a voter initiative, or through their elected representatives in the Legislature.[36]
Having concluded the interests articulated by the state are legitimate and are advanced by the statutory limitation of marriage to opposite-sex couples, we need not consider the legitimacy of additional interests posited by other appellants and amici curiae.

DISPOSITION
For the reasons discussed herein, the judgments in CCSF, Woo, Tyler and Clinton *727 are reversed. The judgments against CCF and the Fund in Thomasson (denoted Campaign for California Families v. Newsom on appeal) and Proposition 22 are affirmed on the ground that the cases do not present justiciable controversies. All parties shall bear their own costs on appeal.
PARRILLI, J., concur.
PARRILLI, J. concurring.
With complete respect to my colleagues, I join in the opinion of Justice McGuiness and write separately only to address what are more philosophical questions presented by the challenging legal issues before us.
In my view, this case is about two things: Who gets to define what marriage is, and an uncomfortable intersection of law, culture, and religion. The court must confine itself to the former question; it is not in a position to resolve the latter issue, though it must be conscious of the dynamic.
I also write separately to identify a major difficulty with all attempts at reasoned dialogue about this subject. There is a legitimate and meaningful disagreement in this country, and in many places around the world today, about what marriage is and should be.[1] Over the last 30 years we have seen a gradual reconfiguration of family; emerging models of family exist alongside traditional models. We have also witnessed an expansion of personal freedom to express who one really is that is desirable if each person is to become who he or she was created to be. The roots of the disagreement over what marriage should be necessarily intertwine cultural, societal, and religious ideas. There is a great tendency, out of zeal to eliminate genuine inequities, to be swayed emotionally and to overreach in applying legal principles. My colleague has done so in his dissent. Justice Kline writes passionately of the "profound nature of the liberty interest" at stake (dis. opn., post at p. 762) and of "autonomy privacy," (dis. opn., post at pp. 736, 745) but does not cite a single case where the asserted liberty or privacy interest has been identified as he would have us recognize. Most of the cases he relies upon are cases where the rights at issue have been discussed in the context of marriage as it has been understood historically, or in situations that criminalize acts of sexual intimacy. In the end the dissent advocates, from cases that do not lead inexorably to such a result, the existence of a fundamental right to participate in an institution that as historically defined excludes such individuals. And to suggest the majority's description and discussion of the California Domestic Partner Rights and Responsibilities Act of 2003 (DPA) (Family Code § 297 et seq.) is like the "`separate but equal' institution analysis" used in earlier United State Supreme Court cases (dis. opn., post, at p. 761) reflects but one example of the way passion can obscure understanding.
The DPA represents a legitimate effort by the Legislature to afford same-sex couples many of the rights and responsibilities currently attached to marriage, but is distinct from marriage. (Knight v. Superior Court (2005) 128 Cal.App.4th 14, 26 Cal.Rptr.3d 687.) The DPA seems to recognize that at this stage, we do not know *728 whether the state must name and privilege same-sex unions in exactly the same way traditional marriages are supported. The nuance at this moment in history is that the institution (marriage) and emerging institution (same-sex partnerships)[2] are distinct and, we hope, equal. We hope they are equal because of the great consequences attached to each. Childrearing and passing on culture and traditions are potential consequences of each. To the degree that any committed relationship provides love and security, encourages fidelity, and creates a supportive environment for children it is entitled to respect. Whether it must be called the same, or supported by the state as equal to the traditional model, only time and patient attention to the models at issue will tell. And whether it applies in every marriage or not, marriage has historically stood for the principle that men and women who may, without planning or intending to do so, give life to a child should raise that child in a bonded, cooperative, and enduring relationship. Obviously, that ideal is far from universally achieved. But to define marriage, as the Family Code does, in a way which recognizes that function of the institution is hardly irrational. Nor is it irrational to admit that wherever children are being raised, their adult providers are performing a public service the community would otherwise have to undertake. The DPA seeks to recognize and protect these partnerships, in no small part, for the sake of the children involved. (See Historical and Statutory Notes, 29C West's Ann. Fam.Code (2004 ed.) foll. § 297, p. 142 [legislative intent].)
The forms marriages can take have changed over the centuries, and will continue to change if history is a reliable teacher. It seems rational that allowing more people to participate in the institution of marriage would only strengthen that institution, not diminish it. Loving covenant relationships encourage stability and mirror the Divine-human relationship of some religious traditions. Seemingly, it would be wise to encourage such formal commitment, especially where children and families are involved.
It is the legitimate business of the Legislature to attempt to close the distance between the parallel institutions (marriage and same-sex committed domestic partnerships) as they develop, and to address such concerns. The "public square" and the Legislature are the appropriate places within a democracy for the debate to fully develop and the evidence to be collected. When and if the Legislature, or the People through the initiative process, provide civil marriage to same-sex couples, we will be called upon to decide legal questions that emerge. Even though equity may favor recognizing such unions equally, it does not follow that courts are free to redefine how marriage has been historically understood under the guise of discovering a fundamental right to marry a person of the same sex. We would essentially have to conclude, as the dissent implies, that an undetected right to marry a member of the same sex has always existed under our state constitution. There is nothing in law or logic that compels such a conclusion.[3] *729 Of course, the arguments for and against the ascertainment of a "fundamental right" become circular when we start from a definition of marriage that presupposes and requires members of the opposite sex and moves inexorably to excluding same-sex couples from participating by definition. Yet, a common understanding and meaning of the word "marriage," or the term "to marry," is required before the word, and the institution, can be discussed intelligently. Or we must admit we are redefining the historical understanding to accommodate this discussion and the cultural developments that precipitated it. Words do matter and there is much in favor of using terms that differentiate to describe biologically different models.
A danger revealed through this debate is that the state has necessarily involved itself in a venture that combines civic process with religious symbolism. (Dis. opn., post at pp. 746-748.) When referring to a civil marriage, we speak of the "sacred" institution, the "spiritual meaning" and the "reverence" accorded to married status, yet avow that the state must remain separated from furthering any particular religious ideation and tradition, and that the institution we deal with is civil in nature. The often unspoken, but underlying, assumption about the current definition of marriage is that it comes from religious tradition. (Dis. opn., post, at p. 747.) Similarly, the opposition to same-sex partnerships comes from biblical language and religious doctrine.[4] This reality is nothing to avoid, and we must acknowledge it if we are to proceed honestly. Humanity did not simply arrive at a definition of marriage devoid of religious concepts informing and shaping that definition, or indeed, us as a people. If we conclude ultimately that marriage is an institution which cannot be separated from its religious history, we must examine whether in an increasingly pluralistic and secular society it can endure as a civic institution.[5] (Miller, Letting Go of a National Religion: Why the *730 State Should Relinquish All Control Over Marriage (2005) 38 Loy. L.A. L.Rev. 2185.) But it seems to me we cannot have it both ways. We say the state must not promote a particular religious viewpoint or establish religion, and then we watch it simultaneously enmesh itself with religious tradition, terminology, and teaching. As the dissent observes, the amici curiae briefs in this case report that some religious denominations that wish to solemnize marriages for same-sex couples are prevented from doing so by the current law; however, other amici curiae argue on behalf of religious denominations against same-sex marriages.[6] The parties to this litigation have not presented those issues directly, but to the degree the issue has been articulated it presents legitimate concern and reflects yet another matter better suited to legislative consideration and public debate.
We are now in the midst of a definitional process that will affect how the citizens of California go forward in the 21st century. The struggles gay men and lesbians have faced to become who they are individually is not to be understated. And though this record does not contain findings of fact nor evidence sufficient to support a conclusion one way or the other, if being gay or lesbian is an immutable trait or biologically determined, then we must conclude classification based on that status which deprives such persons of legitimate rights is suspect. Having endured the often long and difficult process of claiming their true identities, gay men and lesbians are now asking to be recognized as the equally loving and committed partners and capable family units they are, and to be afforded the same responsibilities and protections available to other families. The inequities of the current parallel institutions should not continue if one group of citizens is being denied state privileges and protections attendant to marriage because they were created with a sexual orientation different from the majority, if we are to remain faithful to our Constitution. Although we are being called upon to work together toward a mutual goal of liberty and justice, we must be careful about where the achievement comes from. If respect for the rule of law is to be maintained, courts must accept and abide by their limited powers. The Constitution is not some kind of "origami project"[7] to be twisted and reconfigured to accomplish ends better left to the democratic process. To those who are waiting for the rewards and responsibilities of marriage, this process will seem too slow; to those who feel the challenge to their "sacred" civic institutions and the likelihood of change, it will seem too fast. The courts must move only at the pace, and within the limits, the law permits.
Concurring and Dissenting opinion of *731 KLINE, J.[*]
I dissent from all portions of the majority opinion except the portion concluding that the Campaign for California Families (CCF) and the Proposition 22 Legal Defense and Education Fund (Fund) lack standing to pursue their purely declaratory relief claims, with which I concur.
As the majority rightly states, "whether California's marriage laws infringe upon a fundamental right depends almost entirely on how that right is defined." (Maj. opn., ante, at p. 699.) However, like the determination in Bowers v. Hardwick (1986) 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (Bowers) repudiated by the United States Supreme Court in Lawrence v. Texas (2003) 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (Lawrence), the conclusion my colleagues reach is preordained by a false premise. Respondents are no more asserting a "right to same-sex marriage" than the plaintiffs in Perez v. Sharp (1948) 32 Cal.2d 711, 198 P.2d 17 (Perez) and Loving v. Virginia (1967) 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (Loving), were asserting a right to interracial marriage; or the plaintiff in Bowers was asserting a constitutional right of homosexuals to engage in sodomy. Respondents do not seek the establishment of a "new" constitutional right to serve their special interests, but rather the application of an established right to marry a person of one's choice; a right available to all that government cannot significantly restrict in the absence of compelling need. As in Bowers, the majority's mischaracterization of the right asserted in this case "discloses the Court's own failure to appreciate the extent of the liberty at stake." (Lawrence, supra, 539 U.S. at pp. 566-567, 123 S.Ct. 2472.)
The question at the center of this case is whether the reasons the United States Supreme Court and the California Supreme Court have deemed marriage a fundamental constitutional right are as applicable to same-sex couples as to couples consisting of members of the opposite sex. The majority's indifference to those reasons effectively divests the marital relationship of its most constitutionally significant qualities and permits marriage to be defined instead by who it excludes. Though not its purpose, the inescapable effect of the analysis the majority adopts is to diminish the humanity of the lesbians and gay men whose rights are defeated. The right to marry is "of fundamental importance for all individuals." (Zablocki v. Redhail (1978) 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 618, italics added (Zablocki).) The exclusion of lesbians and gay men from this all-encompassing group denies them the individual autonomy and dignity that is embodied in the freedom to marry the person of one's choice and the reason the right is so highly protected.
The majority's validation of the state's restriction of the freedom of lesbians and gay men to choose whom to marry rests on three determinations: that the right respondents assert is not the fundamental right to marry; that classifications based on sexual orientation do not constitute a "suspect classification" for purposes of equal protection analysis; and that the ban on same-sex marriage survives rational basis review because, while maintaining the traditional definition of opposite-sex marriage, the state provides same-sex couples "equal rights and benefits . . . through a comprehensive domestic partnership system," and "[t]he state may legitimately support these parallel institutions while *732 also acknowledging their differences." (Maj. opn., ante, at pp. 720-721.)
The determinations that the fundamental right to marry is not at issue in this case and that the California Domestic Partner Rights and Responsibilities Act of 2003 (Fam.Code, § 297 et seq.) provides a rational basis upon which to uphold the traditional ban on same-sex marriage are, as I shall explain, unsupportable. As for the question whether sexual orientation is a suspect class for equal protection purposes, I acknowledge most courts have said it is not. However, sexual orientation satisfies the criteria our Supreme Court has used to determine whether a class is suspect.
Respondents' claim that the challenged statutes impose a discriminatory classification restricting their exercise of a substantial liberty rests on both article I, section 7 of the California Constitution, which guarantees equal protection of the law, and article I, section 1, which protects the right of privacy. Claiming privacy jurisprudence does not "fit" same-sex marriage, my colleagues say this case "is most appropriately analyzedlike other unequal access claimsunder equal protection principles." (Maj. opn., ante, at p. 716.) I see the matter a bit differently. The fact of unequal treatment is conceded by the state and is obvious, and I address the remaining equal protection issues (whether respondents are members of a suspect class and whether the restriction survives the appropriate level of judicial scrutiny). But I believe it most appropriate to focus judicial inquiry most sharply on respondents' privacy claim,[1] because privacy principles shed brightest light on what I consider the critical issue in this case, namely, whether the right respondents assert is a "novel" right designed specifically for gay men and lesbians, as appellants and my colleagues claim, or is instead a fundamental right available to all, as respondents maintain. If respondents are right about this, as I believe they are, it is irrelevant whether classifications based on sexual orientation are "suspect" for equal protection purposes, as the challenged restriction would be subject to strict scrutiny even if they are not, and the restriction clearly cannot survive such scrutiny.
Moreover, whether this case is viewed from the perspective of equal protection or that of the substantive due process that informs the right of privacy, the central question is the same: how much may be demanded of the state to justify its restriction of the right? Far from having separate missions and entailing different inquiries, substantive due process and equal protection are profoundly interlocked. (See, e.g., Zablocki, supra, 434 U.S. at pp. 391, 395, 98 S.Ct. 673 (dis. opn. of Stewart, J.) [stating that the majority's reliance on equal protection in striking a restriction on marriage is really "no more than substantive due process by another name"]; Lawrence, supra, 539 U.S. at p. 575, 123 S.Ct. 2472 ["Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests"].)
*733 Part I of this opinion describes the state constitutional right of privacy and its application to this case, part II explains why it is time to abandon the increasingly transparent pretext that sexual orientation is not a "suspect classification" for purposes of equal protection analysis, and part III explains why the challenged restriction has no rational basis, let alone a compelling justification.

I.

The State Constitutional Right of Privacy

A.

The Protection of Individual Autonomy and Personhood
Article I, section 1 of the California Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Italics added.) The only changes in this provision since its original adoption in 1849 were made in 1972. The word "people" was substituted for the original "men" and, much more significantly for our purposes, "privacy" was added to the list of protected rights.
The state constitutional right to privacy encompasses not just informational privacy but also "a variety of rights involving private choice in personal affairs." (Robbins v. Superior Court (1985) 38 Cal.3d 199, 212, 211 Cal.Rptr. 398, 695 P.2d 695.) This is clear not just from the case law (e.g., Committee to Defend Reproductive Rights v. Myers (1981) 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779 [right of procreative choice]; Atkisson v. Kern County Housing Authority (1976) 59 Cal.App.3d 89, 130 Cal.Rptr. 375 [right of unmarried person to cohabit]; City of Santa Barbara v. Adamson (1980) 27 Cal.3d 123, 130, 134, 164 Cal.Rptr. 539, 610 P.2d 436 [the right to choose the people with whom one lives]), but also from the 1972 ballot pamphlet argument in favor of the proposal (Prop. 11 or the Privacy Initiative) to add privacy to the inalienable rights enumerated in article I, section 1. Voters were told: "`The right to privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. . . . [¶] . . . The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth, and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is compelling public need.'" (Robbins v. Superior Court, supra, 38 Cal.3d at p. 212, 211 Cal.Rptr. 398, 695 P.2d 695, quoting Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 27, italics added.)
The distinctive nature of the interests protected by the Privacy Initiative was discussed by the Supreme Court in detail in Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633 (Hill). Hill made clear that the contours of the state constitutional right are influenced by elucidations of the counterpart federal right. Citing the same portion of the ballot argument relied upon in Robbins, the Hill court concluded that the language describing the Privacy Initiative "as `an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, and Ninth Amendments to the U.S. Constitution'" invoked "the federal constitutional right to privacy as recognized in *734 decisions of the United States Supreme Court." (Id. at p. 28, 26 Cal.Rptr.2d 834, 865 P.2d 633.) Hill noted that testimony on the Privacy Initiative given before the Assembly Constitution Committee and analyses submitted to the Senate Constitution Committee, also made "explicit reference to the federal constitutional right to privacy, particularly as it developed beginning with Griswold [v. Connecticut (1965)] 381 U.S. 479[, 85 S.Ct. 1678, 14 L.Ed.2d 510] (Griswold)" (Hill, supra, 7 Cal.4th at p. 28, 26 Cal.Rptr.2d 834, 865 P.2d 633), and that the provisions of the Bill of Rights cited in the ballot argument were precisely those in which Griswold found implicit the "`zones of privacy' emanating from what it called the `penumbras' of the specific constitutional guarantees." (Ibid.) As Hill says, the United States Supreme Court "has included within the post-Griswold implicit right to privacy `certain rights of freedom of choice in marital, sexual, and reproductive matters'" as an aspect of the liberty interest protected by the due process clause. (Id. at p. 29, 26 Cal.Rptr.2d 834, 865 P.2d 633, quoting 3 Rotunda & Nowak, Treatise on Constitutional Law (2d ed.1992) § 18.26, p. 298.)[2]Griswold and its progeny establish that the constitutional right of privacy includes freedom from government regulation within "a zone of prima facie autonomy, of presumptive immunity from regulation," which is separate from and in addition to the doctrinally related protection provided by the First Amendment. (Henkin, Privacy and Autonomy (1974) 74 Colum. L.Rev. 1410, 1425.)[3]Griswold teaches that the right of privacy bars the state not just from arbitrarily restricting an individual's personal liberty (as in Skinner v. Oklahoma (1942) 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 [striking a sterilization scheme applicable to certain habitual criminals]), but also from so restricting an individual's interpersonal or relational liberty.
While drawing on federal privacy jurisprudence, our case law has repeatedly stressed that the state constitutional right to privacy is significantly more protective than the counterpart federal right. "[N]ot only is the state constitutional right of privacy embodied in explicit constitutional language not present in the federal Constitution, but past California cases establish that, in many contexts, the scope and application of the state right is broader and more protective of privacy than the federal constitutional right of privacy as interpreted by the federal courts. (Compare Hill[, supra,] 7 Cal.4th 1, 15-20[, 26 Cal.Rptr.2d 834, 865 P.2d 633] [state constitutional right of privacy applies to private, as well *735 as to state, action] with Skinner v. Railway Labor Executives' Assn. (1989) 489 U.S. 602, 614[, 109 S.Ct. 1402, 103 L.Ed.2d 639] [federal privacy right applies only to governmental action]; City of Santa Barbara [, supra,] 27 Cal.3d 123[, 164 Cal. Rptr. 539, 610 P.2d 436] [for purposes of determining validity of zoning ordinance, state privacy right protects right to reside with unrelated persons] with Village of Belle Terre v. Boraas (1974) 416 U.S. 1[, 94 S.Ct. 1536, 39 L.Ed.2d 797] [contra].)" (American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 326-327, 66 Cal.Rptr.2d 210, 940 P.2d 797, italics added; see also Committee to Defend Reproductive Rights v. Myers, supra, 29 Cal.3d 252, 262-263, 280-281, 172 Cal.Rptr. 866, 625 P.2d 779 ["the federal right of privacy . . . is more limited than the corresponding right in the California Constitution"].)[4]
The autonomy interest protected by the state constitutional privacy clause, which our high court has described as a "fundamental" right (American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th at p. 338, 66 Cal.Rptr.2d 210, 940 P.2d 797), may be seen as a vital aspect of the "personhood" the California Supreme Court has identified as "the foundation for individual rights protected by our state and national Constitutions." (In re William G. (1985) 40 Cal.3d 550, 563, 221 Cal.Rptr. 118, 709 P.2d 1287; see also Rynecki v. Connecticut Dept. of Social Servs. (2d Cir. 1984) 742 F.2d 65, 66 [referring to "rights of privacy and personhood"]; Tribe, American Constitutional Law (2d ed.1988) pp. 1302-1435 [ch. 15 entitled Rights of Privacy and Personhood]; Craven, Personhood: The Right to Be Let Alone (1976) Duke L.J. 699, 702-703; Fried, An Anatomy of Values: Problems of Personal and Social Choice (1970); Reiman, Privacy, Intimacy, and Personhood (1976) 6 Phil. & Pub. Affairs 26; Gerety, Redefining Privacy, 12 Harv. C.R-C.L. L.Rev. (1977) 233, 261-281.)
"The very idea of a fundamental right of personhood rests on the conviction that, even though one's identity is constantly and profoundly shaped by the rewards and penalties, the exhortations and scarcities and constraints of one's social environment, the `personhood' resulting from this process is sufficiently `one's own' to be deemed fundamental in confrontation with the one entity that retains a monopoly over legitimate violence  the government. Thus active coercion by government to alter a person's being, or deliberate neglect by government which permits a being to suffer, are conceived as qualitatively different from the passive, incremental coercion that shapes all of life and for which no one bears precise responsibility." (Tribe, American Constitutional Law, supra, § 15-2, pp. 1305-1306.) This rationale is reflected in the statement in Roberts v. United States Jaycees (1984) 468 *736 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462, that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." (Id. at pp. 617-618, 104 S.Ct. 3244.) Protecting such relationships from undue government intrusion therefore "safeguards the ability to independently define one's identity that is central to any concept of liberty." (Id. at p. 619, 104 S.Ct. 3244; see Karst, The Freedom of Intimate Association (1980) 89 Yale. L.J. 624.)
The marital relationship is within the zone of autonomy protected by the right of privacy not just because of the profound nature of the attachment and commitment that marriage represents, the material benefits it provides, and the social ordering it furthers, but also because the decision to marry represents one of the most self-defining decisions an individual can make. "When two people marry . . . they express themselves more eloquently, tell us more about who they are and who they hope to be, than they ever could do by wearing armbands or carrying red flags." (Karst, The Freedom of Intimate Association, supra, 89 Yale L.J. at p. 654.) There is no reason to think this less true for gay men and lesbians who wish to marry same-sex partners. The assertion that denial to gay men and lesbians of the right to marry does not deprive them of a constitutionally significant expressive interest (maj. opn., ante, at p. 718), cannot be squared with the view of the Supreme Court. In Turner v. Safley (1987) 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (Turner), the high court struck a restriction on the right of prison inmates to marry because, among other things, it deprived prisoners the "expressions of emotional support and public commitment" the court considered "an important and significant aspect of the marital relationship." (Turner, supra, 482 U.S. at pp. 95-96, 107 S.Ct. 2254; see also Cruz, "Just Don't Call It Marriage": The First Amendment and Marriage as an Expressive Resource (2001) 74 So.Cal. L.Rev. 925.) The understanding that privacy protects a constitutionally significant expressive interest was communicated to the voters who enacted the Privacy Initiative, who were told that the right protected "`our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose.'" (Robbins v. Superior Court, supra, 38 Cal.3d at p. 213, 211 Cal.Rptr. 398, 695 P.2d 695.) Marriage cannot give a prison inmate lacking conjugal rights greater expressive rights than it provides members of a law-abiding same-sex couple who are able to live together and raise children in the community.
The protection of personhood provided by autonomy privacy does not divest the state of the ability to impose majoritarian views of morality; it simply tells the state that it cannot do so without justification. However, unlike privacy cases involving informational interests, in which "the federal courts have generally applied balancing tests that avoid rigid `compelling interest' or `strict scrutiny' formulations" (Hill, supra, 7 Cal.4th at p. 30, 26 Cal.Rptr.2d 834, 865 P.2d 633), the United States Supreme Court has generally applied a higher standard of judicial scrutiny in privacy cases involving autonomy interests. (Id. at pp. 30-31, 26 Cal.Rptr.2d 834, 865 P.2d 633; see also Plante v. Gonzalez (5th Cir. 1978) 575 F.2d 1119, 1134.)

B.

The Federal and State Marriage Cases
The United States Supreme Court has in many cases significantly touched upon *737 why the right to marry is among "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men" (Meyer v. Nebraska (1923) 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042), and why government restrictions on the freedom to decide who to marry are subject to the highest level of judicial scrutiny; but it has decided only three cases directly involving government restrictions of that liberty. These cases do not address same-sex marriage, but, because they identify the attributes of marriage that account for the fundamentality of the right to marry, it is possible to learn from them whether those attributes are applicable to same-sex couples. This is the basis upon which it must be determined whether such couples enjoy the fundamental right to marry.
In holding Virginia's antimiscegenation laws unconstitutional, Loving, supra, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, took its cue from the unprecedented decision of our Supreme Court almost two decades earlier in Perez, supra, 32 Cal.2d 711, 198 P.2d 17. Loving cannot be seen as simply the product of the Supreme Court's special concern about the use of racial classifications, as the majority says, because it was not decided just on the basis of equal protection. After explaining why the statutes violated the Lovings' rights under the equal protection clause, Chief Justice Warren declared that the statutes also deprived them of liberty without due process of law, reiterating the statement in Meyer v. Nebraska, supra, 262 U.S. 390, 399, 43 S.Ct. 625, and Skinner v. Oklahoma, supra, 316 U.S. 535, 541, 62 S.Ct. 1110, that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men. [¶] Marriage is one of the `basic civil rights of man,' fundamental to our very existence and survival." (Loving, at p. 12, 87 S.Ct. 1817.) Like Perez, Loving made clear that "the right to marry means little if it does not include the right to marry the person of one's choice, subject to appropriate government restrictions in the interests of public health, safety and welfare." (Goodridge v. Department of Public Health (2003) 440 Mass. 309, 798 N.E.2d 941, 958 (Goodridge).)
In Zablocki, supra, 434 U.S. 374, 98 S.Ct. 673, the second Supreme Court case evaluating a restriction on the right to marry, the high court drew upon its due process holding in Loving and further illuminated the reasons the right to marry is fundamental and therefore subject to "rigorous scrutiny." (Id. at p. 386, 98 S.Ct. 673.) Zablocki struck down a Wisconsin statute providing that any resident having minor issue not in his custody that he is under obligation to support by any court order or judgmenti.e., a facially irresponsible parentmay not marry without court approval. In his opinion for the majority, Justice Marshall reiterated the oft-cited statement in Griswold, supra, 381 U.S. 479, 486, 85 S.Ct. 1678, that "`[m]arriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.'" (Zablocki, supra, 434 U.S. at p. 384, 98 S.Ct. 673.) Justice Marshall emphasized that "[c]ases subsequent to Griswold and Loving have routinely categorized the decision to marry as among the personal decisions protected by the right of privacy. [Citations.] For example, last Term in Carey v. Population Services International [(1973)] 431 U.S. 678[, 97 S.Ct. 2010, 52 L.Ed.2d 675], we declared: [¶] `While the outer limits of [the *738 right of personal privacy] have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage . . . ."'" (Zablocki, supra, 434 U.S. at pp. 384-385, 98 S.Ct. 673.) Thus, Zablocki concludes, "[i]t is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. As the facts of this case illustrate, it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society." (Id. at p. 386, 98 S.Ct. 673.)
Zablocki establishes that the right to marry is constitutionally protected even where restriction on the right is not based on race or membership in some other suspect class. As the court stated, "[a]lthough Loving arose in the context of racial discrimination, prior and subsequent decisions of this court confirm that the right to marry is of fundamental importance for all individuals." (Zablocki, supra, 434 U.S. at p. 384, 98 S.Ct. 673, italics added.) State laws that "interfere directly and substantially with the right to marry" therefore can never be sustained unless the restriction is "supported by sufficiently important state interests and is closely tailored to effectuate only those interests." (Id. at pp. 387, 388, 98 S.Ct. 673.)
Turner, supra, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64, was a challenge to a Missouri prison regulation providing that an inmate could marry "only with the permission of the superintendent of the prison," with approval to be given only "`when there are compelling reasons to do so.'" (Id. at p. 82, 107 S.Ct. 2254.) "[G]enerally only pregnancy or birth of a child [was] considered a `compelling reason' to approve a marriage." (Id. at pp. 96-97, 107 S.Ct. 2254.) Applying the deferential standard of review afforded prison regulationsessentially, whether there is a "`valid rational connection'" between the regulation and a legitimate purpose (id. at pp. 89-91, 107 S.Ct. 2254)  the court found the regulation was "not reasonably related to legitimate penological objectives" and therefore "facially invalid." (Id. at p. 99, 107 S.Ct. 2254.)
Speaking for the court, Justice O'Connor conceded that prisoner marriages could be subjected to "substantial restrictions" (presumably referring to restrictions on conjugal visits), but explained that, "[m]any important attributes of marriage remain . . . after taking into account the limitations imposed by prison life. First, inmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship. In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated.[[5]] Finally, marital *739 status often is a precondition to the receipt of government benefits . . . property rights . . ., and other, less tangible benefits. . . ." (Turner, supra, 482 U.S. at pp. 95-96, 107 S.Ct. 2254.) Justice O'Connor concluded that "[t]hese incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals." (Id. at p. 96, 107 S.Ct. 2254.)
The majority's determinations that the restrictions challenged here "do not interfere with the ability of individuals in this state to enter intimate relations with persons of their choosing" and do not prevent such couples from "expressing their mutual commitment" (maj. opn., ante, at pp. 717, 718), and, therefore, that respondents have not asserted a legally protected privacy interest, are indifferent to the analysis and reasoning of Perez, Loving, Zablocki, and Turner and the pre- and post-Griswold cases they rely upon. Just as the ruling in Turner required the Supreme Court to determine whether the "incidents of marriage" described in that opinion were "unaffected by the fact of confinement," (Turner, supra, 482 U.S. at p. 96, 107 S.Ct. 2254), so too is it necessary for us to inquire and decide whether those attributes are unaffected by the fact that those claiming the right to marry are members of the same sex.
The California Supreme Court attaches the same importance to the right to marry as the United States Supreme Court. It has repeatedly acknowledged a "`right of privacy' or `liberty' in matters related to marriage, family, and sex" (People v. Belous (1969) 71 Cal.2d 954, 963, 80 Cal.Rptr. 354, 458 P.2d 194; accord, Committee to Defend Reproductive Rights v. Myers, supra, 29 Cal.3d 252, 275, 172 Cal.Rptr. 866, 625 P.2d 779), and has described marriage as "`"at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime."'" (Elden v. Sheldon (1988) 46 Cal.3d 267, 275, 250 Cal.Rptr. 254, 758 P.2d 582, quoting Nieto v. City of Los Angeles (1982) 138 Cal.App.3d 464, 471, 188 Cal.Rptr. 31, quoting Marvin v. Marvin (1976) 18 Cal.3d 660, 684, 134 Cal.Rptr. 815, 557 P.2d 106; see also De Burgh v. De Burgh (1952) 39 Cal.2d 858, 863-864, 250 P.2d 598 ["marriage is a great deal more than a contract. . . . The family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life"].) As one court has stated, "under the state Constitution, the right to marry and the right of intimate association are virtually synonymous" (Ortiz v. Los Angeles Police Relief Assn. (2002) 98 Cal. App.4th 1288, 1303, 120 Cal.Rptr.2d 670), so that an assertion of the right to marry is an assertion of the right to privacy. That fundamental right, which belongs to gay men and lesbians as much as it does to all other citizens of this state, is precisely the right asserted in this case.
The fact that the right to marry is a fundamental right does not, of course, mean that the legislative branch may not *740 define marriage in such a way as to as to limit the right to defined groups, or that the courts need pay no mind to a statutory definition or historical understandings. In striking a state statute that restricted the right of marriage, the Zablocki court rejected the view "that every state regulation which relates in any way to the incidents of or perquisites for marriage must be subjected to rigorous scrutiny," and made clear that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." (Zablocki, supra, 434 U.S. at p. 386, 98 S.Ct. 673, citing Califano v. Jobst (1977) 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 as providing an example of such a permissible regulation.) As Justice Stewart stated in his concurring opinion in Zablocki, "[a] State may not only `significantly interfere with decisions to enter into the marital relationship,' but may in many circumstances absolutely prohibit it. Surely, for example, a State may legitimately say that no one can marry his or her sibling, that no one can marry who is not at least 14 years old, that no one can marry without first passing an examination for venereal disease, or that no one can marry who has a living husband or wife. But, just as surely, in regulating the intimate human relationship of marriage, there is a limit beyond which a State may not constitutionally go." (Zablocki, supra, 434 U.S. at p. 392, 98 S.Ct. 673 (conc. opn. of Stewart, J.), italics added, fn. omitted.)
If, after the interest balancing required by due process analysis, prohibitions of marriage involving an interracial couple, an irresponsible parent or a prison inmate exceed the constitutional limit, so too must the absolute ban at issue in this case, because there is nothing about same-sex couples that makes them less able to partake of the attributes of marriage that are constitutionally significant. My colleagues accuse me of positing a fundamental right of same-sex marriage on the basis not of "controlling precedent," (maj. opn., ante, at p. 685), but rather a social policy that cannot be judicially invented. This is not so. The right I posit is that which has been declared fundamental and available to all by the highest court of this nation in Loving, Zablocki, Turner, and other cases, and by our own Supreme Court in Perez. As will be seen, the state does not deny that the attributes of marriage which explain the fundamentality of the right to marry are as applicable to same-sex couples as to all others.
My colleagues' conclusion that respondents have no constitutionally protected privacy interest in marrying same-sex partners rests on "the reality that respondents have never enjoyed such a right before." (Maj. opn., ante, at pp. 715-716.) This differentiates the case from Zablocki and Turner, they say, because in those cases the state had "taken away" a right to marry that previously existed. This attempt to avoid the reasoning of Zablocki and Turner fails. No court has ever suggested, and it would be absurd to think, that a class of persons who have never enjoyed a fundamental right available to others can, for that reason, continue to be denied it. As earlier indicated, if that were true, Perez and Loving would not have been decided as they were, because interracial couples in California and Virginia never previously possessed the right to marry. The majority's reasoning is circular: same-sex couples have no fundamental right to marriage because same-sex couples "have never had a legal right to marry each other" (maj. opn., ante, at p. 716), as the rights and benefits marriage affords "have historically been reserved for others." (Maj. opn., ante, at p. 716.)
In her concurring opinion, Justice Parrilli says we could not grant respondents *741 the right to marry without concluding "that an undetected right to marry a member of the same sex has always existed under our state constitution," a conclusion she finds incompatible with "law or logic." (Conc. opn., ante, at pp. 728-729.) Aware the Perez and Loving courts could have employed that reasoning to defeat the right to marry a member of a different race, but did not, Justice Parrilli distinguishes Perez and Loving (and presumably also Zablocki and Turner) on the ground that the individuals in those cases "were not excluded from the institution of marriage" because those cases "did not concern the definition of marriage." (Conc. opn., ante, at p. 729, fn. 3.) This reasoning is faulty. It is true that the legislative definition of marriage presented to the Perez and Loving courts was that which excluded interracial, not same-sex, couples. But the "definition" the marriage cases focus upon is that which relates to the nature and significance of the marital relationship; that is, to what Turner variously describes as the "attributes," "elements," or "incidents of marriage" (Turner, supra, 482 U.S. at pp. 95-96, 107 S.Ct. 2254) that make the right of all individuals to choose whom to marry a highly protected liberty interest. From the point of view of autonomy privacy, a ban on same-sex marriage is no less intrusive than a ban on interracial marriage. Thus, unless it can be shown that same-sex couples are less able than interracial couples to partake of the constitutionally significant attributes of marriage, it is no more difficult for us to say that a previously undetected right to marry a member of the same sex exists under our constitution than it was for the Perez and Loving courts to say the same thing with respect to the previously undetected right to marry a person of a different race. The attempt to distinguish Perez and Loving fails. The crucial similarities between the ban on interracial marriage and that on same-sex marriage are that both involve state interference with the right to marry, a supposed state interest that rests heavily on the symbolic significance of marriage, and a restriction designed to preserve a traditional prejudice against a disfavored group.
The majority's statement that I have not and cannot "explain precisely how the marriage laws intrude upon respondents' right to privacy and intimate association" (maj. opn., ante, at p. 716) is bewildering. As earlier noted, the constitutional right to marry and that of intimate association are "synonymous." (Ortiz v. Los Angeles Police Relief Assn., supra, 98 Cal.App.4th at p. 1303, 120 Cal.Rptr.2d 670.) Parties cannot marry, however, merely on the basis of mutual consent, but only upon the issuance of a license by the state. (Fam.Code, § 300.) Because the state has made its license a condition to the exercise of a fundamental constitutional right, it cannot deny the necessary license to an entire class without a showing of compelling need. As stated by the Supreme Court, a state cannot "interfere directly and substantially with the right to marry" without showing that the restriction is "supported by sufficiently important state interests and is closely tailored to effectuate only those interests." (Zablocki, supra, 434 U.S. at pp. 387, 388, 98 S.Ct. 673.)

C.

The Significance of Lawrence v. Texas
Use of the concept of privacy autonomy to sustain the right of homosexuals to marry persons of the same sex was, for a time, cast in doubt by the majority opinion in Bowers, supra, 478 U.S. 186, 106 S.Ct. 2841. The opinion of the United States Supreme Court in Lawrence, supra, 539 U.S. 558, 123 S.Ct. 2472, which overruled *742 Bowers, decisively eliminates that uncertainty.
Because the Lawrence majority went out of its way to endorse the view of the dissenters in Bowers, it is useful to examine their views before turning to Lawrence itself. In his dissent, which was joined by Justices Brennan, Marshall and Stevens, Justice Blackmun declared that Hardwick stated a cognizable claim that the Georgia anti-sodomy statute "interferes with constitutionally protected interests in privacy and freedom of intimate association." (Bowers, supra, 478 U.S. at p. 202, 106 S.Ct. 2841 (dis. opn. of Blackmun, J.).) "[W]e protect the decision whether to marry," Justice Blackmun explained, "precisely because marriage `is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects[,]' (Griswold v. Connecticut, supra, 381 U.S. at p. 486[, 85 S.Ct. 1678])," and "we protect the family because it contributes so powerfully to the happiness of individuals, not because of a preference for stereotypical households. . . . [¶] . . . The fact that individuals define themselves in a significant way through their intimate sexual relationships with others suggests, in a Nation as diverse as ours, that there may be many `right' ways of conducting those relationships, and that much of the richness of a relationship will come from the freedom an individual has to choose the form and nature of these intensely personal bonds." (Bowers, supra, 478 U.S. at pp. 204-205, 106 S.Ct. 2841 (dis. opn. of Blackmun, J.).)
The Bowers dissenters also refused to agree that "either the length of time a majority has held its convictions or the passions with which it defends them can withdraw legislation from this Court's scrutiny." (Bowers, supra, 478 U.S. at p. 210, 106 S.Ct. 2841 (dis. opn. of Blackmun, J.).) Quoting Board of Education v. Barnette (1943) 319 U.S. 624, 641-642, 63 S.Ct. 1178, 87 L.Ed. 1628, Justice Blackmun emphasized that "`[f]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.' [Citation.] It is precisely because the issue raised by this case touches the heart of what makes individuals what they are that we should be especially sensitive to the rights of those whose choices upset the majority." (Bowers, supra, 478 U.S. at pp. 210-211, 106 S.Ct. 2841 (dis. opn. of Blackmun, J.).)
In his separate dissent in Bowers, Justice Stevens reinforced this point, stating that prior Supreme Court cases made two propositions abundantly clear. "First, the fact that a governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of `liberty' protected by the Due Process Clause of the Fourteenth Amendment. Griswold v. Connecticut [, supra,] 381 U.S. 479[, 85 S.Ct. 1678]." (Bowers, supra, 478 U.S. at p. 216, 106 S.Ct. 2841 (dis. opn. of Stevens, J.), fn. omitted.) Stating that Justice Stevens's view "should have been controlling in Bowers," the Lawrence majority concluded that "Bowers was not correct when it was decided and it is not correct today." (Lawrence, supra, 539 U.S. at p. 578, 123 S.Ct. 2472.)
The principle defect of Bowers was its erroneous definition of the right at stake as "`whether the Federal Constitution confers *743 a fundamental right upon homosexuals to engage in sodomy. . . .'" (Lawrence, supra, 539 U.S. at p. 566, 123 S.Ct. 2472.) As Lawrence explained, "[t]o say that the issue in Bowers was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse. The laws involved in Bowers and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes do seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the personal liberty of persons to choose without being punished as criminals." (Id. at p. 567, 123 S.Ct. 2472; see also Carey v. Population Services, Int'l., supra, 431 U.S. at p. 687, 97 S.Ct. 2010 [pointing out that the "individual autonomy" vindicated in Griswold and Eisenstadt v. Baird (1972) 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 protected the individual's "right of decision" regarding procreation, not the right to procreate].)
Speaking for the Lawrence majority, Justice Kennedy acknowledged that Bowers "was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." (Lawrence, supra, 539 U.S. at p. 571, 123 S.Ct. 2472.) These considerations nevertheless present no answer, Lawrence says, because "[t]he issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. `Our obligation is to define the liberty of all, not to mandate our own moral code.' Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 850[, 112 S.Ct. 2791, 120 L.Ed.2d 674] (1992)." (Ibid.)
Lawrence goes on to explain how the rationale of Bowers was undermined by Planned Parenthood of Southeastern Pa. v. Casey, which reconfirmed that constitutional protection is accorded to personal decisions relating to "marriage, procreation, contraception, family relationships, child rearing, and education" because "`[t]hese matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.'" (Lawrence, supra, 539 U.S. at pp. 573-574, 123 S.Ct. 2472, quoting Planned Parenthood of Southeastern Pa. v. Casey, supra, 505 U.S. at p. 851, 112 S.Ct. 2791.) "Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." (Lawrence, supra, 539 U.S. at p. 574, 123 S.Ct. 2472, italics added.)
My colleagues purport to downplay and distinguish Lawrence on the grounds that the majority in that case did not apply strict scrutiny to Texas's antisodomy law, and that having intimate relations is private conduct while civil marriage is a public institution to which the reasoning of *744 Lawrence is inapplicable. (Maj. opn., ante, at pp. 711-713.) Neither attempt to differentiate Lawrence succeeds.
First of all, as our Supreme Court has observed, federal courts generally apply strict scrutiny "to serious intrusions of specific autonomy rights such as marriage, family and procreation" (Hill, supra, 7 Cal.4th at p. 30, 26 Cal.Rptr.2d 834, 865 P.2d 633, citing Plante v. Gonzalez, supra, 575 F.2d at p. 1134), and nothing in Lawrence suggests any retreat from this consistent practice. On the contrary, a fair reading of Lawrence renders it impossible to think that the court's failure to explicitly state that it was applying strict scrutiny means it did not do so, as my colleagues say. "[T]he strictness of the Court's standard in Lawrence, however articulated, could hardly have been more obvious. That much follows not only from what the Court did but from what it said in declaring Griswold, [supra, 381 U.S. 479, 85 S.Ct. 1678] `the most pertinent beginning point' for its analysis and then proceeding to invoke precedents such as Roe [v. Wade (1973) 410 U.S. 113, 155, 93 S.Ct. 705] in which the strictness of the scrutiny employed was explicit. To search for the magic words proclaiming the right protected in Lawrence to be `fundamental,' and to assume that in the absence of those words mere rationality review applied, is to universalize what is in fact only an occasional practice [i.e., explicit announcement of the standard of review]. Moreover, it requires overlooking passage after passage in which the Court's opinion indeed invoked the talismanic verbal formula of substantive due process but did so by putting the key words in one unusual sequence or anotheras in the Court's declaration that it was dealing with a `protection of liberty under the Due Process Clause [that] has a substantive dimension of fundamental significance in defining the rights of the person.'" (Tribe, Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak Its Name (2004) 117 Harv. L.Rev. 1893, 1917, fns. omitted.)
The theory that Lawrence has no application to the public institution of marriage because that case related to private conduct is also refuted by the language and clear meaning of the opinion. "The Lawrence opinion not only denies that the Court's decision was just about sex, it also goes out of its way to equate the insult of reducing a same-sex intimate relationship to the sex acts committed within that relationship with the insult of reducing a marriage to heterosexual intercourse. Besides, . . . the evil targeted by the Court in Lawrence wasn't criminal prosecution and punishment of same-sex sodomy, but the disrespect for those the Court identified as `homosexuals' that labeling such conduct as criminal helped to excuse. . . . Similarly, by denying a same-sex couple a civil marriage license that it would have given them if only they were of opposite sexes, a state tells the couple that they should keep their love behind closed doors rather than `flaunt' that love by proclaiming marital intentions or pronouncing marriage vows. By imposing this lopsided regimetelling a same-sex couple that its members are guilty of unseemly display when they say and do in public no more than what, for a mixed-sex couple, would be described as displaying reassuring signs of affection and symbols of enduring commitmentthe state engages in what amounts to discriminatory, viewpoint-based suppression of expression." (Tribe, Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak Its Name, supra, 117 Harv. L.Rev. at pp. 1948-1949, fns. omitted.) As Justice Scalia has observed, the majority opinion in Lawrence leaves no room to "deny[ ] the benefits of marriage to homosexual couples exercising `[t]he liberty protected by the Constitution.'" (Lawrence, supra, 539 *745 U.S. at p. 605, 123 S.Ct. 2472 (dis. opn. of Scalia, J.).)
In short, a fair reading of Lawrence undermines my colleagues' belief that the opinion provides no authority for subjecting the restriction on same-sex marriage to strict judicial scrutiny.

D.

The Right to Marry Asserted in this Case is That Which Has Been Declared a Fundamental Right
My colleagues accept, as they must, that a fundamental right to marriage exists, but consider Perez, Loving, Zablocki, Turner and the many other cases bearing upon the right to marry largely irrelevant because they view this case as presenting the different question whether there is a fundamental right to same-sex marriage, and no court, save the Supreme Judicial Court of Massachusetts, in Goodridge, supra, 440 Mass. 309, 798 N.E.2d 941, has said such a "novel" right exists. The majority insists that same-sex unions do not fit within the definition of marriage that has been declared a fundamental right and that the state and federal autonomy privacy interest does not encompass same-sex marriage, but provide no explanation at all as to why this is so.
Washington v. Glucksberg (1997) 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 does not support the majority's view that the right respondents assert is not fundamental because it is not "`deeply rooted in this Nation's history and tradition.'" (Id. at p. 721, 117 S.Ct. 2258, quoting Moore v. East Cleveland (1977) 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531; accord, Dawn D. v. Superior Court (1998) 17 Cal.4th 932, 940, 72 Cal.Rptr.2d 871, 952 P.2d 1139.) Whether the right at issue fits this description depends, like almost everything else in this case, on how one defines that right. Glucksberg states that, in addition to the specific freedoms protected by the Bill of Rights, "the `liberty' specially protected by the Due Process Clause includes the rights to marry . . . [and] to marital privacy . . . ." (Glucksberg, supra, 521 U.S. at p. 720, 117 S.Ct. 2258, citing, inter alia, Loving, supra, 388 U.S. 1, 87 S.Ct. 1817, and Griswold, supra, 381 U.S. 479, 85 S.Ct. 1678.) Glucksberg may be seen as impeding the application of strict scrutiny in this case only by refusing to see that the right to marry it referred to is a liberty interest "of fundamental importance for all individuals" (Zablocki, supra, 434 U.S. at p. 384, 98 S.Ct. 673, italics added), including gay men and lesbians who wish to marry same-sex partners.
It also bears emphasizing that, except for the aberrant and now overruled decision in Bowers, supra, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140, the limiting principle reflected in the language of Glucksberg my colleagues rely upon has never been employed by the United States Supreme Court or the California Supreme Court to sustain a government restriction of privacy autonomy remotely comparable to that presented in this case. After Lawrence, supra, 539 U.S. 558, 123 S.Ct. 2472, it is impossible to sustain such a restriction on the basis of Glucksberg. The focus of Lawrence is not on whether the asserted liberty interest is among those traditionally considered beyond government control or fits comfortably within historical understandings (and the Lawrence majority virtually acknowledged it would have had to reach a different result if, as in Bowers, that were the test), but on whether the government restriction substantially interferes with the type of "`intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, [that] are central to the liberty protected by the Fourteenth Amendment.'" (Lawrence, at p. 574, 123 *746 S.Ct. 2472, quoting Planned Parenthood of Southeastern Pa. v. Casey, supra, 505 U.S. at p. 851, 112 S.Ct. 2791.) The decision to marry is unquestionably such an "intimate and personal choice," and it is therefore protected by the substantive due process accorded by the right of privacy enshrined in article I, section 1 of the California Constitution.
My colleagues' view of the right at issue here rests largely on opinions of some courts in other states concluding that the institution of marriage is by its very nature necessarily restricted to opposite-sex couples. The rationale of these opinions, which embodies no serious inquiry into the attributes of marriage the Supreme Court considers constitutionally significant, and is therefore entirely blind to the nature and importance of the liberty interest at stake, is the only justification the majority can muster for its most crucial determinationthat the right to marry of a same-sex couple is different from and not included within the right to marry that has judicially been declared fundamental.
According to the cases my colleagues rely upon, the word "marriage"in and of itself, even if not specifically described as between a man and a womanpertains to a relationship that can only be between a man and a woman. (Maj. opn., ante, at p. 700.) For example, in Adams v. Howerton (C.D.Cal.1980) 486 F.Supp. 1119, which the majority cites, the court declares that "[t]he term `marriage,' (and therefore the term `spouse' which is derivative from the term `marriage,') necessarily and exclusively involves a contract, a status, and a relationship between persons of different sexes." (Id. at p. 1122, italics added, fn. omitted.) Similarly, in Jones v. Hallahan (Ky.App.1973) 501 S.W.2d 588, which the majority also relies upon, the court declared that "[the] appellants [were] prevented from marrying, not by the statutes of Kentucky or the refusal of the County Court Clerk of Jefferson County to issue them a license, but rather by their own incapability of entering into a marriage as that term is defined," so that "the relationship proposed by the appellants . . . is not a marriage." (Id. at pp. 589-590.) For courts that hold this view, marriage is not defined by love and commitment, by the benefits it confers and the burdens it entails, or even by children, but rather by its exclusion of homosexualsthat is, by its discriminatory aspect. Therefore, as they see it, the concept of same-sex marriage is an oxymoron: Because the statutory definition of marriage as a relationship between members of the opposite sex represents what they consider the unalterable nature of things,[6] these courts treat the right of same-sex couples to marry as constitutionally unsupportable as a claim of the right to be 10 feet tall.
Courts adopting this circular reasoning invariably rely upon dictionary definitions showing the common usage of the word "marriage" (e.g., Jones v. Hallahan, supra, 501 S.W.2d at p. 589; Dean v. District of Columbia (D.C.1995) 653 A.2d 307, 315), historical understandings (e.g., Anonymous v. Anonymous (1971) 67 Misc.2d 982, 325 N.Y.S.2d 499, 500 [marriage "always has been a contract between a man and a woman"]), the importance of procreation (e.g., Andersen v. King County (2006) ___ Wash.2d ___, 138 P.3d 963, *747 969 ["limiting marriage to opposite-sex couples furthers procreation, essential to survival of the human race, and furthers the well-being of children"]) and religious doctrine (e.g., Lewis v. Harris (2005) 378 N.J.Super. 168, 875 A.2d 259, 269 ["Our leading religions view marriage as a union of men and women recognized by God"]). Neither the religious aspect of marriage nor the issues of procreation and child rearing are placed at issue in this case by the state, as it does not assert those factors as justification for prohibiting same-sex couples from marrying, and the majority disclaims reliance upon such grounds. However, some form of the procreation argument is vigorously advanced by several amici curiae, and reasons related to religion and procreation are relied upon in most of the opinions rejecting constitutional challenges to restrictions on same-sex marriage, including those relied upon by my colleagues. It is therefore necessary to address these issues.
The scriptural basis of marriage as between a man and a woman, which appears to be the subtext of some opinions that do not dwell on the subject (e.g., Baker v. Nelson (1971) 291 Minn. 310, 191 N.W.2d 185, 186, app. dism. 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 ["institution of marriage as a union of man and woman . . . is as old as the book of Genesis"]), was articulated with unabashed clarity in Adams v. Howerton, supra, 486 F.Supp. 1119. The opinion in that case explains, in soritical fashion, that the definition of marriage is governed by our civil law, which has its roots in English civil law, which in turn "took its attitudes and basic principles from canon law, which, in early times, was administered in the ecclesiastical courts. Canon law in both Judaism and Christianity could not possibly sanction any marriage between persons of the same sex because of the vehement condemnation in the scriptures of both religions of all homosexual relationships. Thus there has been for centuries a combination of scriptural and canonical teaching under which a `marriage' between persons of the same sex was unthinkable and, by definition, impossible." (Id. at p. 1123, italics added, fns. omitted.) This reasoning rests upon a religious doctrine that cannot influence the civil law and, in any case, is not universally shared.[7] Furthermore, it begs *748 the crucial question whether the constitutionally significant attributes of marriage identified by the Supreme Court apply to same-sex couples.
The relationship between marriage and procreation emphasized by some religions is not a factor the United States Supreme Court has ever relied upon. The first statement of that court indicating the reasons marriage is a fundamental right, from which all of that court's later analyses of the right have evolved, is the frequently quoted description of marriage in Griswold, supra, 381 U.S. at page 486, 85 S.Ct. 1678. Griswold makes no reference to procreation; and the precise holding of Griswold, that the state could not criminalize a married couple's use of contraceptives, is itself incompatible with the proposition that the constitutionally protected status of marriage turns on its relationship to procreation. The language and the facts of Turner, supra, 482 U.S. 78, 107 S.Ct. 2254, also exclude procreation from the constitutionally significant attributes of marriage. As previously discussed, Turner invalidated prison regulations restricting inmates' rights to marry even though the regulations contained exceptions for cases involving pregnancy or birth of a child and therefore did not preclude marriage where procreation was directly involved. Prison regulations ordinarily prohibit inmates from physically conceiving a child. In holding that prisoners, including life prisoners who typically lack conjugal rights (see, e.g., Cal.Code Regs., tit. 15, § 3177, subd. (b)(2)) and cannot conceive, have a fundamental right to marry, Turner necessarily recognized that the fundamentality of the right to marry is not tied to procreation.
Furthermore, as is often pointed out, "[n]o State marriage statute mentions procreation or even the desire to procreate among its conditions for legal marriage. No State requires that heterosexual couples who wish to marry be capable or even desirous of procreation. Moreover, many heterosexual couples who discover they cannot procreate in the usual way have chosen to procreate using the technologies of artificial insemination, sometimes involving strangers to their marital relationship; or they have availed themselves of adoption provided by state law. Artificial insemination and adoption, which all States today permit, are equally available as a practical matter to same-sex couples who wish to have and raise children." (Doherty, Constitutional Methodology and Same-Sex Marriage (2000) 11 J. Contemp. Legal Issues 110, 113.)
The nuanced argument that the state's primary interest in recognizing and regulating marriage is "responsible procreation," i.e., steering procreation into marriage, focuses on the protection of children resulting from potentially unplanned natural procreation. (See, e.g., Hernandez v. Robles, supra, ___ N.Y.S.3d at p. ___, ___ N.E.2d at p. ___, 2006 WL 1835429 at pp. *5-6; Morrison v. Sadler (Ind.Ct.App. 2005) 821 N.E.2d 15, 24-25; Lewis v. Harris, supra, 875 A.2d at pp. 266-267; see id. at p. 276 (conc. opn. of Parrillo, J.A.D.) *749 ["Marriage's vital purpose is not to mandate procreation but to control or ameliorate its consequences"].) The argument is based on the idea that children are best raised in a stable environment, that children conceived accidentally are more apt to be raised in unstable environments, and that because only opposite-sex couples can conceive accidentally, these couples are in need of incentives to marry. This argument not only ignores the children of lesbians and gay men, but fails to explain how excluding same-sex couples from marriage encourages opposite-sex couples to marry or otherwise enhances the interests of their children. Under no reasonably conceivable facts would the care received by accidentally conceived children be improved in any way by denying the right to marry to same-sex couples. All the restriction accomplishes is to deprive the children of same-sex unions the greater stability enjoyed by the children of married couples.
The Attorney General's failure to claim that the state has an interest in "steering procreation into marriage" is understandable. California has decided to provide same-sex couples who register as domestic partners the same legal rights and obligations with respect to a child of either of them as are enjoyed by spouses. (Fam. Code, § 297.5, subd. (d).) Our law also authorizes same-sex second parent adoptions (Sharon S. v. Superior Court (2003) 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554), and our Supreme Court has held that a same-sex partner not biologically related to a child may nevertheless be considered a parent for purposes of the Uniform Parentage Act (Elisa B. v. Superior Court (2005) 37 Cal.4th 108, 33 Cal.Rptr.3d 46, 117 P.3d 660). California's "public policy favoring that a child has two parents rather than one" (Kristine H. v. Lisa R. (2005) 37 Cal.4th 156, 166, 33 Cal.Rptr.3d 81, 117 P.3d 690), both of whom may be members of the same sex, is difficult to reconcile with the view that the relationship between procreation and marriage justifies the prohibition of same-sex marriage.
Because the ability of spouses to procreatenaturally and/or responsiblyis not among or necessarily related to the reasons the United States Supreme Court deems the right to marry a fundamental constitutional right, and because the reasons the high court has relied upon to reach that conclusion are as applicable to same-sex couples as to others, the right of such couples to marry is as highly protected by our Constitution as the right of opposite-sex couples.

E.

Recognizing Same-Sex Marriage Would Not Usurp a Legislative Function
Central to the majority's resolution of this case is its position that respondents and this court cannot make "marriage" a legally protected privacy interest without impermissibly invading the legislative right to define the term. The majority says that "[o]ur role is limited to determining whether the Legislature's definition comports with constitutional standards" (maj. opn., ante, at p. 705), but in the next breath declares that "[w]ere we to expand the definition of marriage to include same-sex unions, we would overstep our bounds as a coequal branch of government." (Maj. opn., ante, at p. 705.) We are not being asked to redefine marriage, but simply to say that the Legislature cannot define it in a way that violates the Constitution. As our Supreme Court has declared, "`The regulation of marriage and divorce is solely within the province of the Legislature, except as the same may be restricted by the Constitution.'" (Lockyer v. City and County of San Francisco (2004) 33 Cal.4th 1055, 1074, 17 Cal.Rptr.3d 225, 95 *750 P.3d 459, italics added, quoting Beeler v. Beeler (1954) 124 Cal.App.2d 679, 682, 268 P.2d 1074.)
The majority feels free, indeed obliged, to defer to the legislative definition of marriage, and leave the matter to the political process, because of its conclusion that the right to marry asserted in this case is different from, and not as highly protected as, the right to marry that the Supreme Court has declared a fundamental constitutional right. That conclusion is unjustified because, in the end, it rests on no more than the facts that same-sex marriage has not traditionally been recognized and there is no public consensus favoring recognition of such marriage. Thus, the majority finds it significant that some states have reacted to the "controversial" decision of the Massachusetts Supreme Judicial Court in Goodridge, supra, 440 Mass. 309, 798 N.E.2d 941, by amending their constitutions to prohibit same-sex marriage. (Maj. opn., ante, at p. 701, fn. 16.) I do not think political developments in some other states deserve the emphasis the majority places upon them; we are deciding this case only for California, and we must be faithful to the mandates of our Constitution.
Moreover, the fact that same-sex couples have traditionally been prohibited from marrying is the reason this lawsuit was commenced; it cannot be converted into the dispositive reason it cannot succeed. The inquiry whether the right claimed in this case is fundamental should include its historical applications, to be sure, but it must consist of a careful weighing of the values at stake against the justifications asserted by the state for their restriction, not a mechanical application of a historical definition of marriage and popular opinion. The jurisprudential purpose of declaring a right fundamental is, of course, to remove it from the vagaries of popular opinion and the political process. What Justice Jackson said in Board of Education v. Barnette, supra, 319 U.S. 624, 63 S.Ct. 1178, about the Bill of Rights, can also be said about the inalienable rights protected under article I, section 1 of the California Constitution: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." (Board of Education v. Barnette, supra, 319 U.S. at p. 638, 63 S.Ct. 1178.)
The doctrine of separation of powers is thus modified by the principle of checks and balances, which appropriately comes into play in this case. "It is precisely because we cannot expect the Legislature, representing majoritarian interests, to act to protect the rights of the homosexual minority, that our courts must take the necessary steps to acknowledge and act in protection of those rights. [¶] Moreover, the assumption that `a majority of citizens has the right to insure by legal fiat that marriage continue to have its historical associations . . . contradicts a very basic principle of human dignity, which is that no person or group has the right deliberately to impose personal ethical values  the values that fix what counts as a successful and fulfilled lifeon anyone else.' [Citation.]" (Hernandez v. Robles (2005) 26 A.D.3d 98, 805 N.Y.S.2d 354, 383 (dis. opn. of Saxe, J.).)[8]
Perez and Loving demonstrate that the fundamentality of the right to marry does *751 not depend in any way upon whether its application would be consistent with the norms of the dominant culture. Interracial marriage was certainly not "deeply rooted in this Nation's history and tradition" when those cases were decided.[9] Indeed, the dissent in Perez emphasized the depth of the then-existing antipathy toward interracial marriage, arguing that in light of scientific, judicial and religious support for the traditional prohibition of such marriages, it was not within the court's province to upset the legislative determination. (Perez, supra, 32 Cal.2d at pp. 744-760, 198 P.2d 17 (dis. opn. of Shenk, J.)) Same-sex marriage is now indeed "controversial," as my colleagues say. But even if one believes this is a factor we should heavily weight, as Loving and Perez certainly did not, the opposition to such unions in this state is not nearly as broad, as deep-seated, and as fierce as the hostility to interracial marriage when our Supreme Court invalidated the prohibition of such marriages.[10]
Nor could the Loving and Perez courts have reached the result they did if the *752 Supreme Courts of this nation and state accepted my colleagues' constricted view of the scope of judicial review. It is telling that the majority's theory that judicial invalidation of the challenged restrictions would usurp the Legislature's function was the basis not only of the dissent in Perez, but also of the unanimous decision of the Supreme Court of Appeals of Virginia in Loving. (Loving v. Commonwealth (1966) 206 Va. 924, 147 S.E.2d 78, revd. by Loving, supra, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010).[11] The Virginia court refused *753 to examine "texts dealing with the sociological, biological and anthropological aspects of the question of interracial marriages," because it thought that consideration of such materials "would be judicial legislation in the rawest sense of that term.[12]Such arguments are properly addressable to the legislature, which enacted the law in the first place, and not to this court, whose prescribed role in the separated powers of government is to adjudicate, and not to legislate." (Loving v. Commonwealth, supra, 147 S.E.2d at p. 82, italics added.) The Virginia court considered it significant that "[t]oday, more than ten years since [the opinion in which we last sustained the ban on interracial marriage], a number of states still have miscegenation statutes and yet there has been no new decision reflecting adversely upon the validity of such statutes." (Ibid.)
The analysis of the Supreme Court of Appeals of Virginia is strikingly similar to that of my colleagues here. Ignoring the reasons Brown repudiated the doctrine of separate but equal, which rested heavily on its stigmatizing effect (Brown, supra, 347 U.S. at p. 493, 74 S.Ct. 686), the Virginia court dismissed Brown as inapposite. (Loving v. Commonwealth, supra, 147 S.E.2d at pp. 80-81.) Because the reference in Plessy to the validity of prohibitions of interracial marriage was not explicitly contradicted by Brown, the court felt free to rely on Plessy in validating restrictions on interracial marriage and declaring that they could be changed only by the Legislature. Similarly, it is only by ignoring the reasoning of the United States Supreme Court opinions relating to marriage and our Supreme Court's opinion in Perez  because none speak directly to the issue of same-sex marriagethat my colleagues can conclude that it would offend the separation of powers for this court to declare the restriction on same-sex marriage unconstitutional. As I have said, the federal marriage cases fully respect the legislative responsibility to define marriage; they stand only for the settled proposition that a definition repugnant to the Constitution is void, and it is the special duty of the judicial branch to say so when this is the case. (Marbury v. Madison (1803) 5 U.S. (1 Cranch) 137, 176-177, 2 L.Ed. 60.)

II.

A Classification Based on Sexual Orientation Should Be Subjected to Heightened Scrutiny
The legislative exclusion of same-sex couples from civil marriage should be subjected to strict scrutiny not only because it affects the fundamental constitutional right to marry, but also because it burdens a suspect class. Whether a classification is "suspect" depends on three factors: (1) The classification is based on "an immutable trait, a status into which the class members are locked by the accident of *754 birth"; (2) the defining characteristic "frequently bears no relation to ability to perform or contribute to society"; and (3) the characteristic defining the class is associated with a "stigma of inferiority and second class citizenship" and history of "severe legal and social disabilities." (Sail'er Inn v. Kirby (1971) 5 Cal.3d 1, 18-19, 95 Cal. Rptr. 329, 485 P.2d 529 (Sail'er Inn).) All of these factors apply to lesbians and gay men.
Homosexuality was once widely considered a biological disease or psychological disorder that could be medically "cured" by a horrifying array of surgical procedures, as well as by electroshock treatment, psychoanalysis and other more bizarre conversion therapies. (Katz, Gay American History (rev. ed.1992) pp. 129-207.)[13] This has long ceased to be the case. The American Psychiatric Association stopped considering homosexuality a disease in 1973 (Bayer, Homosexuality and American Psychiatry (1981) p. 138), and in 1994 mention of homosexuality completely disappeared from the Association's authoritative manual of mental disorders. (See Am. Psychiatric Assn., Task Force on DSM-IV, Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994) pp. 493-538.)
Concluding that "[s]exual orientation and sexual identity are immutable" and "so fundamental to one's identity that a person should not be required to abandon them," the Ninth Circuit has found that the imposition of conversion therapies by foreign nations may constitute "persecution" within the meaning of the Immigration and Nationality Act. (Hernandez-Montiel v. I.N.S. (9th Cir.2000) 225 F.3d 1084, 1093-1094, overruled on other grounds in Thomas v. Gonzales (9th Cir.2005) 409 F.3d 1177, 1187, revd. on other grounds Gonzales v. Thomas (2006) ___ U.S. ___, 126 S.Ct. 1613, 1615, 164 L.Ed.2d 358; Pitcherskaia v. I.N.S. (9th Cir.1997) 118 F.3d 641; see Amanfi v. Ashcroft (3d Cir.2003) 328 F.3d 719, 727-730.) It may be true that the scientific community has not dispositively established that homosexuality is biologically immutable. Nevertheless, "[a]lthough the causes of homosexuality are not fully understood, scientific research indicates that we have little control over our sexual orientation and that, once acquired, our sexual orientation is largely impervious to change. [Citations.] . . . It may be that some heterosexuals and homosexuals can change their sexual orientation through extensive therapy, neurosurgery or shock treatment. [Citations.] But the *755 possibility of such a difficult and traumatic change does not make sexual orientation `mutable' for equal protection purposes. . . . [A]llowing the government to penalize the failure to change such a central aspect of individual and group identity would be abhorrent to the values animating the constitutional ideal of equal protection of the laws." (Watkins v. United States (9th Cir.1989) 875 F.2d 699, 725-726 (conc. opn. of Norris, J.); see also Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality (1984) 57 S.Cal. L.Rev. 797, 817-821 [collecting scientific studies on the immutability of homosexuality].)[14]
Our Supreme Court has also recognized the centrality of sexual orientation to individual identity, viewing it, for purposes of the Unruh Civil Rights Act (Civ.Code, § 51), as akin to sex, race, color, religion, ancestry, national origin, disability and medical condition, in that all these categories "represent traits, conditions, decisions, or choices fundamental to a person's identity, beliefs and self-definition." (Koebke v. Bernardo Heights Country Club (2005) 36 Cal.4th 824, 842-843, 31 Cal.Rptr.3d 565, 115 P.3d 1212 (Koebke).) "The kinds of intimate relationships a person forms and the decision whether to formalize such relationships implicate deeply held personal beliefs and core values." (Id. at p. 843, 31 Cal.Rptr.3d 565, 115 P.3d 1212.)
The proposition that homosexuality is not a freely elected characteristic also comports with common sense. "Given the personal and social disadvantages to which homosexuality subjects a person in our society, the idea that millions of young men and women have chosen it or will choose it in the same fashion in which they might choose a career or a place to live or a political party or even a religious faith seems preposterous." (Posner, Sex and Reason (1992) pp. 296-297.)
Turning to the second Sail'er Inn factor, our state law clearly recognizes that sexual orientation is unrelated to an individual's ability to contribute to society. Gay Law Students Assn. v. Pacific Tel. & Tel. Co. (1979) 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592, expressly described workplace discrimination against gay men and lesbians as "arbitrary discrimination on grounds unrelated to a worker's qualifications." (Id. at pp. 474-475, 156 Cal.Rptr. 14, 595 P.2d 592.) Discrimination on the basis of sexual orientation is prohibited in areas ranging from employment (e.g., Gov. Code, § 12940; Exec. Order No. B-54-79 (Apr. 4, 1979)), to judicial bias (Cal.Code of Judicial Ethics, canon 3) and custody and visitation determinations (Nadler v. Superior *756 Court (1967) 255 Cal.App.2d 523, 525, 63 Cal.Rptr. 352; In re Marriage of Birdsall (1988) 197 Cal.App.3d 1024, 1031, 243 Cal.Rptr. 287.) Same-sex parents have been held to have the same rights and responsibilities as opposite-sex parents toward children they have had and raised together. (See Elisa B. v. Superior Court, supra, 37 Cal.4th 108, 33 Cal.Rptr.3d 46, 117 P.3d 660; Kristine H. v. Lisa R., supra, 37 Cal.4th 156, 33 Cal.Rptr.3d 81, 117 P.3d 690; Sharon S. v. Superior Court, supra, 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554.)
Finally, the record of discrimination against lesbians and gay men is long and well known. In western culture since the time of Christ the prevailing attitude has been "one of strong disapproval, frequent ostracism, social and legal discrimination, and at times ferocious punishment." (Posner, Sex and Reason, supra, at p. 291.) Courts have recognized that "[t]he aims of the struggle for homosexual rights, and the tactics employed, bear a close analogy to the continuing struggle for civil rights waged by blacks, women, and other minorities." (Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra, 24 Cal.3d at p. 488, 156 Cal.Rptr. 14, 595 P.2d 592.) "Lesbians and gay men . . . share a history of persecution comparable to that of Blacks and women." (People v. Garcia (2000) 77 Cal.App.4th 1269, 1276, 92 Cal. Rptr.2d 339.) "Outside of racial and religious minorities, we can think of no group which has suffered such `pernicious and sustained hostility' (Rowland v. Mad River Local Sch. Dist. (1985) 470 U.S. 1009, 1014[, 105 S.Ct. 1373, 84 L.Ed.2d 392] (dis. opn. of Brennan, J.) [dissenting from denial of certiorari]), and such `immediate and severe opprobrium' (ibid.) as homosexuals." (Garcia, supra, 77 Cal.App.4th at p. 1279, 92 Cal.Rptr.2d 339, fn. omitted [lesbians and gay men are "cognizable group" requiring protection against discrimination in jury selection].)[15] Even High Tech Gays agreed that "homosexuals have suffered a history of discrimination." (High Tech Gays v. Defense Industrial Security Clearance Office, supra, 895 F.2d at p. 573.) The California Legislature officially acknowledged this history in its findings regarding the California Domestic Partner Rights and Responsibilities Act of 2003 (Fam.Code, § 297 et seq.). (Koebke, supra, 36 Cal.4th at p. 849, 31 Cal.Rptr.3d 565, 115 P.3d 1212.)[16] Three years earlier, when it enacted the statute that prohibits peremptory challenges of prospective *757 jurors on the basis of sexual orientation, the Legislature similarly found and declared that "[l]esbians and gay men share the common perspective of having spent their lives in a sexual minority, either exposed to, or fearful of, persecution and discrimination." (Stats.2000, ch. 43, § 1, subd. (4), pp. 104-105.)
Examples of discrimination against lesbians and gay men abound. Because of their sexual orientation, lesbians and gay men have been denied custody of children (e.g., Thigpen v. Carpenter (1987) 21 Ark. App. 194, 730 S.W.2d 510, 512-514; S.E.G. v. R.A.G. (Mo.Ct.App.1987) 735 S.W.2d 164, 167; Roe v. Roe (1985) 228 Va. 722, 324 S.E.2d 691, 694), denied employment opportunities (e.g., Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra, 24 Cal.3d at pp. 463, 464, 475, 156 Cal.Rptr. 14, 595 P.2d 592; Murray v. Oceanside Unified School Dist. (2000) 79 Cal.App.4th 1338, 95 Cal.Rptr.2d 28; Kovatch v. California Casualty Management Co. (1998) 65 Cal.App.4th 1256, 1275, 77 Cal.Rptr.2d 217, overruled on other grounds in Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 853, fn. 18, 107 Cal.Rptr.2d 841, 24 P.3d 493; Collins v. Shell Oil Co. (1991) 56 Fair Empl.Prac.Cas. (BNA) 440, 1991 WL 147364, 1991 Cal.App.LEXIS 783; Gaylord v. Tacoma School Dist. No. 10 (1977) 88 Wash.2d 286, 559 P.2d 1340); and subjected to harassment on the job (e.g., Carreno v. Local Union No. 226, International Brotherhood of Electrical Workers (D.Kan.1990) 54 Fair Empl.Prac.Cas. (BNA) 81, 1990 WL 159199, 1990 U.S.Dist. LEXIS 13817.) As earlier discussed, lesbians and gay men have been treated as deviants, in need of treatment, and have frequently been victims of pervasive harassment and violence. (See, e.g., In re M.S. (1995) 10 Cal.4th 698, 707-708, 42 Cal.Rptr.2d 355, 896 P.2d 1365; In re Joshua H. (1993) 13 Cal.App.4th 1734, 1748, fn. 9, 17 Cal.Rptr.2d 291.)[17] Moreover, the sheer brutality of attacks against gay people demonstrates the animosity such individuals engender in some members of society.[18]
Simply put, as an Oregon court stated in finding sexual orientation a suspect *758 class under that state's constitution, "it is beyond dispute that homosexuals in our society have been and continue to be the subject of adverse social and political stereotyping and prejudice." (Tanner v. Oregon Health Sciences Univ. (1998) 157 Or. App. 502, 971 P.2d 435, 447.) The discrimination homosexuals suffer is at least comparable to that visited on women, illegitimate children, and often aliens, all of whom are members of classes entitled to heightened protection. (Frontiero v. Richardson (1973) 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 [women]; Jimenez v. Weinberger (1974) 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 [illegitimate children]; Graham v. Richardson (1971) 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 [aliens].)
To say that the factors which determine whether a classification is suspect do not all apply to homosexuals requires us to deny as judges what we know as people.

III.

There is Not Even a Rational Basis for the Challenged Restriction
As indicated, I believe the challenged statutes must be subjected to strict scrutiny both because they burden a fundamental right and, independently, because they target a suspect class. However, the statutes do not bear any reasonably conceivable rational relationship to a legitimate state purpose even assuming that is the proper test.
The state encapsulates its rational basis argument as follows: "The word `marriage' has a particular meaning for millions of Californians, and that common understanding of marriage is important to them. [¶] At the same time, Californians do not want to deny same-sex couples the rights, benefits and protections afforded to spouses. Accordingly, the California Legislature approved, and the Governor signed, sweeping laws dictating that registered domestic partners shall have the same rights, benefits and protections as spouses. [¶] . . . The resulting statutes create an appropriate and constitutional balance of legitimate interests, and the statutes are rationally related to those interests." Accepting this argument, the majority concludes that "it is rational for the Legislature to preserve the opposite-sex definition of marriage, which has existed throughout history and which continues to represent the common understanding of marriage in most other countries and states of our union, while at the same time providing equal rights and benefits to same-sex partners through a comprehensive domestic partnership system. The state may legitimately support these parallel institutions while also acknowledging their differences."[19] (Maj. opn., ante, at pp. 720-721.)
*759 The theories that California provides same-sex partners rights and benefits equal to those provided spouses and that the state has a legitimate interest in perpetuating a traditional form of discrimination are both unsustainable.

A.

Domestic Partnership and Marriage are Not Equal
The California Domestic Partner Rights and Responsibilities Act of 2003 does not provide same-sex couples the same benefits as spouses, even if consideration is limited to those rights, protections and benefits the state has the power to grant, and ignoring also the disparity between the tangible benefits of domestic partnership and those of marriage, which is not great. The real problem lies in the disparity between the intangible disparities which, though difficult to measure precisely, is enormous. (See Brown, supra, 347 U.S. at p. 492, 74 S.Ct. 686 [decision "cannot turn on merely a comparison of [the] tangible factors. . . . We must look instead to the effect of segregation on public education"].)
To begin with, because domestic partnership is significantly easier to enter and leave than marriage (see Fam.Code, §§ 298-299), denying same-sex couples the right to marry denies their children the greater stability of home environment offered by the marital relationship. Permitting their parents to marry would much more effectively protect the interests of these children and permit them to see their family as more normal than is now the case. More stable same-sex relationships would also benefit the individuals involved and the larger community.
More fundamentally, my colleagues' disclaimer notwithstanding, their claim that domestic partnership and marriage are "parallel institutions" is not very different from that made in Plessy, supra, 163 U.S. 537, 16 S.Ct. 1138, and with the rejected reasoning of the Virginia Supreme Court of Appeals in Loving v. Commonwealth, supra, 206 Va. 924, 147 S.E.2d 78, which explicitly relied on Plessy. (See discussion, ante, pp. 752-753, fn. 11.) Just as "[e]very one kn[ew]" that the statute at issue in Plessy "had its origin in the purpose, not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied by or assigned to white persons" (Plessy, supra, 163 U.S. at p. 557, 16 S.Ct. 1138 (dis. opn. of Harlan, J.)), so too does everyone know that the domestic partnership act was created not so much for the purpose of excluding heterosexual couples (though it does exclude most)[20] as to ameliorate the effect of and thereby help justify the state's refusal to permit homosexual couples to marry.
The point is not that relegating same-sex couples to domestic partnerships rather than marriage is as "bad" as racial segregation, for it clearly is not; but it is similar to the doctrine of "separate but equal" in that it also serves to legitimate and perpetuate differential group treatment. Offering homosexual couples the opportunity to become domestic partners *760 does not eradicate the stain of their exclusion from the institution of civil marriage our society venerates so highly and makes readily available to everybody else. The difference between the terms "civil marriage" and "domestic partnership" "is not innocuous; it is a considered choice of language that reflects a demonstrable assigning of same-sex, largely homosexual, couples to second-class status." (Opinions of the Justices to the Senate (2004) 440 Mass. 1201, 1207, 802 N.E.2d 565, 570.) A domestic partnership therefore does not provide a same-sex couple the same self-identifying expression of personhood made available by marriage. On the contrary, entrance of a gay or lesbian couple into a legal relationship known to have been made available to them to compensate for their exclusion from the superior marital relationship compels such a couple to acknowledge their inferior status.[21] The most powerful message their partnership communicates, to which everything else they may wish to communicate is subordinated, is that their sexual orientation disqualifies them from receiving the same respect and benefits the state accords heterosexual unions.[22] Laudable as the domestic *761 partnership act may be as providing at least half a loaf, it is in the end a simulacrum, a form of pseudomarriage that stigmatizes homosexual unions in much the same way "separate but equal" public schools stigmatized black students. Like separate educational facilities, domestic partnership and marriage are "inherently unequal." (Brown, supra, 347 U.S. at p. 495, 74 S.Ct. 686.) The trial court was right in stating that offering same-sex couples "marriage-like rights" instead of marriage itself "`generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.'" (See id. at p. 494, 74 S.Ct. 686.) The majority's characterization of the issue here as a "largely symbolic" quarrel about the word that will be used to describe same-sex relationships (maj. opn., ante, at p. 722) downplays the extraordinary significance of the symbol in question and the profound consequence of barring its use. (See Opinions of the Justices to the Senate, supra, 440 Mass. at p. 1208 & fn. 4, 802 N.E.2d 565, 570 & fn. 4.)
I do not say the domestic partnership act cannot bear legal or constitutional scrutiny, or that it is bad policy, which I do not believe; but there seems to me something perverse about relying upon a law which tells the public homosexual unions may be treated less well than heterosexual unions as a basis upon which to constitutionally justify a law that bars homosexuals from marrying.

B.

The State Has No Legitimate Interest in Perpetuating Traditional Disapproval of Same-Sex Marriage
The state says the traditional understanding of marriage as excluding same-sex couples is "important" to "millions of Californians," but does not explain why. It is fair to assume that it is because permitting same-sex marriage would acknowledge that homosexual relationships can be as loving, committed, and socially useful as heterosexual relationships, and thereby offend those who for religious or moral reasons reject that possibility. Preserving the traditional understanding of marriage may thus be seen, as Justice Scalia says, as simply a "way of describing the State's moral disapproval of same-sex couples." (Lawrence, supra, 539 U.S. at p. *762 601, 123 S.Ct. 2472 (dis. opn. of Scalia, J.).) If that moral attitude still prevails in this state, it cannot be legitimated by its historical roots. As stated in Perez, "the fact alone" that California and most other states always prohibited interracial marriage cannot justify the practice. (Perez, supra, 32 Cal.2d 711 at p. 727, 198 P.2d 17.) While tradition will often be a relevant factor, because the enduring nature of a practice does suggest it has social utility, reliance upon historical understandings to validate an intentionally discriminatory restriction not otherwise justified would devitalize and embalm the Constitution as we know it. Constitutional principles are "not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights." (People v. Belous, supra, 71 Cal.2d at p. 967, 80 Cal.Rptr. 354, 458 P.2d 194; see also Lawrence, supra, 539 U.S. at pp. 578-579, 123 S.Ct. 2472.)
I do not take the position that the state can have no interest in promoting a moral view, but the state constitutional right of privacy would be meaningless if government repression of expressive and intimate associational conduct can be justified by the risk that a competing moral view will gain acceptance. Lawrence, supra, 539 U.S. 558, 123 S.Ct. 2472, rejects such a morality-based rationale. In response to Texas's argument that its anti-sodomy law promoted morality, the Lawrence court adopted the view expressed by Justice Stevens in his dissent in Bowers, supra, 478 U.S. 186, 106 S.Ct. 2841: "`the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice.'" (Lawrence, supra, 539 U.S. at p. 577, 123 S.Ct. 2472.) Judicial deference to the importance the state or many of its citizens attach to a traditional bias against homosexuals is fundamentally at war with judicial responsibility to protect the constitutional rights of traditionally disfavored minorities. If the Constitution permits the state to prohibit same-sex marriage because homosexuality offends many people, the right to marry of other unpopular groups can also be abridged.
The interest the state claims in maintaining the ban on same-sex marriage ignores not only the profound nature of the liberty interest it denies to an entire class of citizens, but also the dramatic extent to which traditional concepts of marriage are constantly evolving, so that many of the features that once most significantly defined marriage have been discarded. Such changes were almost always strongly resisted. When the New York Legislature was considering whether to allow married women to own property independently of their husbands, a legislator claimed that the measure would lead "to infidelity in the marriage bed, a high rate of divorce, and increased female criminality," while turning marriage from "its high and holy purposes" into something that merely facilitated "convenience and sensuality." (Graff, What is Marriage For? (1999) pp. 30-31.) The fundamental changes that have been made in the institution of marriage include not just divorce and property reform "but also the abolition of polygamy, the fading of dowries, the abolition of childhood betrothals, the elimination of parents' rights to choose mates for their children or to veto their children's choices, the legalization of interracial marriage, the legalization of contraception, the criminalization of marital rape (an offense that wasn't even recognized until recently), and of course the very concept of civil marriage. Surely *763 it is unfair to say that marriage may be reformed for the sake of anyone and everyone except homosexuals, who must respect the dictates of tradition." (Rauch, Gay Marriage (2004) p. 168.)
Because marriage is central to one's sense of self, resistance to change in the traditional concept of the institution is to be expected, particularly when the change is related to sexual identity. Nevertheless, the state has not even claimed, let alone shown, that same-sex marriage conflicts with any legitimate interest it has in preserving and strengthening the institution of marriage. Respondents "seek only to be married, not to undermine the institution of civil marriage. They do not want marriage abolished. They do not attack the binary nature of marriage, the consanguinity provisions, or any of the other gate-keeping provisions of the marriage licensing law. Recognizing the right of an individual to marry a person of the same sex will not diminish the validity or dignity of opposite-sex marriage, any more than recognizing the right of an individual to marry a person of a different race devalues the marriage of a person who marries someone of her own race. If anything, extending civil marriage to same-sex couples reinforces the importance of marriage to individuals and communities. That same-sex couples are willing to embrace marriage's solemn obligations of exclusivity, mutual support, and commitment to one another is a testament to the enduring place of marriage in our laws and in the human spirit." (Goodridge, supra, 798 N.E.2d at p. 965.)
The majority acknowledges that Family Code section 300 was enacted for the express purpose of prohibiting persons of the same sex from marrying. (Maj. opn., ante, at pp. 691-692.) But rational basis inquiry is meant to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law . . . ." (Romer v. Evans (1996) 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855, italics added.) The Romer court faulted the Colorado constitutional amendment at issue in that case for imposing a "broad and undifferentiated disability on a single named group" (id. at p. 632, 116 S.Ct. 1620), noting that "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it effects." (Ibid.) The amendment was "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." (Id. at p. 635, 116 S.Ct. 1620.) Thus the court felt compelled to draw "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." (Id. at p. 634, 116 S.Ct. 1620.) Because "`desire to harm a politically unpopular group cannot constitute a legitimate governmental interest'" (ibid., quoting U.S. Dept. of Agriculture v. Moreno (1973) 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782), the court concluded that the amendment violated the "conventional and venerable" principle that "a law must bear a rational relationship to a legitimate governmental purpose." (Romer, supra, 517 U.S. at p. 635, 116 S.Ct. 1620.)
Much the same reasoning applies here. Though the ban on same-sex marriage does not have as many different applications as the constitutional amendment at issue in Romer, it is just as completely unconnected to any legitimate governmental purpose. The state and the majority agree that the restriction of marriage to opposite-sex couples cannot be justified by reliance upon the procreation rationale that focuses on the only trait genuinely distinguishing same-sex from opposite-sex couples. The same-sex marriage ban thus singles out a defined group to completely exclude from a crucial social institution, *764 without basis in any characteristic of the group that distinguishes it for any relevant purpose. There is here no connection whatsoever between the exclusion of same-sex marriage and the quality of opposite-sex marriage. Neither the rights or interests of opposite-sex couples nor those of their children are in any conceivable way advanced by banning same-sex marriage, though the ban substantially impairs the rights of same-sex couples and their children. The ban on same-sex marriage is thus as discontinuous with the reasons offered for it as the disability imposed by the amendment stricken in Romer.

IV.

CONCLUSION
To say that that the inalienable right to marry the person of one's choice is not a fundamental constitutional right, and therefore may be restricted by the state without a showing of compelling need, is as terrible a backward step as was the unfortunate and now overruled opinion in Bowers, supra, 478 U.S. 186, 106 S.Ct. 2841. Ignoring the qualities attached to marriage by the Supreme Court, and defining it instead by who it excludes, demeans the institution of marriage and diminishes the humanity of the gay men and lesbians who wish to marry a loved one of their choice.
We are told by the Supreme Court of the United States that the right to marry  which is among "the vital personal rights essential to the orderly pursuit of happiness by free men" (Loving, supra, 388 U.S. at p. 12, 87 S.Ct. 1817)  cannot be taken from deadbeat dads, spousal abusers, and other condemned criminals because their characteristics do not render them unable to partake of the attributes of marriage that render the right to marry a fundamental constitutional right. Gay men and lesbians are no less capable of enjoying and benefiting from the constitutionally significant aspects of marriage. Homosexual couples are as able as heterosexual couples to love and commit themselves to one another, to responsibly raise children, and to define for themselves and to express to the world the authenticity of their relationship. So too are they as able as other couples to benefit from the spiritual, religious, and emotional experience marriage best provides, and as deserving of the official respect and numerous other benefits the state confers upon the marital relationship. My colleagues do not say otherwise (nor does the state), but the restriction they uphold does, because it sends the unmistakable message that, unlike all other citizens, to whom marriage is made easily available, "gay people are not genuinely capable of the unitive good of interpersonal joy and commitment." (Eskridge, Equality Practice: Civil Unions and the Future of Gay Rights (2002) pp. 237-238.) Judicial opinions upholding blanket denial of the right of gay men and lesbians to enter society's most fundamental and sacred institution are as incompatible with liberty and equality, and as inhumane, as the many opinions that upheld denial of that right to interracial couples. Like them, such opinions will not stand the test of time.
For the foregoing reasons, I dissent from all portions of the majority opinion except that concluding that CCF and the Fund lack standing to pursue their declaratory relief claims.
NOTES
[*] City and County of San Francisco v. State of California (A110449 [S.F. City & County Super. Ct. No. CGC-04-429539]); Tyler v. State of California (A110450 [L.A. County Super. Ct. No. BS-088506]); Woo v. Lockyer (A110451 [S.F. City & County Super. Ct. No. CGC-04-504038]); Clinton v. State of California (A110463 [S.F. City & County Super. Ct. No. CGC-04-429548]); Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco (A110651 [S.F. City & County Super. Ct. No. CPF-04-503943]); Campaign for California Families v. Newsom (A110652 [S.F. City & County Super. Ct. No. CGC-04-428794]).
[1] Although Mayor Newsom addressed Alfaro as the "County Clerk," there is some indication that she is in fact the Director of the County Clerk's Office, while Daryl M. Burton is the actual San Francisco County Clerk. (See Lockyer, supra, 33 Cal.4th at p. 1070, fn. 3, 17 Cal.Rptr.3d 225, 95 P.3d 459.) The difference is not material to the issues on appeal.
[2] An organization called the Campaign for California Families (CCF) is the sole appellant in Thomasson; accordingly, the case is denoted Campaign for California Families v. Newsom (A110651) on appeal.
[3] In addition, the advocacy groups Our Family Coalition and Equality California participated as plaintiffs in the Woo case, and Equality California was granted leave to intervene as a plaintiff in the Tyler case.
[4] In separate opinions, Justices Kennard and Werdegar argued the marriages already performed should have been allowed to stand pending a decision on the constitutionality of the marriage statutes. (Lockyer, supra, 33 Cal.4th at pp. 1131-1133, 17 Cal.Rptr.3d 225, 95 P.3d 459 (conc. & dis. opn. of Kennard, J.); id. at pp. 1133-1136, 17 Cal.Rptr.3d 225, 95 P.3d 459 (conc. & dis. opn. of Werdegar, J.).)
[5] Because of the differing procedural postures of the cases, the proceedings in CCSF, Woo, Tyler and Clinton were styled hearings on applications for writ of mandate, while the proceedings in Thomasson and Proposition 22 were styled hearings on motions for summary judgment or judgment on the pleadings.
[6] Requests for judicial notice were filed by the respondents in Thomasson and Proposition 22 and by the respondent-interveners in Tyler. We grant these requests, though it appears all of the documents in question may be found elsewhere in the record of these consolidated appeals.
[7] A broad reading was required because the complaints did not mention the constitutionality of the statutes. Rather, in virtually identical passages, both complaints sought "a judicial determination of the rights and duties of the parties and a declaration that Defendants have failed to comply with state statutes governing the issuance of marriage licenses by unlawfully issuing marriage licenses to same-sex couples; and that all marriage licenses issued and marriages solemnized under circumstances not provided by law are invalid."
[8] At oral argument, counsel confirmed the Fund is not claiming injury-based standing in this appeal.
[9] Although one might, more concisely, describe such relationships as "heterosexual unions," the marriage laws make no such reference to sexual orientation. California law does not prohibit gays and lesbians from marrying, so long as they marry a person of the opposite sex. It is therefore more accurate to refer to "same-sex" or "opposite-sex" unions, rather than a moniker that assumes facts about the sexual orientation of the participants.
[10] For example, the argument in favor of Proposition 22 included a letter from a "fellow voter" stating: "When people ask, `Why is this necessary?' I say that even though California law already says only a man and a woman may marry, it also recognizes marriages from other states. However, judges in some of those states want to define marriage differently than we do. If they succeed, California may have to recognize new kinds of marriages, even though most people believe marriage should be between a man and a woman." (Ballot Pamp., Primary Elec. (Mar. 7, 2000) argument in favor of Prop. 22, p. 52.)
[11] "A domestic partnership shall be established in California when both persons file a Declaration of Domestic Partnership with the Secretary of State pursuant to this division, and, at the time of filing, all of the following requirements are met: [¶] (1) Both persons have a common residence. [¶] (2) Neither person is married to someone else or is a member of another domestic partnership with someone else that has not been terminated, dissolved, or adjudged a nullity. [¶] (3) The two persons are not related by blood in a way that would prevent them from being married to each other in this state. [¶] (4) Both persons are at least 18 years of age. [¶] (5) Either of the following: [¶] (A) Both persons are members of the same sex. [¶] (B) One or both of the persons meet the eligibility criteria under Title II of the Social Security Act as defined in 42 U.S.C. Section 402(a) for old-age insurance benefits or Title XVI of the Social Security Act as defined in 42 U.S.C. Section 1381 for aged individuals. Notwithstanding any other provision of this section, persons of opposite sexes may not constitute a domestic partnership unless one or both of the persons are over the age of 62. [¶] (6) Both persons are capable of consenting to the domestic partnership." (Fam.Code, § 297, subd. (b).)
[12] The Legislature ameliorated this disparity to the extent possible by providing that, where California law adopts or relies upon contrary federal law, domestic partners shall be treated as if federal law recognized domestic partnerships in the same manner as California law. (Fam.Code, § 297.5, subd. (e).)
[13] A new law, signed by the Governor on September 30, 2006, resolves this discrepancy, in part, by enabling registered domestic partners to file joint state income tax returns and allows their joint income to be treated as community property. (Sen. Bill No. 1827 (2005-2006 Reg. Sess.) as amended June 14, 2006.) These changes will go into effect January 1, 2007.
[14] Of course, the state imposes other limits on the right to marry a person of one's choosing. For example, one's intended spouse must be at least 18 years old, or else parental consent or a court order is required for the marriage to occur. (Fam.Code, §§ 301-303.) The intended spouse cannot be a blood relative within a specified degree of relationship, or else the marriage will be prohibited as incestuous. (Fam.Code, § 2200.) Bigamous and polygamous marriages are also illegal and void when entered. (Fam.Code, § 2201.)
[15] Although the dissent assumes this question involves the mere application of Supreme Court precedents holding marriage is a fundamental right, the precise nature of this right is far from clear. "The Supreme Court has said that there is a constitutional `right to marry'; but what can this possibly mean? People do not have a right to marry their dog, their aunt, June 29, a rose petal or a sunny day." (Sunstein, The Right to Marry (2005) 26 Cardozo L.Rev.2081, 2081.)
[16] To date, the only appellate decision holding that same-sex couples have a constitutionally protected right to marry is the controversial decision of the Massachusetts Supreme Judicial Court in Goodridge v. Department of Public Health (2003) 440 Mass. 309, 798 N.E.2d 941. Several trial courts across the country have agreed with the Goodridge majority. (E.g., Deane v. Conaway (Md.Cir.Ct., Jan. 20, 2006, No. 24-C-04-005390) 2006 WL 148145; Hernandez v. Robles (2005) 7 Misc.3d 459, 794 N.Y.S.2d 579, revd. (2005) 26 A.D.3d 98, 805 N.Y.S.2d 354; Castle v. State of Washington (Wn.Super.Ct., Sept. 7, 2004, No. 04-2-00614-4) 2004 WL 1985215, revd. sub nom. Andersen v. King County (2006) ___ Wash.2d ___, 138 P.3d 963; see also Baker v. State of Vermont (1999) 170 Vt. 194, 744 A.2d 864, 867 [holding state is constitutionally required to extend all benefits and protections of marriage to same-sex couples, but allowing the state's legislature to do so through creation of civil unions].) However, many courts at the trial and appellate levels have reached the opposite conclusion. (E.g., Smelt v. County of Orange, supra, 374 F.Supp.2d at pp. 878-879; In re Kandu (Bankr.W.D.Wn.2004) 315 B.R. 123; Standhardt v. Superior Court (2003) 206 Ariz. 276, 77 P.3d 451; Lewis v. Harris, supra, 378 N.J.Super. 168, 875 A.2d 259; Hernandez v. Robles (2006) 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 2006 WL 1835429; Andersen v. King County, supra, 138 P.3d 963.)
[17] The Woo respondents argue it is just as improper to speak of a right to "gay marriage" as it would be to speak of a right to "women's vote" or to "Negro citizenship." While they have semantic appeal, these comparisons are flawed because gender and race are both recognized as constitutionally suspect classifications. (See, e.g., City of Richmond v. J.A. Croson Co. (1989) 488 U.S. 469, 493-494, 109 S.Ct. 706, 102 L.Ed.2d 854 [race]; Mississippi Univ. for Women v. Hogan (1982) 458 U.S. 718, 723-724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 [gender].) In contrast, classifications based on sexual orientation have not been accorded the same degree of searching constitutional scrutiny. (See, e.g., Holmes v. California Army Nat. Guard (9th Cir.1997) 124 F.3d 1126, 1132-1133.)
[18] The trial court dismissed respondents' description of the asserted right as one to same-sex marriage by asserting, "The point is not to define a right so as to make it inexorably inviolate from governmental intrusion." However, it is not the narrow  and accurate  label "same-sex marriage" that forecloses constitutional protection for this asserted right; rather, it is the requirement that the right in question find support in history. The label in itself is benign, or should be. It is the newness or novelty of this right, narrowly defined, that precludes its recognition as "fundamental."
[19] Indeed, the Massachusetts Supreme Judicial Court acknowledged that its decision to extend marriage rights to same-sex couples "[c]ertainly . . . marks a significant change in the definition of marriage as it has been inherited from the common law, and understood by many societies for centuries." (Goodridge v. Department of Public Health, supra, 798 N.E.2d at p. 965.) The court predicted, however, that this new definition would not alter the "fundamental value of marriage in our society." (Ibid.)
[20] "[M]ost appellate courts that have addressed the issue have rejected the claim that defining marriage as the union of one man and one woman discriminates on the basis of sex. [Citations.]" (Baker v. State of Vermont, supra, 744 A.2d at p. 880, fn. 13; see, e.g., Baker v. Nelson (1971) 291 Minn. 310, 191 N.W.2d 185; Singer v. Hara, supra, 11 Wash. App. 247, 522 P.2d 1187; cf. Hernandez v. Robles, supra, 26 A.D.3d at p. 105, 805 N.Y.S.2d 354 [plaintiffs conceded New York's marriage laws do not discriminate based on gender].) Although a plurality of the Hawaii Supreme Court concluded this definition was facially discriminatory and triggered strict scrutiny (Baehr v. Lewin (1993) 74 Haw. 530, 852 P.2d 44, 59-60, 63-67), the Hawaii Legislature and voters essentially nullified the court's decision by amending the state's Constitution. (See Baehr v. Miike (1999) 92 Hawai`i 634, 994 P.2d 566, 1999 Haw. Lexis 391.)
[21] Respondents seize upon the Connerly court's statement  made in regard to racial classifications  that a law need not "confer a preference" for strict scrutiny to apply. (Connerly v. State Personnel Bd., supra, 92 Cal. App.4th at p. 44, 112 Cal.Rptr.2d 5.) However, after explaining why racial classifications are immediately suspect, the court clarified that strict scrutiny is not required "merely because [a law] is `race conscious.'" (Id. at p. 45, 112 Cal.Rptr.2d 5.)
[22] As proof that the marriage definition is gender-discriminatory, the Woo respondents point to the Legislature's findings and pronouncements in Assembly Bill No. 205. In this bill, the Legislature declared expanding domestic partnership rights and responsibilities was "intended to help California move closer to fulfilling the promises of inalienable rights, liberty, and equality . . . by providing all caring and committed couples, regardless of their gender or sexual orientation, the opportunity to obtain essential rights, protections, and benefits and to assume corresponding responsibilities, obligations, and duties. . . ." (Stats.2003, ch. 421, § 1, subd. (a), italics added.) Assembly Bill No. 205 also recited the Legislature's finding that "[e]xpanding the rights and creating responsibilities of registered domestic partners . . . would reduce discrimination on the bases of sex and sexual orientation. . . ." (Stats.2003, ch. 421, § 1, subd. (b), italics added.) While identifying gender discrimination is undoubtedly within the Legislature's competence (Catholic Charities of Sacramento, Inc. v. Superior Court, supra, 32 Cal.4th at p. 564, 10 Cal. Rptr.3d 283, 85 P.3d 67), these bare statements do not reflect a studied finding of sex discrimination based on the Legislature's evaluation of evidence. We have found no other mention of gender discrimination in the bill's legislative history, nor have the parties directed us to any legislative analysis of this issue. Moreover, deciding the purely legal question of whether the marriage laws facially discriminate based on gender, in violation of the equal protection clause, is properly the role of the judicial branch, not the Legislature. (See Lockyer, supra, 33 Cal.4th at p. 1068, 17 Cal.Rptr.3d 225, 95 P.3d 459 ["the legislative power is the power to enact statutes, the executive power is the power to execute or enforce statutes, and the judicial power is the power to interpret statutes and to determine their constitutionality"].)
[23] Indeed, as intervener Equality California notes, the statutory definition does not merely have a "greater impact" on lesbian and gay couples; it excludes 100 percent of them from entering marriage.
[24] Justice Scalia's dissent challenged this "more searching form" of rational basis review as ill defined and unsupported by precedent, arguing the cases Justice O'Connor cited had merely concludedunder a conventional rational basis analysis"that no conceivable legitimate state interest support[ed] the classification at issue." (Lawrence v. Texas, supra, 539 U.S. at p. 601, 123 S.Ct. 2472 (dis. opn. of Scalia, J.).)
[25] The dissent's suggestion that Romer requires invalidation of the marriage laws (dis. opn., post, at pp. 763-764) is unconvincing. Quite unlike Colorado's notorious Amendment 2, which stripped gay men and lesbians of many rights and completely crippled their ability to participate in the political process (see Romer v. Evans, supra, 517 U.S. at pp. 627-631, 116 S.Ct. 1620), the Family Code amendments here did not deprive gays and lesbians of any right they previously enjoyed.
[26] In describing equal protection requirements, our colleagues in Division Two of this District once mentioned "race or sexual orientation" as suspect classifications warranting strict scrutiny. (Children's Hospital & Medical Center v. Bonta, supra, 97 Cal.App.4th at p. 769, 118 Cal.Rptr.2d 629.) However, the court cited no authority for the proposition that sexual orientation is a suspect classification, and its statement to this effect was purely dicta, since the case before it involved the "differential treatment of in-state and out-of-state [enterprises]." (Ibid.) "Dicta is not authority upon which we can rely. [Citation.]" (Mattco Forge, Inc. v. Arthur Young & Co. (1997) 52 Cal.App.4th 820, 850, 60 Cal. Rptr.2d 780.)
[27] Even the meaning of "immutability," and its appropriate place in equal protection analysis, is the subject of debate. (See Marcosson, Constructive Immutability (2001) 3 U. Pa. J. Const. L. 646 [discussing academic criticism of the immutability requirement and proposing that the concept of immutability be expanded beyond inherent biological traits to encompass socially constructed aspects of identity].)
[28] Article I, section 1 of the California Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Italics added.)
[29] The federal Defense of Marriage Act limits "marriage," for purposes of federal law, to opposite-sex couples. (1 U.S.C. § 7; see Knight v. Superior Court, supra, 128 Cal. App.4th at p. 20, 26 Cal.Rptr.3d 687.) This federal law also provides that no state is required to recognize rights accorded by another state to same-sex relationships. (28 U.S.C. § 1738C.) Same-sex couples are thus precluded from receiving federal entitlements or tax benefits in the same manner enjoyed by married spouses. (Knight v. Superior Court, supra, 128 Cal.App.4th at p. 30, 26 Cal. Rptr.3d 687.) It is, of course, beyond the ken of the California Legislature to change these federal laws. The Legislature has instead granted domestic partners equal rights and benefits under state law. The main point of differencei.e., that domestic partners were required to file state income tax forms in the same manner as they filed federal forms (Fam.Code, § 297.5, subd. (g))was recently eliminated by the Legislature. (See Sen. Bill No. 1827 (2005-2006 Reg. Sess.) as amended June 14, 2006 [signed by Gov. Schwarzenegger on Sept. 30, 2006].)
[30] Indeed, though the dissent assumes all gay and lesbian couples wish to enter a traditional marriage, some of these couples may value, perhaps even prefer, a separate type of union that is not inextricably tied to conservative, heterosexual norms. (See Johnson, In Praise of Civil Unions (2002) 30 Capital U. L.Rev. 315, 339-342 [arguing civil unions offer gay and lesbian couples the chance to develop a vibrant alternative institution that maintains and celebrates their separate identity, "to obtain all the rights and responsibilities of marriage without being totally swallowed up in the straight community"]; see also Eskridge, Equality Practice: Civil Unions and the Future of Gay Rights (2002) pp. 206-213 [discussing arguments against same-sex marriage advanced by some progressive theorists within the gay and lesbian community].)
[31] The refusal of the federal government and many other states to extend such rights and benefits to same-sex couples does not defeat the rationality of California's dual system of marriage and domestic partnership. No matter whether California calls a solemnized same-sex union "marriage" or "domestic partnership," at present other jurisdictions will treat this union differently than it will an opposite-sex marriage. One Massachusetts Supreme Court Justicea dissenter in Goodridge  has posited that such substantive differences provide, in themselves, a rational basis for calling the license issued to same-sex couples by a different name. (Opinions of the Justices to the Senate (2004) 440 Mass. 1201, 802 N.E.2d 565, 574-578 (opn. of Sosman, J.).)
[32] Indeed, noted scholar and gay-rights advocate William N. Eskridge, Jr. has argued that the creation of civil unions is a valid and useful incremental step for states to take along the path toward social and political acceptance of same-sex relationships and, ultimately, same-sex marriage. (Eskridge, Equality Practice: Civil Unions and the Future of Gay Rights, supra, pp. 153-158.)
[33] There are obvious biological reasons why marriage developed through history as an opposite-sex institution. As CCF and the Fund and several amici curiae have stressed, only heterosexual unions have the potential of producing unintended offspring. Marriage, with all the social and legal benefits it confers, apparently developed as an incentive to encourage heterosexual couples to raise their children together, in a reasonably stable and structured environment. (See, e.g., Baker v. Nelson, supra, 291 Minn. at pp. 312-313, 191 N.W.2d 185; Crain, "Where Have All the Cowboys Gone?" Marriage and Breadwinning in Postindustrial Society (1999) 60 Ohio State L.J. 1877, 1889-1890.) Although some appellants and amici curiae argue this "responsible procreation" incentive justifies the state's continued definition of marriage as opposite-sex, we do not analyze the legitimacy of this asserted state interest because the Attorney General has expressly disavowed it. Many same-sex couples in California are raising children, and our state's public policy supports providing equal rights and protections to such families. (See Koebke v. Bernardo Heights Country Club, supra, 36 Cal.4th at pp. 845-847, 31 Cal.Rptr.3d 565, 115 P.3d 1212; Bouley v. Long Beach Memorial Medical Center, supra, 127 Cal.App.4th at p. 611, 25 Cal. Rptr.3d 813.) Indeed, the Attorney General takes the position that arguments suggesting families headed by opposite-sex parents are somehow better for children, or more deserving of state recognition, are contrary to California policy. (Cf. Sharon S. v. Superior Court, supra, 31 Cal.4th at pp. 438-439, 2 Cal.Rptr.3d 699, 73 P.3d 554 [decision authorizing second-parent adoptions by same-sex partners "encourages and strengthens family bonds"].) However, this does not mean the historical understanding of marriage as an opposite-sex union is irrational. On the contrary, this understanding is consistent with the biological reality that, before the development of reproductive technologies, only heterosexual couples were capable of procreating.
[34] "[W]hen the Court seeks to situate itself at the vanguard of cultural change, it can interrupt the process by which society arrives at a consensus on its own: ordinary democratic politics and the cultural redefinition that invariably occurs over time. Constitutionalizing a matter, and thereby removing it from democratic politics, also can serve to radicalize opponents." (Rosen, Why the Defense of Marriage Act Is Not (Yet?) Unconstitutional: Lawrence, Full Faith and Credit, and the Many Societal Actors that Determine What the Constitution Requires (2006) 90 Minn. L.Rev. 915, 928.)
[35] Lest there be any speculation that the Legislature is powerless to address this issue, because Governor Schwarzenegger vetoed its one attempt to do so in Assembly Bill No. 849, one should not oversimplify what the Governor's veto message actually said. In exercising his veto power, the Governor expressed doubts about the Legislature's ability to amend Fam.Code, section 308.5 without submitting the matter to voters, because section 308.5 was enacted by initiative, and appropriately urged restraint while constitutional issues concerning same-sex marriage were determined by the courts. As his press release explained, the proposed legislation risked adding confusion to the issues on appeal and, depending on the appeal's outcome, could have proven unnecessary. (Governor's veto message to Assem. on Assem. Bill No. 849 (Sept. 29, 2005) Recess J. No. 4 (2005-206 Reg. Sess.) pp. 3737-3738.)
[36] As the City notes, when the Legislature most recently spoke to this issue, it expressed a desire to extend marriage to same-sex couples. (Assem. Bill No. 849 (2005-2006 Reg. Sess.) as amended June 28, 2005.) Assembly Bill No. 849 was not ultimately enacted into law, however. Although the Governor did not openly disagree with the bill's intentions, neither did his veto message endorse the idea of extending civil marriage rights to gay and lesbian couples. (See Governor's veto message to Assem. on Assem. Bill No. 849 (Sept. 29, 2005) Recess J. No. 4 (2005-2006 Reg. Sess.) pp. 3737-3738; cf. Johnson v. Calvert (1993) 5 Cal.4th 84, 95, 19 Cal.Rptr.2d 494, 851 P.2d 776 [reservations expressed in Governor's veto prevented court from concluding bill was consistent with public policy].) No party has suggested our constitutional analysis must begin and end with the legislative statements in Assembly Bill No. 849, and it is just as well, since rational basis review obliges us to consider all reasonably conceivable state interests justifying the challenged law. (Warden v. State Bar, supra, 21 Cal.4th at p. 644, 88 Cal.Rptr.2d 283, 982 P.2d 154.) Given that the marriage laws in this state originate with both the Legislature and the voters, we cannot say Assembly Bill No. 849 reflects the final or complete word on the state's public policy with respect to marriage.
[1] The Netherlands, Belgium, Canada and Spain have enacted legislation allowing same-sex couples to marry. Denmark, Norway, Sweden, Iceland, France, Germany, Finland, Luxembourg, and Britain allow same-sex registered partnerships or civil unions. (Eskridge & Spedale, Gay Marriage: For Better or for Worse? What We've Learned from the Evidence, pp. 43-87. (Oxford U. Press, USA 2006), pp. 43-87.) The rights available vary from country to country.
[2] One of the reasons the later institution seems so inadequate is the nomenclature, in my view. "Domestic partnership" connotes neither the achievement nor dignity of "marriage." Even "civil union" sounds more permanent and dignified. Though both terms describe commitment to a partner, "civil union" would denote a state-recognized unity of persons and purpose. Under specified circumstances, however, the DPA affords rights to opposite-sex couples that do not seek a "union" of this sort.
[3] The individuals in Perez v. Sharp (1948) 32 Cal.2d 711, 198 P.2d 17 and Loving v. Virginia (1967) 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, were not excluded from the institution of marriage; the legal issue in these cases did not concern the definition of marriage. Rather they focused on what restrictions the state could legitimately impose based on the racial characteristics of the man and woman applying for a license. Had the cases involved same-sex couples of different races, one can imagine the opinions would have read very differently. This illustrates the problem with using Perez and Loving as authority for the proposition that there is a fundamental right to marry a person of the same sex. The ability of same-sex couples to benefit from the "incidents of marriage" (dis. opn., post, at p. 741) or to enjoy the full capacity for human love and lasting commitment is not at issue. They are as capable as opposite-sex couples of doing so. Because Justice Kline recognizes they are similarly capable, he concludes same-sex couples must be given the right to marry. However, even if they are identically qualified to enjoy the benefits and attributes of marriage, it does not follow that the current statutory distinctions between the parallel institutions violate the Constitution. My dissenting colleague reads the existing case law imaginatively, but no amount of imagination entitles us to rely upon cases as authority for issues not addressed.
[4] Such arguments were presented to this court, for example, in the amicus curiae brief filed by the Church of Jesus Christ of Latter-Day Saints, California Catholic Conference, National Association of Evangelicals, and Union of Orthodox Jewish Congregations. Historically, passages from sacred scripture were also used to justify support of slavery and to assert the superiority of men over women. (Rogers, Jesus, The Bible and Homosexuality: Explode the Myths, Heal the Church. (Westminster John Knox Press, 2006) pp. 17-51.)
[5] In what is undoubtedly an oversimplification, one religious leader has written: "Let all marriages be conducted in the private realm with no legal sanction by the state, and then those religious communities that oppose gay marriage will not sanction them, and those like mine that do sanction gay marriage will conduct them, and the state will have no say one way or the other, nor any role in issuing marriage certificates or divorces. It will enforce laws imposing obligations on people who bring children into the world, and it will enforce contracts between consenting adults (civil unions), but it will get out of the business of giving state sanction to what had always been a sacred sacrament." (Lerner, The Only Winning Way to Fight the Ban on Gay Marriage, Baltimore Chronicle & Sentinel, June 6, 2006 [as of Oct. 5, 2006].)
[6] The first argument was raised in the amicus curiae brief filed by the General Synod of the United Church of Christ and dozens of other religious associations. The second was raised in the amicus curiae brief filed by the Church of Jesus Christ of Latter-Day Saints, et al.
[7] Lilek, The Fizzle in Filibuster Fission, Newhouse News Service (May 25, 2005) (as of Oct. 5, 2006).
[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] As the majority recognizes, this privacy claim was asserted in respondents' complaint for declaratory relief and petition for writ of mandate. All parties addressed the privacy issue theory in their briefs on this appeal, albeit not at great length, and at oral argument. The trial court declined to address the issue only because it felt that its decision for respondents on their equal protection claim rendered it unnecessary to do so. Although the majority says otherwise (maj. opn., ante, at p. 717), my discussion explores concepts falling directly within the parameters of the constitutional right to privacy invoked by respondents and also by several amici curiae.
[2] The Hill court went on to state that the United States Supreme Court "has not recognized a general right to engage in sexual activities done in private," citing Bowers, supra, 478 U.S. 186, 106 S.Ct. 2841. (Hill, supra, 7 Cal.4th at p. 29, 26 Cal.Rptr.2d 834, 865 P.2d 633.) As Bowers has since been overruled (Lawrence, supra, 539 U.S. 558, 123 S.Ct. 2472), this statement is no longer accurate.
[3] The right of privacy protected under article I, section 1 of California's Constitution is distinct from that protected under the federal search and seizure clauses of the Fourth Amendment and the counterpart provision of our state Constitution (Cal. Const., art. 1, § 13), which are also referred to as "privacy" provisions. "Collectively, the federal cases `sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.' (Whalen v. Roe (1977) 429 U.S. 589, 598-600[, 97 S.Ct. 869, 51 L.Ed.2d 64]) . . . . The former interest is informational or data-based; the latter involves issues of personal freedom of action and autonomy in individual encounters with government." (Hill, supra, 7 Cal.4th at p. 30, 26 Cal.Rptr.2d 834, 865 P.2d 633, fns. omitted.)
[4] The fact that our state Constitution offers broader protection of the right to privacy than does the federal Constitution distinguishes California from many other states. For example, in Hernandez v. Robles (2006), 7 ___ N.Y.3d 338, ___ N.Y.S.2d ___, ___ N.E.2d ___, 2006 WL 1835429, in which the New York Court of Appeals upheld a ban on same-sex marriage, the plurality opinion (7 N.Y.3d at 370-71, ___ N.Y.S.2d ___, ___ N.E.2d ___, 2006 WL 1835429, at p. *11) and the concurring opinion both pointed out that "[a]lthough our Court has interpreted the New York Due Process Clause more broadly than its federal counterpart on a few occasions, all of those cases involved the rights of criminal defendants, prisoners, or pretrial detainees, or other confined individuals . . . [and] [e]ven then, our analysis did not turn on recognition of broader family privacy rights than those articulated by the Supreme Court." (Id., 7 N.Y.3d at 369, ___ N.Y.S.2d ___, ___ N.E.2d ___, 2006 WL 1835429, at p. *10 (conc. opn. of Graffeo, J.).) A California court could not make such a statement.
[5] In his dissent in Goodridge, supra, 798 N.E.2d 941, Justice Cordy suggested that the words "will be fully consummated" show that the possibility of procreation is "essential to the Supreme Court's denomination of the right to marry as fundamental." (Id. at p. 985 (dis. opn. of Cordy, J.).) However, as has been noted, "[c]onsummation of a marriage ordinarily refers to sexual relations or cohabitation, . . . not procreation. See, e.g., Conner ex rel. Curry v. Schweiker, No. C81-281A, 1981 U.S. Dist LEXIS 18399, at p. *5-6 (N.D.Ga. Nov. 30, 1981) (`A marriage is consummated according to law when the parties co-habitate and hold themselves out as husband and wife. . . .') [This is consistent with the dictionary definition of the word. (See, e.g., Oxford English Dict. (2d ed.1989) (defining `consummate' as `To complete marriage by sexual intercourse'))]; see also Webster's New Collegiate Dictionary 242 (9th ed.1981) (defining `consummate' as `to make (marital union) complete by sexual intercourse'); [see also] Laurence Drew Borten, Note, Sex, Procreation, and the State Interest in Marriage, 102 Colum. L.R. 1089, 1109 (2002) (noting that impotence as a ground for divorce does not typically encompass `those who have the capacity to copulate but are infertile')." (Comment, Divorcing Marriage From Procreation (2005) 114 Yale L.J.1989, 1995, fn. 40.)
[6] If it were permissible to use so imprecise a notion as the "natural order of things" to distinguish between those acts protected by the right of privacy and those that are not, contraception and abortion would be unprotected, which is, of course, not the case. The many problems created by the use of this factor in constitutional analysis are discussed in Richards, Unnatural Acts and the Constitutional Right to Privacy: A Moral Theory (1977) 45 Ford. L.Rev. 1281.
[7] The religious aspect of marriage is emphasized by amici curiae who represent certain Christian, Jewish, and other religious denominations that recognize and sanctify same-sex unions, and also the California Council of Churches. They maintain that the state ban on such marriages places the state in one religious camp over another and therefore violates the principle of separation of church and state and the religious clauses of the state and federal Constitutions. (Cal. Const., art. I, § 4; U.S. Const., 1st Amend.) As they emphasize, "[o]urs is a religiously diverse nation. Within the vast array of Christian denominations and sects, there is a wide variety of belief and practice. Moreover, substantial segments of our population adhere to non-Christian religions or to no religion. Respect for the religious choices of the people of this country requires that government neither place its stamp of approval on any particular religious practice, nor appear to take a stand on any religious question." (Sands v. Morongo Unified School Dist. (1991) 53 Cal.3d 863, 883-884, 281 Cal.Rptr. 34, 809 P.2d 809, fn. omitted.) These amici curiae maintain that the ban on same-sex marriage has no secular legislative purpose, and the state's reliance on the "common understanding of marriage" is "a pretext for naked religious preference" which impermissibly prefers certain religious beliefs over others. (Everson v. Board of Education (1947) 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711; Sands v. Morongo Unified School Dist., supra, 53 Cal.3d at p. 871, 281 Cal.Rptr. 34, 809 P.2d 809; Fox v. City of Los Angeles (1978) 22 Cal.3d 792, 796, 150 Cal.Rptr. 867, 587 P.2d 663; see also Mandel v. Hodges (1976) 54 Cal.App.3d 596, 617, 127 Cal.Rptr. 244.)

These amici curiae also claim the ban on same-sex marriage violates the free exercise clause of the California Constitution, which is stronger than the counterpart federal right (Sands v. Morongo Unified School Dist., supra, 53 Cal.3d at pp. 882-883, 281 Cal.Rptr. 34, 809 P.2d 809), and which guarantees not just freedom to believe, but "freedom to act." (McNair v. Worldwide Church of God (1987) 197 Cal.App.3d 363, 374, 242 Cal.Rptr. 823.) Their religious beliefs and practices are abridged by the ban, they argue, because it prevents their clergy from administering the sacrament of marriage to couples they deem fit. They claim this abridgement can be sustained "only upon a demonstration that some compelling state interest outweighs the . . . interests in religious freedom." (People v. Woody (1964) 61 Cal.2d 716, 718, 40 Cal. Rptr. 69, 394 P.2d 813.)
[8] The majority supports its deference to the statutory definition of marriage by noting "the exclusionary intent of California voters who passed Proposition 22," which prevented California from recognizing same-sex marriages entered into in jurisdictions that authorize such marriages. (Maj. opn., ante, at p. 710.) However, the sentiments of the people reflected in a referendum or initiative are entitled to no greater deference than the legislative sentiments embodied in a statute. As Chief Justice Burger stated in Citizens Against Rent Control v. Berkeley (1981) 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492, "[i]t is irrelevant that the voters rather than a legislative body enacted [this law], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." (Id. at p. 295, 102 S.Ct. 434, italics added; accord, Lucas v. Colorado Gen. Assembly (1964) 377 U.S. 713, 715, 84 S.Ct. 1459, 12 L.Ed.2d 632; Felix v. Milliken (E.D.Mich.1978) 463 F.Supp. 1360, 1375.) The California Supreme Court shares this view. (See, e.g., Wallace v. Zinman (1927) 200 Cal. 585, 593, 254 P. 946 ["We do not recognize an initiative measure as having any greater strength or dignity than attaches to any other legislation"].) For an explanation of the view that "judicial review of direct democracy frequently calls for less rather than more [judicial] restraint," and an inquiry as to whether elected state judges are "up to this task," see Eule, Judicial Review of Direct Democracy (1990) 99 Yale L.J. 1503, 1507, especially at pages 1579-1584.
[9] "The first antimiscegenation law in the colonies was enacted in Virginia in 1691 and thus antedated the Constitution by almost a century. Thirty-one states still had such laws at the end of World War II; sixteen states still had them in 1966, shortly before Loving was decided. [Citation.] In the Dred Scott decision, Chief Justice Taney cited the antimiscegenation laws of several states, including Massachusetts, Connecticut, New Hampshire, and Rhode Island, as evidence that blacks could not be citizens of the United States; such laws represented the fact that `intermarriages between white persons and negroes or mulattoes were regarded as unnatural and immoral, and punished as crimes, not only in the parties, but in the person who joined them in marriage.' Scott v. Sandford, 60 U.S. (19 How.) 393, 409, 413-16[, 15 L.Ed. 691] (1857)." (Hohengarten, Same-Sex Marriage and the Right of Privacy (1994) 103 Yale L.J. 1495, 1506, fn. 42.)
[10] The Perez dissent explained that marriage between Whites and Negroes was prohibited by our Legislature at its original session, and the ban was thereafter extended to marriages between White persons and Mongolians. When the district court of appeal decided in 1933 that those laws did not prohibit a marriage between a White person and a Filipino (Roldan v. Los Angeles County (1933) 129 Cal.App. 267, 18 P.2d 706), the Legislature promptly extended the prohibition to apply to marriages between White persons and "members of the Malay race." (Perez, supra, 32 Cal.2d at pp. 746-747, 198 P.2d 17 (dis. opn. of Shenk, J.).) When Perez was decided, 29 other states prohibited interracial marriage, six "regarded the matter to be of such importance that they have by constitutional enactments prohibited their legislatures from passing any law legalizing marriage between white persons and Negroes or mulattoes," and "[s]everal states refuse[d] to recognize such marriages even if performed where valid." (Id. at p. 747, 198 P.2d 17.) The Perez dissent also noted that there was an "unbroken line of judicial support, both state and federal, for the validity of our own legislation, and there is none to the contrary" (id. at p. 752, 198 P.2d 17), and emphasized that in Pace v. Alabama (1882) 106 U.S. 583, 1 S.Ct. 637, 27 L.Ed. 207, rejected by McLaughlin v. Florida (1964) 379 U.S. 184, 188, 85 S.Ct. 283, 13 L.Ed.2d 222, the United States Supreme Court had upheld an Alabama statute mandating a state prison sentence for "`any white person and any negro . . . [who] intermarry or live in adultery or fornication with each other.'" (Perez, supra, 32 Cal.2d at pp. 748-749, 198 P.2d 17.) The dissent argued that, given the overwhelming scientific and judicial support for the traditional prohibition of interracial marriage, and because "the Church bids her ministers to respect these laws, and to do all that is in their power to dissuade persons from entering into such unions" (id. at p. 744, 198 P.2d 17), "[i]t is not within the province of the courts to go behind the findings of the Legislature and determine that conditions did not exist which gave rise to and justified the enactment" (id. at p. 754, 198 P.2d 17). According to the dissent, "[w]hat the people's legislative representatives believe to be for the public good must be accepted as tending to promote the general welfare" (id. at p. 756, 198 P.2d 17), because "under our tripartite system of government this court may not substitute its judgment for that of the Legislature as to the necessity of the enactment where it was, as here, based upon existing conditions and scientific data and belief. . . ." (Id. at p. 760, 198 P.2d 17.)
[11] The Virginia Supreme Court of Appeals noted in Loving v. Commonwealth that the defendants' claims that the prohibition of interracial marriage denied them due process of law and equal protection of law had been earlier addressed and rejected in Naim v. Naim (1955) 197 Va. 80, 87 S.E.2d 749, remanded 350 U.S. 891, 76 S.Ct. 151, 100 L.Ed. 784, affirmed 197 Va. 734, 90 S.E.2d 849, appeal dismissed 350 U.S. 985, 76 S.Ct. 472, 100 L.Ed. 852. "There, it was pointed out that more than one-half of the states then had miscegenation statutes and that, in spite of numerous attacks in both state and federal courts, no court, save one, had held such statutes unconstitutional. The lone exception, it was noted, was the California Supreme Court which declared the California miscegenation statutes unconstitutional in Perez v. Sharp, 32 Cal.2d 711[, 198 P.2d 17]. . . ." (Loving v. Commonwealth, supra, 147 S.E.2d at p. 80.) Rejecting Perez, which it described as "contrary to the otherwise uninterrupted course of judicial decision, both State and Federal" (Naim, supra, 197 Va. at p. 85, 87 S.E.2d 749), the Naim opinion relied instead upon the statement in Plessy v. Ferguson (1896) 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (Plessy)  which had been overruled by Brown v. Board of Education (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (Brown) the year before Naim was decidedthat "`[l]aws forbidding the intermarriage of the two races . . . have been universally recognized as within the police power of the state.'" (Naim, supra, 197 Va. at p. 87, 87 S.E.2d 749.) The Virginia Supreme Court of Appeals felt Plessy survived Brown on this point because "[n]othing was said in the Brown v. Board of Education case which detracted in any way from the effect of the language quoted from the Plessy opinion" relating to the power of the state to prohibit interracial marriage. (Loving v. Commonwealth supra, 147 S.E.2d at p. 80, quoting Plessy, supra, 163 U.S. at p. 545, 16 S.Ct. 1138.)

The Virginia court was equally unimpressed with the defendants' reliance on "numerous federal decisions in the civil rights field in support of their claims that the Naim case should be reversed and that the statutes under consideration deny them due process of law and equal protection of the law," because "none of them deals with miscegenation statutes or curtails a legal truth which has always been recognizedthat there is an overriding state interest in the institution of marriage." (Loving v. Commonwealth, supra, 147 S.E.2d at p. 82.)
[12] The court's condemnation of judicial reliance on "texts dealing with the sociological, biological and anthropological aspects of the question of interracial marriages" was a not-so-veiled criticism of the opinion in Perez, supra, 32 Cal.2d 711, 198 P.2d 17, in which Justice Traynor relied on such texts in repudiating the proposition that "`[t]he amalgamation of the races is not only unnatural, but is always productive of deplorable results.'" (Id. at p. 720, 198 P.2d 17; see also id, p. 720, fn. 3, 198 P.2d 17.) The many scholarly studies of the effects of racial segregation Justice Traynor relied on (id. at p. 722, fns. 4 & 5, p. 723, fn. 6, p. 727, fn. 8, and p. 729, fn. 8a, 198 P.2d 17), included the 1944 study, An American Dilemma: The Negro Problem and Modern Democracy, by Swedish economist and Nobel laureate Gunnar Myrdal, which was subsequently and more famously relied upon by the United States Supreme Court in Brown, supra, 347 U.S. at pp. 494-495, fn. 11, 74 S.Ct. 686.
[13] The treatments included "surgical measures: castration, hysterectomy, and vasectomy. In the 1800's, surgical removal of the ovaries and of the clitoris [were considered] a `cure' for various forms of female `erotomania,' including . . . Lesbianism. Lobotomy was performed as late as 1951. A variety of drug therapies have been employed, including the administration of hormones, LSD, sexual stimulants, and sexual depressants. Hypnosis, used on Gay people in America as early as 1899, was still being used to treat such `deviant behavior' in 1967. Other documented `cures' are shock treatment, both electric and chemical; aversion therapy, employing nausea-inducing drugs, electric shock, and/or negative verbal suggestion; and a type of behavior therapy called `sensitization,' intended to increase heterosexual arousal, making ingenious use of pornographic photos. Often homosexuals have been the subjects of Freudian psychoanalysis and other varieties of individual and group psychotherapy. Some practitioners . . . have treated homosexuals by urging an effort of the will directed toward the goal of sexual abstinence. Primal therapists, vegetotherapists, and the leaders of each new psychological fad have had their say about treating homosexuals. Even musical analysis has reportedly assisted a doctor in such a `cure.' Astrologers, Scientologists, Aesthetic Realists, and other quack philosophers have followed the medical profession's lead with their own suggestions for treatment." (Katz, Gay American History, supra, at p. 129, fn. omitted.)
[14] The majority in Watkins did not find homosexuality to be a suspect classification, and High Tech Gays v. Defense Industrial Security Clearance Office (9th Cir.1990) 895 F.2d 563, 572-573, expressly disagreed with Judge Norris's equal protection analysis in Watkins. High Tech Gays and the other federal cases that have held sexual orientation does not constitute a suspect classification (see, e.g., Lofton v. Secretary of the Dept. of Children and Family Services (11th Cir.2004) 358 F.3d 804, 818 & fn. 16; Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati (6th Cir. 1997) 128 F.3d 289, 292-293; Thomasson v. Perry (4th Cir.1996) 80 F.3d 915, 928; Richenberg v. Perry (8th Cir.1996) 97 F.3d 256, 260, fn. 5; Steffan v. Perry (D.C.Cir.1994) 41 F.3d 677, 685, fn. 3; Ben-Shalom v. Marsh (7th Cir.1989) 881 F.2d 454, 464; Woodward v. United States (Fed.Cir.1989) 871 F.2d 1068, 1076; Padula v. Webster (D.C.Cir.1987) 822 F.2d 97, 102-103) can no longer be regarded as persuasive authority. The opinions in these cases all relied upon the since-overruled Bowers, supra, 478 U.S. 186, 106 S.Ct. 2841, reasoning that since homosexual conduct could be criminalized, and it would be incongruous to view homosexuals as a protected class. The premise of this conclusion was destroyed by Lawrence, supra, 539 U.S. 558, 123 S.Ct. 2472.
[15] The Legislature codified the decision in People v. Garcia, supra, 77 Cal.App.4th 1269, 92 Cal.Rptr.2d 339, by enacting Code of Civil Procedure section 231.5, which prohibits the use of "a peremptory challenge to remove a prospective juror on the basis of an assumption that the prospective juror is biased merely because of his or her . . . sexual orientation. . . ."
[16] Koebke stated: "[T]he Legislature has found that expanding the rights and obligations of domestic partners `would reduce discrimination on the bases of sex and sexual orientation in a manner consistent with the requirements of the California Constitution.' (Stats.2003, ch. 421, § 1, subd. (b).)" (Koebke, supra, 36 Cal.4th at p. 846, 31 Cal. Rptr.3d 565, 115 P.3d 1212.)

"[D]iscrimination based on marital status implicates discrimination against homosexuals who, as the Legislature recognized in the Domestic Partner Act, have been subject to widespread discrimination. For example, in its findings with respect to [Code of Civil Procedure] section 297.5, the Legislature notes that gay, lesbian, and bisexual Californians have established `lasting, committed, and caring relationships' despite `longstanding social and economic discrimination' (Stats. 2003, ch. 421, § 1, subd. (b).) Additionally, the Legislature declared that one purpose served by expanding the rights of domestic partners is to combat such discrimination. (Ibid.)" (Koebke, supra, 36 Cal.4th at p. 849, 31 Cal.Rptr.3d 565, 115 P.3d 1212.)
[17] According to a national survey conducted in 2000, 74 percent of lesbians, gay men and bisexuals reported having been subjected to verbal abuse because of their sexual orientation and 32 percent reported being the target of physical violence. (Henry J. Kaiser Family Foundation, Inside-Out: A Report on the Experiences of Lesbians, Gays and Bisexuals in America and the Public's View on Issues and Policies Related to Sexual Orientation (2001) pp. 3-4 [www.kff.org/kaiserpolls].)

The Federal Bureau of Investigation reported that 15.6 percent of hate crimes in the United States in 2004 resulted from sexual orientation prejudice (FBI, Hate Crime Statistics 2004 (2005) p. 5); in California in 2004, 18.7 percent of hate crimes were based on sexual orientation. (Cal. Dept. of Justice, Criminal Justice Statistics Center, Hate Crime in California 2004 (2005) p. 7 [www.ag.ca.gov.cjsc/publications/hatecrimes/hc04/preface. pdf].) These statistics are vastly disproportionate to the percentage of lesbians and gays in the general population: One study found approximately 2.1 percent of the United States population self-identified as gay or lesbian. (Rubenstein, et al., Some Demographic Characteristics of the Gay Community in the United States (2003) pp. 3-4) [www.law.ucla.edu/williamsinstitute/publications/Gay Demographics.pdf].
[18] (See, e.g., Clines, For Gay Soldier, A Daily Barrage of Threats and Slurs, N.Y. Times (Dec. 12, 1999) p. 33, col. 1 [gay soldier harassed for months, then bludgeoned to death while sleeping in barracks]; Firestone, Trial in Gay Killing Opens, To New Details of Savagery, N.Y. Times (Aug. 4, 1999) p. A8, col. 1 [gay man brutally murdered then set on fire]; Brooke, Witnesses Trace Brutal Killing of Gay Student, N.Y. Times (Nov. 21, 1998) p. A9, col. 1 [Wyoming college student beaten, chained to fence and left to die by attackers, one taunting him with "It's Gay Awareness Week"].)
[19] As noted above, and unlike the recent decisions of the New York Court of Appeals and the Supreme Court of Washington (Hernandez v. Robles, supra, 7 N.Y.3d 338, ___ N.Y.S.2d ___, ___ N.E.2d ___, 2006 WL 1835429; Andersen v. King County, supra, 138 P.3d 963), and other courts, the majority does not purport to find a rational basis for banning same-sex marriage in the child-bearing and child-rearing purposes of marriage. The majority explicitly acknowledges that the "responsible procreation" argument advanced by some amici curiae (but expressly disavowed by the Attorney General, who alone speaks for the state) cannot be considered, "because [m]any same-sex couples in California are raising children, and our state's public policy supports providing equal rights and protections to such families. [Citations.]" (Maj. opn., ante, at pp. 723-724, fn. 33, italics added.) Nevertheless, the majority insists, "this does not mean the historical understanding of marriage as an opposite-sex union is irrational. On the contrary, this understanding is consistent with the biological reality that, before the development of reproductive technologies, only heterosexual couples were capable of procreating." (Ibid.) The majority thus reveals that, while it is aware that the historical understanding of marriage as excluding same-sex couples is inconsistent with our state policy of treating opposite-sex and same-sex couples equally (see, e.g., Fam.Code, § 297.5, subd. (a)), and does not take contemporary reproductive technology into account, it is in fact relying in some measure on the very procreative theory it purports to reject.
[20] The domestic partnership act provides that "persons of opposite sexes may not constitute a domestic partnership unless one or both of the persons are over the age of 62." (Fam. Code, § 297, subd. (b)(6)(B).)
[21] This point was made in Brown, supra, 347 U.S. at page 494, 74 S.Ct. 686: "`Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.'"
[22] Declarations submitted to the trial court eloquently illustrate the distinction between marriage and domestic partnerships. Helen Zia, a Chinese-American woman, explained: "In Chinese culture . . . marriage is a very important institution because it is regarded as the social expression of family, and affirms the strong values and obligations that family members owe one another. . . . [¶] . . . [¶] Neither we nor our families have been blessed with the sense of legitimacy and social support that comes with marriage. Marriage is something that Asian cultures, including Asian American culture, view in an almost spiritual way. It is a bonding of two families, the family of each person in the couple. It signifies lifelong commitment not only of the individuals in the couple to each other, but of each person in the couple to the family of the other and vice versa. . . ."

Zia married Lia Shigemura in San Francisco on February 16, 2004. "My 15-year-old niece has only ever known us as being together. Yet, when we told her we had married, she said to Lia: `Now you're really my auntie. . . . How can you explain domestic partnership or civil union to a child or even to an older person? These concepts mean nothing to most people and certainly not to children. Marriage, on the other hand, has an acquired meaning that everyone understands. Now everyone in our families and our livesincluding the children  `gets it.' [¶] . . . [¶] In the eyes of the law and of much of society, our commitment and our union, to each other and to our families, is not legitimate and not real, including because the stigma associated with being lesbian or gay in the Asian American community is deeply rooted. . . . Our relationship with our families has changed inalterably, and indescribably, as a result of our very brief civil marriage. . . ."
Zia's mother confirmed the point. "When you tell somebody that your daughter or son is `married,' they know what you mean. They know your son or daughter has someone they love and someone they are committed to. [¶] When your son or daughter is married, you know how to introduce their spouse to your friends: you call them your son or son-in-law or your daughter or daughter-in-law. Everyone knows what it means. It means they are related to you and are part of your family. [¶] . . . [¶] For many years, Helen and Lia lived together and loved each other but could not get married. I almost never talked with my friends about Helen and Lia's relationship because I did not know how to describe it. . . . I didn't call Lia my `daughter' even though I thought of her as a daughter, because it was not official and I didn't have the right words to explain what she means to Helen or why she is part of my family. [¶] Now I tell people that all of my children are married. I introduce Lia to my friends as `my daughter' or `my daughter-in-law.' I feel that Lia and her family are now truly our relatives."
Cecilia Manning described marrying Cheryl (Sher) Strugnell, with whom she had lived for 28 years: "I finally got to say out loud the vows that I had lived by with Sher my entire life. We felt like we were full-fledged citizens for the first time. [¶] . . . When we became domestic partners we did not receive gifts or gift certificates or bottles of wine, and we did not receive one single card. But when we got married, we received an abundance of cards and other gifts which signified the recognition of our legal union. That is something domestic partnership could not give us because in other people's eyes domestic partnership is not marriage and it never will be. There is something about the institution of marriage that is not only about the benefits that you get and the tax breaks that you get because you're married, but there's a homage, almost, that is paid by the rest of society because you are spouses."
Michael Allen Quenneville pestered his two mothers to get married in February 2004 because he felt "marriage is the way to show the highest form of love to someone" and wanted his mothers to be "equal with everyone else." "Even though they've been together for a very long time, they seem less equal in other people's eyes because they are not married. . . . It's an acknowledgement of a relationship and it isn't the real thing until you get married. . . . [¶] . . . [¶] I'll never forget my parents' wedding day. I cannot say the same for when they became domestic partners."